UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

AT&T CREDIT HOLDINGS, INC.,                     :
                                                :
                                   Appellant,   :   **Case No. 08-cv-2411 (DLC)**
                                                :   (ECF Case)
v.                                              :
                                                :   Chapter 11 Case No. 05-17923 (ASH)
DELTA AIR LINES, INC. and                       :
THE POST-EFFECTIVE DATE                         :   (Jointly Administered)
COMMITTEE OF DELTA                              :
AIR LINES, INC.,                                :
                                                :
                                   Appellees.   :
                                                :
---------------------------------------------------------------X


## APPELLANT'S OPENING BRIEF ON APPEAL


KAYE SCHOLER LLP
Richard G. Smolev (RS 2222)
Piper A. Brock (PB 6335)
425 Park Avenue
New York, New York 10022
(212) 836-8000 (telephone)
(212) 836-8689 (facsimile)

*Counsel for AT&T Credit Holdings, Inc.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

    (1)    Delta Delivered the Tax Indemnity Agreements to Induce AT&T to Enter into the Leveraged Leases............................................................................. 1

    (2)    AT&T Became Entitled to Indemnity When Its Interest Was Foreclosed and Delta's Subsequent Rejection of the Lease and Agreement With the Indenture Trustees Regarding the Amount of Its Claim Does Not Relieve It of Its Indemnity Obligation ................................................................... 3

    (3)    The Claims Delta Negotiated With Its Indenture Trustee Do Not Result in Delta Paying an Amount Equal to SLV So As To Trigger TIA § 6(c)................... 4

    (4)    The Bankruptcy Court Violated Principles of Contract and Claim Interpretation............................................................................................. 6

JURISDICTION ..................................................................................................... 9

STANDARD OF REVIEW ..................................................................................... 9

ISSUES ON APPEAL ........................................................................................... 10

STATEMENT OF THE CASE................................................................................ 10

ARGUMENT ........................................................................................................ 11

    I.    The Bankruptcy Court Erroneously Applied Section 6(c) of the TIAs ................ 11

    II.    Having Erroneously Determined that Exclusion 6(c) Was Applicable, the Bankruptcy Court Then Misconstrued It ................................................. 13

    III.    The Bankruptcy Court's Novel "Bankruptcy Context" Rule of Contract Interpretation Contradicts Supreme Court Precedent ........................................... 18

    IV.    The Bankruptcy Court Erred in Declining to Consider the Uncontroverted Extrinsic Evidence ...................................................................................... 24

CONCLUSION....................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>CASES</u>

*Aetna Cas & Sur. Co. v. Namrod Development Corp*,
    140 B.R. 56 (S.D.N.Y. 1992)..................................................................... 23

*Alexander & Alexander Services, Inc. v. Lloyd's*,
    136 F.3d 82, 87 (2d Cir. 1998)........................................................... 24, 25

*American Express Bank Ltd. v. Uniroyal*,
    562 N.Y.S.2d 613 (N.Y. App. Div. 1990) ...................................... 21

*Astroline Communications Co., Ltd. P'ship v. Astroline Co.*,
    1996 U.S. App. LEXIS 24940 (2d Cir. 1996) .............................. 10

*B. Lewis Productions, Inc. v. Angelou*,
    2007 WL 2295971 (S.D.N.Y. Aug. 10, 2007) ............................. 17

*Butner v. United States*,
    440 U.S. 48 (1979)........................................................................ 20

*Commissioner v. Tufts*,
    461 U.S. 300 (1983)...................................................................... 3

*DeVanzo v. Newark Ins. Co.*,
    353 N.Y.S.2d 29 (N.Y. App. Div. 1974) *aff'd* 374 N.Y.S.2d 619 (N.Y. Jun 26,
    1975) ............................................................................................. 20

*Fin. One Publ. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*,
    414 F.3d 325 (2d Cir. 2005)........................................................ 10

*Fiore v. Fiore*,
    389 N.E.2d 138 (N.Y. 1979)........................................................ 20

*G. Golden Associates of Oceanside, Inc. v. Arnold Foods Co., Inc.*,
    870 F. Supp. 472 (E.D.N.Y. 1994) ............................................. 25

*Garza v. Marine Trans. Lines Inc.*,
    861 F.2d 23 (2d Cir. 1988).......................................................... 25

*In re Delta Air Lines, Inc.*,
    370 B.R. 552 (Bankr. S.D.N.Y. 2007)........................................ 11

*In re Enron Creditors Recovery Corp.*,
    370 B.R. 64 (Bankr. S.D.N.Y. 2007) *rev'd on other grounds* 380 B.R. 307, 322
    (S.D.N.Y. 2008)........................................................................... 13

**Page(s)**

*Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.),*
    993 F.2d 915, 923 (1st Cir. 1993) ................................................................. 24

*Kass v. Kass,*
    91 N.Y.2d 554 (N.Y. 1998) ........................................................................ 24

*Krumme v. West Point Stevens, Inc.,*
    238 F.3d 133 (2d Cir. 2000) ........................................................................ 21

*Levine v. Ribicoff,*
    201 F. Supp. 692 (S.D.N.Y. 1962) ............................................................. 21

*LTV Corp. v. Aetna Cas. & Sur. Co. (In re Chateaugay Corp.),*
    116 B.R. 887 (Bankr. S.D.N.Y. 1990) ...................................................... 25

*P. G. Lake, Inc. v. Comm'r,*
    148 F.2d 898 (5th Cir. 1945) ...................................................................... 21

*Parker v. Delaney,*
    186 F.2d 455 (1st Cir. 1950) ......................................................................... 3

*Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co.,* 472 F.3d 33,
    45 (2d Cir. 2006) ........................................................................................ 25

Rev. Rul. 76-111, 1976-1 C.B. 214 ..................................................................... 3

*Scotto v. Brink's Inc.,*
    962 F.2d 225 (2d Cir. 1992) ........................................................................ 21

*Terwilliger v. Terwilliger,*
    206 F.3d 240 (2d Cir. 2000) ........................................................................ 20

*This is Me, Inc. v. Taylor,*
    157 F.3d 139 (2d Cir. 1998) ........................................................................ 22

*Towne v. Eisner,*
    245 U.S. 418 (U.S. 1918) ............................................................................ 24

*Travelers Cas. & Surety Co. v. Pacific Gas & Elec. Co.,*
    127 S. Ct. 1199 (2007) ...................................................................... 8, 18, 20

*UBS Sec. LLC v. Finish Line, Inc.,*
    No. 07-10382, slip op. at 12 (S.D.N.Y. Feb. 22, 2008) .............................. 25

*Vanston Bondholders Protective Comm. v. Green,*
    329 U.S. 156 (1946) .................................................................................... 20

*Wachovia Bank, N.A. v. Schmidt,*
    546 U.S. 303 (2006) ...................................................................................... 7

**Page(s)**

*Wards Co., Inc. v. Stamford Ridgeway Associates,*
    761 F.2d 117 (2d Cir. 1985).......................................................................... 25

*World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.,*
    345 F.3d 154 (2d Cir. 2003).......................................................................... 7

## STATUTES

11 U.S.C. § 101(5)(a)........................................................................................ 20

11 U.S.C. § 502(a) ............................................................................................ 18

28 U.S.C. § 158(a)(1)........................................................................................ 9

## OTHER AUTHORITIES

Jeffrey H. Khan, *The Mirage of Equivalence and the Ethereal Principles of Parallelism*
    *and Horizontal Equity,* 57 Hastings L.J. 645, 669 (2006) ................................. 23

## TREATISES

*Equipment Leasing - Leveraged Leasing* § 6:8 (James C. Alstrom, Iris C. Egelson &
    Victor Sirelson) (2004) ........................................................................................ 2

## REGULATIONS

Treasury Regulation Section 1.1001-2(a)(1) ............................................................. 3

# PRELIMINARY STATEMENT

This appeal seeks reversal of the disallowance of certain claims (the "AT&T Claims")

filed by AT&T Credit Holdings, Inc. ("AT&T") in the chapter 11 bankruptcy case of Delta Air

Lines, Inc. and its affiliates ("Delta").  Reversal is warranted because the Bankruptcy Court

committed at least two fundamental errors when it interpreted the contracts at issue.  First, while

acknowledging that it could not rewrite the parties' agreements, the Bankruptcy Court changed

the meaning of defined terms, ignored critical related provisions in the contracts and misapplied

fundamental rules of contract construction to reach its result.  Second, the Bankruptcy Court

violated the United States Supreme Court's mandate that claims in a bankruptcy proceeding must

be analyzed exactly as they would be in a state court proceeding.  Although Delta admitted in

oral argument that the AT&T Claims would be enforceable in state court, the Bankruptcy Court

interpreted Delta's obligations under the contracts "in the context of bankruptcy," and disallowed

them.

The Bankruptcy Court set forth its reasoning in a January 16, 2008 decision ("Decision")

and subsequently issued the February 7, 2008 order disallowing and expunging the AT&T

Claims ("Disallowance Order").

   **(1)**      **Delta Delivered the Tax Indemnity Agreements to Induce AT&T to Enter Into the Leveraged Leases**

The AT&T Claims arose out of tax indemnity agreements ("TIAs") between Delta and

AT&T.  The parties entered into the TIAs as part of the leveraged lease financings of seven

aircraft (the "Aircraft")[1] that were beneficially owned by AT&T and leased to Delta.  As is

---

[1]      The registration numbers of the Aircraft are N131DN, N178DN, N660DL, N962DL, N963DL, N964DL, and N965DL.

customary in leveraged lease transactions,[2] AT&T established a separate grantor trust (an

"Owner Trust") to hold title to each Aircraft for AT&T, as beneficiary (the "Owner Participant").

A financial institution (the "Owner Trustee") administered each trust.  AT&T made an "equity"

contribution to each trust to fund part of the purchase price for its Aircraft; the Owner Trustee

incurred nonrecourse debt to finance the remainder of the purchase price.  After the Owner

Trustee purchased its Aircraft, it leased the Aircraft to Delta pursuant to a long-term lease (the

"Lease").  To secure the debt that it borrowed to purchase the Aircraft, the Owner Trustee then

mortgaged the Aircraft and collaterally assigned the Lease to a financial institution (the

"Indenture Trustee") pursuant to a mortgage and security agreement (the "Indenture"), for the

benefit of the debtholders.

   As the beneficial owner, AT&T was entitled to take accelerated depreciation deductions

in respect of the Aircraft for tax purposes.[3]  To protect AT&T from any loss of these tax benefits

---

[2]  The structure and economics of the typical leveraged aircraft lease are described in TIA/SLV Objection 5I:  Objection by Delta Air Lines, Inc. and the Official Committee of Unsecured Creditors to Certain Claims Filed by AT&T Credit Holdings and the Bank of New York for Tax Indemnities and Stipulated Loss Values ("TIA/SLV Objection 5I") (D-10), 4-8, and the Response of DFO Partnership to TIA/SLV Objection 1: Objection by Delta Air Lines, Inc. and the Official Committee of Unsecured Creditors to Certain Claims Filed by DFO Partnership and the Bank of New York for Tax Indemnities and Stipulated Loss Values, [Bankr. Ct. Dkt. No. 4822], at 5-6, incorporated by reference into the Response of AT&T Credit Holdings to TIA/SLV Objection 1 ("AT&T Response") (D-29), 2 n.1.  Each leveraged lease transaction at issue here was documented in a highly complex, precisely drafted set of interrelated agreements ("Operative Documents"), consisting principally of (i) the "Participation Agreement," (ii) the Lease, (iii) the Indenture, and (iv) the TIA.  All of these Operative Documents are governed by New York law.

[3]  The ability to take accelerated depreciation deductions is the prime motivator to induce investors seeking substantial tax benefits to enter into leveraged leases.  *Equipment Leasing - Leveraged Leasing* § 6:8 (James C. Alstrom, Iris C. Egelson & Victor Sirelson) (2004), "the primary objective in a leasing transaction is often the sale of tax benefits to the lessor in exchange for a lease rate that is lower than the lessee's borrowing rate."

Delta entered into the TIAs, pursuant to which it agreed to indemnify AT&T for its liability upon a loss of these tax benefits (a "Loss") if, *inter alia*, the general cause of the Loss was an act or omission by Delta.  (TIA, D-30, Ex. D, §5(a))[4]  The TIAs also delineated certain exclusions from this indemnity obligation:  if the Loss also resulted from one of several very specific events, then Delta need not indemnify AT&T.  (TIA, D-30, Ex. D, §6)  The parties agree AT&T's Loss was subject to indemnity under TIA §5, because the general cause of the loss was Delta's action (its bankruptcy filing, rent defaults, etc.), which eventually resulted in the Indenture Trustee's foreclosures on the Aircraft and Leases; the parties differ, however, on whether an exclusion in TIA §6 applies.

> **(2)    AT&T Became Entitled to Indemnity When Its Interest Was Foreclosed and Delta's Subsequent Rejection of the Lease and Agreement With the Indenture Trustees Regarding the Amount of Its Claim Does Not Relieve Delta of Its Indemnity Obligation**

Both AT&T and Delta recognize AT&T suffered no Loss until the Indenture Trustee foreclosed on the Aircraft,[5] causing AT&T to recognize taxable income and, effectively, a recapture of deal inducing depreciation deductions previously taken by AT&T.  AT&T maintains this was the immediate cause of its Loss and no exclusion in TIA §6 applies to it.  Delta argues the exclusion in TIA §6(c) applies, which says that Delta has no indemnity obligation if the Loss results from "any event whereby the Lessee pays an amount equal to Stipulated Loss Value" ("Exclusion 6(c)").  (TIA, D-30, Ex. D, §6(c))  Delta focused narrowly on the word "event" in

---

[4]    "D-__" refers to documents enumerated in the Appellant's Designation of Record and Statement of Issues Presented on Appeal [Dkt. No. 2].

[5]    U.S. tax law treats the foreclosure as a sale of the aircraft for the amount of the outstanding debt and an owner participant realizes taxable income to the extent that such deemed sales price exceeds its basis in the collateral.  *Commissioner v. Tufts,* 461 U.S. 300 (1983); *Parker v. Delaney,* 186 F.2d 455 (1st Cir. 1950); Rev. Rul. 76-111, 1976-1 C.B. 214; Treasury Regulation Section 1.1001-2(a)(1).

the exclusion, and argued the same general event that gave rise to its indemnity obligation in the first place under TIA §5, (*i.e.*, its event of default), also provided it with an exclusion under TIA §6(c), because this event of default eventually led to the allowance of the Indenture Trustee's claim, which was calculated in part by reference to Stipulated Loss Value ("SLV"). In a reversal of its analysis in a related case, the Bankruptcy Court agreed with Delta.[6] In doing so, the Bankruptcy Court ignored the structure of the contract, which looks to general events in TIA §5, but to different and specific events in TIA §6 to see if they proximately caused the Loss.

(3)     **The Claims Delta Negotiated With Its Indenture Trustee Do Not Result in Delta Paying an Amount Equal to SLV So As To Trigger TIA § 6(c)**

TIA §6 also is inapplicable because there has been no event whereby Delta has paid an amount equal to SLV. SLV is a liquidated damages amount agreed upon by the parties at Lease inception as the lessor's damages upon an early termination of the Lease caused by the lessee. (Lease, D-30, Ex. A, §15(d), (e)) SLV is equal to a specific dollar amount determined by calculations set forth in a schedule to the Lease. These calculations produce a number that, as of any date during the Lease term, always will be sufficient to (i) pay off the amount of debt then outstanding, (ii) provide AT&T with an amount equal to the estimated residual value of the Aircraft, and (iii) provide AT&T with an amount estimated to cover its tax liability upon disposition of the Aircraft. (Decision, D-2, at 5 (SLV is calculated to provide sufficient funds to pay lender in full and to pay owner's tax loss in full)) If SLV were paid in full to the Indenture

---

[6]     In an opinion dated October 22, 2007 (D-44, Ex. A) the Bankruptcy Court reasoned that no tax loss was realized merely because of Delta's default. The Bankruptcy Court did not attempt to distinguish its holding in the Decision that AT&T's Loss can be tied to Delta's default from its earlier reasoning. In a pleading filed in connection with the Appeal from the October 22 order, Delta admitted that the mere fact that it defaulted on its lease does not give rise to a tax indemnity claim. *Lone Star Air Partners v. Delta Air Lines, Inc.*, Case No. 07-11143 [Dkt. No. 6], at 16.

Trustee (as the assignee of the lessor under the Lease), then the distribution or "waterfall" provisions of the Indenture would require the Indenture Trustee to distribute any excess of SLV (over the amounts owed to the debt parties) to the Owner Trustee, for distribution to AT&T. (Trust Indenture and Security Agreement, D-31, Ex. C, § 5.03) As AT&T then would have received an amount designed to compensate it for its tax Loss, it would not need to pursue a claim under the TIA. This is the rationale for TIA §6(c) — if an event has required Delta to pay an amount equal to SLV, then other contractual provisions ensure that a portion of such amount will get to AT&T to compensate it for its tax Loss (plus any residual value in the Aircraft). Thus, TIA §6(c) operates as a waiver by AT&T of its right to make a claim under the TIA when SLV has been paid and AT&T will be compensated for its Loss through its receipt of a portion of the SLV payment. (D-30, ¶ 8)

In this case, prior to AT&T's incurring any Loss, the Indenture Trustee and Delta entered into side agreements ("Restructuring Agreements") not authorized by the Leases (or consented to by either the Owner Trustee or AT&T) assuring that Delta never would pay SLV. The Restructuring Agreements required the Indenture Trustee to foreclose upon the Owner Trustee's title to each Aircraft and its related Lease, while leaving the Lease in place so Delta would retain possession of the Aircraft. (Restructuring Agreement, D-29, Ex. B, §§2.01(b), 6.08) The Restructuring Agreements then required Delta to reject each Lease, enter into a new, restructured lease with the Indenture Trustee, and give the Indenture Trustee an allowed claim for less than SLV. The amount of the claim (the "IT Claim") was specified in the Restructuring Agreements, in relevant part: SLV minus the residual value of the Aircraft and minus the present value of the payment streams under the restructured leases. (Decision, D-2, at 20) The IT Claims were to be paid in stock of the reorganized Delta, which was worth approximately fifty cents on the dollar at

the time of Delta's emergence from bankruptcy.  This payment structure meant that the Indenture Trustee would not recover the full amount of the outstanding debt from the IT Claims and nothing would be paid to AT&T under the waterfall provisions of the Indentures.

### (4)    The Bankruptcy Court Violated Principles of Contract and Claim Interpretation

The foreclosures required by the Restructuring Agreements not only deprived AT&T of the residual value of the Aircraft, but also caused the tax recapture described above, resulting in AT&T's obligation to pay millions of dollars in taxes.  After negotiating with the Indenture Trustee to strip AT&T of its equity interest in the Aircraft, and to credit against SLV not only the value of this equity interest but also the present value of rent under the restructured leases — thus ensuring that the IT Claim would not produce any "excess" amount that could be paid to AT&T — Delta nevertheless argued and the Bankruptcy Court agreed that by allowing the IT Claim Delta had paid SLV within the meaning of TIA §6(c) and that, accordingly, AT&T is entitled to *no recovery whatsoever* for the millions of dollars in tax liability it incurred as a result of events precipitated by Delta's actions.

The Bankruptcy Court reached this result by ignoring two principles that should have governed resolution of the claims objection.  First, it ignored fundamental principles of contract construction under New York law:  a court must look to the plain language of the contract, interpret related contracts as a whole, and consider the contract language in light of the customs, practices, usages and terminology (including, especially, terms that the parties specifically defined) as generally understood by participants regularly engaged in the particular business.[7]

---

[7]    Leveraged leasing is a highly specialized method of financing — regularly engaged in by sophisticated parties who are represented by counsel experienced in such financings —
(continued...)

31611490 V28.DOC                    -6-

The Bankruptcy Court's errors in this regard are legion: it found that the term "SLV" as used in the TIAs did not mean that term as defined, but rather the amount that Delta *might be required to pay* under the remedies section of the Lease (which referenced SLV in its calculations) *in factual circumstances that did not even correspond to the actual facts of this case.* It also ignored contract provisions specifying (i) the medium of payment (cash), and (ii) that a bankruptcy of Delta would not change its payment obligations, and found that Delta could trigger the exclusion in TIA §6(c) by giving the Indenture Trustee an allowed claim in an amount less than SLV which eventually would be "paid" in stock of the reorganized Delta worth a fraction of the amount of the claim.

The Bankruptcy Court then compounded its errors by refusing to consider extrinsic evidence of the parties' intent on these issues. In the context of highly specialized leveraged lease financings, unless the court otherwise has expertise in such financings, which, in the test case objection process, the Bankruptcy Court admitted it did not (Tr. 3/2/2007, D-8, at 7), the court should consider extrinsic evidence from the parties to assist in its interpretation. *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.,* 345 F.3d 154, 186 (2d Cir. 2003), *overruled in part on other grounds by Wachovia Bank, N.A. v. Schmidt,* 546 U.S. 303 (2006). AT&T submitted such evidence, but the Bankruptcy Court ignored it, as well as provisions in the contracts cited by AT&T which expressly contradicted the Bankruptcy Court's interpretation of the disputed language. Delta submitted no evidence supporting its interpretation of the contracts, and Delta never rebutted AT&T's evidence with evidence of its own. The Bankruptcy Court

---

and involves as its driving force the impact of the financing structure on the Owner Participant under U.S. federal income tax law, itself a highly specialized area of the law.

nevertheless found that the disputed contract language was unambiguous and that no extrinsic evidence of the parties' intent was necessary to aid its interpretation.

Fundamental to the Bankruptcy Court's Decision was its conclusion that Delta's payment obligations must be interpreted "in the context of bankruptcy". Here, the Bankruptcy Court ignored a second governing principle applicable to this case:  contracts must be interpreted in bankruptcy just as they would be in a state court proceeding.  This principle was reaffirmed by the United States Supreme Court in *Travelers Cas. & Surety Co. v. Pacific Gas & Elec. Co.*, 127 S. Ct. 1199 (2007) ("*Travelers*").  The Supreme Court held that a bankruptcy claim is a right to payment under state law and unless some federal interest requires a different result, "there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Id.* at 1206.  Thus, a court must "generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed." *Id.*

Despite these governing principles, the Bankruptcy Court found that although TIA §6(c) required a payment of SLV in order to relieve Delta of its indemnity obligations, and although the Lease required such payment to be made in U.S. dollars and immediately available funds, and expressly stated that Delta's bankruptcy filing would not change Delta's payment obligation, the TIAs' requirement must be interpreted "in the context of bankruptcy" with the result that the Indenture Trustee's receipt of non-cash proceeds (the common stock of Delta to be distributed on the IT Claims, the residual value of the Aircraft and chattel paper in the form of the restructured leases) having an aggregate value that was less than SLV, satisfied the plain language requirement of the Leases that SLV be paid in the specified amount in U.S. dollars and in immediately available funds.

The Bankruptcy Court reached this conclusion <u>without citation</u> to a single legal authority or contractual provision supporting that proposition.  Rather, the Bankruptcy Court's Decision proceeded from its own policy-based rationale that contractual obligations must mean one thing outside of bankruptcy and another thing in bankruptcy, if the parties contemplated that at some point the obligor might become a debtor in bankruptcy, which virtually all parties to commercial contracts do.  In so reasoning, the Bankruptcy Court rejected the Supreme Court's mandate that, absent a specific provision of the Bankruptcy Code to the contrary, the contract terms must mean the same thing — and produce the same result — in a bankruptcy courtroom as in a state court.

The Bankruptcy Court's application of its novel "bankruptcy context" rule of contract interpretation and its refusal to determine AT&T's contract claims under applicable standards of New York law constitutes reversible error.  AT&T respectfully requests this Court to (i) reverse the Disallowance Order, and, as Delta already admitted its "bankruptcy context" argument would not prevail in a state court proceeding, direct the Bankruptcy Court to enter an order allowing the AT&T Claims as to liability, and remand for determination of their proper amounts, or (ii) alternatively, remand for further evidentiary proceedings and direct the Bankruptcy Court to consider extrinsic evidence with respect to the meaning of the relevant contractual provisions.

## JURISDICTION

On February 7, 2008, the Bankruptcy Court entered the Disallowance Order, *inter alia*, disallowing and expunging the AT&T Claims.  The Disallowance Order is a final order determining the AT&T Claims.  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1).

## STANDARD OF REVIEW

This appeal involves solely questions of contract interpretation which, as matters of law, are subject to *de novo* review by this Court.  *See Fin. One Publ. Co. Ltd. v. Lehman Bros. Special*

*Fin., Inc.*, 414 F.3d 325, 339 (2d Cir. 2005) ("We review contract interpretation *de novo.*'');

*Astroline Communications Co., Ltd. P'ship v. Astroline Co.*, 1996 U.S. App. LEXIS 24940, at *5

(2d Cir. 1996) ("In assessing a bankruptcy court's interpretation of a contract, we review its

textual interpretation *de novo* . . . .").

## ISSUES ON APPEAL

1.      Whether the Bankruptcy Court erred as a matter of law in holding that the specific

event that gave rise to AT&T's Loss was the same specific event that required Delta to give the

Indenture Trustee a lease rejection claim.

2.      Whether the Bankruptcy Court erred as a matter of law in holding that a contract

can be interpreted differently in a "bankruptcy context" than it would be if interpreted in

accordance with applicable state law and its rules of contract interpretation.

3.      Whether the Bankruptcy Court erred as a matter of law in holding that the

requirements of Section 6(c) of the Tax Indemnity Agreements (which relieve Delta from its tax

indemnity obligations under the Tax Indemnity Agreements only if the Lessee "pays an amount

equal to Stipulated Loss Value") are satisfied by the Indenture Trustee's receipt of consideration

that included negotiated credits and stock that will result in the recovery of only a portion of

Stipulated Loss Value.

4.      Whether the Bankruptcy Court erred as a matter of law in declining to consider

the uncontroverted extrinsic evidence presented by AT&T with respect to the meaning of

Section 6(c) of the Tax Indemnity Agreements and with respect to the amounts received by the

Indenture Trustee under the Restructuring Agreements.

## STATEMENT OF THE CASE

Due to the large number of leveraged lease tax indemnity claims filed in the Delta

bankruptcy proceeding, Delta and the Unsecured Creditors Committee initiated a "test case"

process under which they grouped claims together according to similar exclusion language in the TIAs. The Bankruptcy Court issued a number of decisions in the test cases that were heard before the AT&T objections discussed herein.

In the earlier test cases, the Bankruptcy Court initially ruled the payments made under the "Bingham Term Sheet" (the precursor of the Restructuring Agreements) were not the equivalent of a payment of SLV. *In re Delta Air Lines, Inc.*, 370 B.R. 552, 562-63 (Bankr. S.D.N.Y. 2007); (Tr. 8/20/07, D-23, at 58-59) The Bankruptcy Court then reversed itself and found, as it did in the Decision, that as Delta was paying close to what it would pay if the Lessor (or the Indenture Trustee as its assignee) enforced remedies under the Lease, the amounts paid under the Restructuring Agreements allowed Delta to avoid its liability under the TIAs by invoking TIA §6(c). (Decision, D-2, at 19) ("To reiterate, the adjustments called for under the Modified Term Sheet are substantially the same if not identical to the adjustments provided for under the "Remedies" sections of the Lease respecting the payment of SLV.")

## ARGUMENT

### I.    The Bankruptcy Court Erroneously Applied Section 6(c) of the TIAs

AT&T drew the Bankruptcy Court's attention to the fact that TIA §5, which obligates Delta to indemnify AT&T for a Loss, and TIA §6, which relieves Delta from that indemnity obligation, are very different. (Tr 11/13/07, D-43, at 109-116) TIA §5 contains broad and general language relating to the cause of the Loss — *inter alia*, that it must be caused by Delta's acts or omissions. TIA §6 focuses on very specific events that were the proximate cause of the Loss. (Indemnity Agreement, D-31, Ex. D, at 7, 12)

The foreclosure of AT&T's interests was an event that triggered a TIA §5 indemnity obligation because it ultimately could be traced to Delta's defaults. Delta's bankruptcy and other

defaults under the Leases triggered defaults under the Indentures, which enabled the Indenture Trustees to choose among a variety of remedies under both the Indentures and (as assignees of the Owner Trustee, as lessor) under the Leases. These remedies included, but did not require, foreclosure. (Lease, D-30, Ex. A, §15) In other words, Delta's default was a necessary, but not a sufficient, cause of AT&T's Loss.

The foreclosures themselves supplied the actual cause of AT&T's Loss for purposes of TIA §6. These foreclosures occurred over a year after Delta filed for bankruptcy. AT&T suffered no Loss when Delta filed for bankruptcy or when Delta entered into the Restructuring Agreements with the Indenture Trustees. AT&T's Loss only occurred when the Indenture Trustees foreclosed, extinguished AT&T's interests in the Aircraft and, for tax purposes, caused a deemed sale of the Aircraft for the amount of the debt and a recapture of AT&T's previously taken depreciation deductions.

Similarly, the subsequent rejection of the Leases and the allowance of the IT Claims did not cause AT&T's Loss. The Loss already had occurred before the IT Claim was allowed, and well before any payment in respect of the IT Claim would be made. It therefore was impossible for a subsequent "event whereby the Lessee pays Stipulated Loss Value" — which, even assuming full SLV were to be paid in respect of the IT Claim, would occur only upon confirmation of Delta's reorganization plan — to cause AT&T's Loss.

Although it acknowledged at page 25 of the Decision that it was obligated to enforce the parties' agreements as written, the Bankruptcy Court ignored the distinct triggering events of these two TIA sections. Notwithstanding its earlier holding to the contrary, the Bankruptcy Court then traced both the cause of the Loss and the cause of the payment of SLV to the same common event, Delta's default under the Lease. (Decision, D-2, at 20; *but see* Decision, D-2, at

17 (recognizing, in a different context, that "owner participants did not suffer any tax loss giving rise to a putative TIA claim until after, and as a consequence of, the indenture trustees' exercise of their rights following the defaults."))  As a result, it held nonsensically that the same event both invoked Delta's indemnity obligation and automatically triggered an exclusion for that indemnity.  Contracts should not be interpreted in a way that produces absurd results. *In re Enron Creditors Recovery Corp.*, 370 B.R. 64, 72 (Bankr. S.D.N.Y. 2007) ("However, a court should, if possible, avoid an interpretation that 'will result in an absurdity, an injustice or have an inequitable or unusual result.'") *rev'd on other grounds* 380 B.R. 307, 322 (S.D.N.Y. 2008) (same).

The Bankruptcy Court's reliance on TIA §6(c) also ignored evidence in the record as to the rationale for the exclusion.  It is supposed to apply when AT&T will be compensated for its Loss out of the "excess" of the SLV payment over the outstanding debt amount.  (D-30, ¶ 8) Applying the exclusion in this context clearly contravened the parties' intent — rather than precluding double recovery by AT&T, it assured <u>no</u> recovery by AT&T for its multimillion dollar tax liability.

The Bankruptcy Court cited no authority for holding.  Its comment in response to AT&T's arguments that TIA §6 required the Loss to result from one of the specific events described therein, was "so what?"  (Decision, D-2, at 18)

## II.    Having Erroneously Determined that Exclusion 6(c) Was Applicable, the Bankruptcy Court Then Misconstrued It

TIA §6(c) provides that Delta need not indemnify AT&T if "any event [occurs] whereby [Delta] pays an amount equal to [SLV]".  Accordingly, the Bankruptcy Court should have reviewed in detail the amounts Delta actually was paying under the Restructuring Agreements

(D-29, Ex. B) and compared those payments to SLV to see if they were equal. Had it done so, the Bankruptcy Court could not have disallowed the AT&T Claims.[8]

One critical example of how the Bankruptcy Court erred is that it equated the payment by Delta of SLV with the payment by Delta of a lesser amount (SLV _minus_ the Fair Market Value of the Aircraft) that Delta might have been required to pay under one remedies provision of the Lease, if the Indenture Trustee had elected that remedy **and** if the Indenture Trustee had repossessed the Aircraft. The Bankruptcy Court then assumed that the amount Delta was obligated to pay under the Restructuring Agreements was "quite consistent" with what it would have had to pay if this Lease remedy had been exercised. (Decision, D-2 at 20) This assumption, which is the foundation upon which the Bankruptcy Court based its decision, is completely wrong. The Lease provides that where, as here, the lessor (or the Indenture Trustee, as its assignee) does not take physical possession of the Aircraft in accordance with the specific Lease return provisions, the Fair Market Value of the Aircraft is zero. (Lease, D-31, Ex. A, §5(b)(ii)) Thus, if the Indenture Trustee had elected this remedy (which Delta cited as comparable to its obligations under the Restructuring Agreements), Delta would have been obligated to pay full SLV, without any offset for the Fair Market Value of the Aircraft, which is far more than it is paying under the Restructuring Agreements.

The claims disallowance is all the more remarkable because Delta admitted during oral argument that what it was paying under the Restructuring Agreements was not SLV and that it could not prevent AT&T's recovery under the TIAs if the matter were being heard in a state

---

[8]    Although the Bankruptcy Court found that the payments Delta was making under the Restructuring Agreements to be "quite consistent" with what it would pay in a remedies scenario, TIA §6(c) may be invoked only when Delta's payments _equal_ SLV, not when they "come close."

court:

| MR. WILES: | But in Test Case 5, the one that says "pay an amount equal to." Okay? So that one, I still have my argument about what "pay" means in the bankruptcy context. |
|---|---|
| THE COURT: | Yes. |
| MR. WILES: | But if you decide that it's focusing on value, I'm not going to stand here and pretend that the indenture trustees are going to receive value equal to the entire amount of that stipulated loss starting point. That's just not the case. |
| THE COURT: | Even net of deductions. |
| MR. WILES: | Exactly. |
| THE COURT: | Okay. |
| MR. WILES: | So the case then for AT&T, is from its point of view, that's the main issue, is what does "pays" mean in bankruptcy. |
| THE COURT: | And you would acknowledge that if I don't rule in your favor on the issue of what "pays" means in the context of bankruptcy, that AT&T prevails in terms of the exclusion. |
| MR. WILES: | Yes. [Mr. Wiles then discussed the amount of the claim.] |

(Tr. 11/13/07, D-43, at 98-99)

In addition to committing error regarding the amount that Delta must pay so as to bring itself within TIA §6(c), the Bankruptcy Court clearly erred regarding the medium in which that payment was to be made.

The Bankruptcy Court found that, when TIA §6(c) uses the words "to pay" SLV, this was intended by the parties to apply to a payment in stock or any other non-cash medium of payment, as well as to payments in U.S. dollars. The Bankruptcy Court quoted definitions of the word "pay" from 10 different dictionaries to support the proposition that "pay" means "satisfaction of a debt by money or property." (Decision, D-2, at 12)

As discussed in more detail in Section IV below, the Second Circuit has held that dictionary definitions are not determinative of the meaning of disputed contract terms, but even beyond that principle, the Bankruptcy Court did not have to turn to the dictionary, for in this case, the parties were very specific in their agreements as to the medium in which Delta was

required to make payments under the Lease, whether for SLV or any other amount.  Section 3(d)

of the Lease provides as follows:

> Manner of Making Payments. . . .  All payments pursuant to this Lease shall be made by 12:00 noon Eastern Standard (or Daylight) Time on the date payment is due **in U.S. Dollars and in immediately available funds**.

(Lease, D-31 Ex. A, §3(d)) (emphasis supplied)

Similarly, Section 10 of the TIA requires all payments thereunder to be made in

immediately available funds or by check:

> Payments. . . .  Payments made by Lessee or the Owner Participant pursuant to this Indemnity Agreement shall be made by wire transfer **of immediately available funds** to such bank and/or account in the continental United States as specified by the other party in written directions to such other party, **and if no such direction shall have been given, by check payable to the order of such payee** and mailed to such other party by certified mail, postage prepaid.

(TIA, D-31 Ex. D, §10) (emphasis supplied)

Nothing in the Operative Documents authorizes Delta to substitute a payment in stock or

in any other non-cash medium for the payment in immediately available funds in U.S. dollars

that it is required by Section 3(d) of the Lease when paying SLV under any of the Operative

Documents, regardless of whether such payment obligation becomes operative when Delta is in

bankruptcy.  Indeed, the opposite is true:  Section 20 of the Lease specifically states that:

> Lessee's obligations to pay all Rent [defined to include SLV] . . . payable hereunder . . . shall be absolute and unconditional and shall not be affected by any circumstance whatsoever, including, without limitation . . . (c) **any insolvency, bankruptcy, reorganization or similar proceedings by or against Lessee** . . , or (d) any other circumstances, whether or not unforeseen or similar to any of the foregoing.

(Lease, D-31, Ex. A, §20) (emphasis supplied)  Section 20 directly contradicts the Bankruptcy

Court's conclusion, however, that the parties must have intended Delta's payment obligations to

be construed in such a manner as to comport with the meaning of "pay" and "paid" in "the

context in which SLV would most likely be required, namely, bankruptcy."  (Decision, D-2, at

13) Rather, Lease Section 20 evidences the intent of the parties that Delta's bankruptcy should have no affect whatsoever on its payment obligations under the Lease. The Bankruptcy Court completely ignored any discussion of Section 20 and its implications in its Decision, despite AT&T's emphasis on this provision in its pleadings and in oral argument. (D-29, ¶ 21, Tr. 11/13/07, D-43 at 126-128)

Thus, the Bankruptcy Court clearly was wrong when suggesting the parties "must have intended" for there to be a reduction or alteration of Delta's payment obligations if it filed for bankruptcy relief, as the Operative Documents say just the opposite. Even if one were to resort to a dictionary definition, the definitions the Bankruptcy Court cited are action verbs that transfer something of value owned by one party to another party.[9] The Bankruptcy Court failed to explain the alchemy by which a negotiated credit for the residual value of the Aircraft, an asset that Delta never owned and did not transfer to the Indenture Trustee,[10] could be considered something Delta "paid" for purposes of the exclusion in the TIAs.

This Court's recent decision in *B. Lewis Productions, Inc. v. Angelou,* 2007 WL 2295971 (S.D.N.Y. Aug. 10, 2007), instructs that "[t]he phrase 'paid to' is not the equivalent of the phrase 'earned by.' Funds are paid when they are actually transferred to the payee . . . ." *Id.* at *2 (citation omitted). *Angelou* involved a royalty advance, but the holding is equally applicable to the instant case, for a negotiated credit (for something that Delta never owned) plainly is neither a transfer nor a payment by Delta for purposes of TIA §6(c).

---

[9]   Indeed, most of the definitions cited by the Bankruptcy Court reference the payment of money. None of the definitions suggest that where the parties specify the medium of payment, it should be ignored; rather, they suggest it is the payment in that medium which would constitute payment.

[10]  The Owner Trustee owned the residual value of the Aircraft. The Indenture Trustee obtained it by foreclosing the Owner Trustee's interest.

III.    **The Bankruptcy Court's Novel "Bankruptcy Context" Rule of Contract Interpretation Contradicts Supreme Court Precedent**

A venerable line of United States Supreme Court case law established the black-letter-law principle governing this case: claims based on the terms of enforceable, state-law-governed contracts must be allowed in bankruptcy cases, absent a provision of the Bankruptcy Code expressly requiring their disallowance. This principle was reiterated most recently by the Supreme Court in *Travelers*, which was decided while this matter was pending below. Neither Delta nor the Bankruptcy Court has identified any Bankruptcy Code provision requiring disallowance of the AT&T Claims. Therefore, the AT&T Claims must be allowed unless Delta would have had a valid defense to liability under New York state law, which governs these contracts. This basic principle is at the heart of this appeal.

The Bankruptcy Court's approach to contract interpretation in this case improperly conflates two separate and entirely distinct issues: (1) the claims allowance question, *i.e.*, whether AT&T has a "claim" that "shall" be allowed pursuant to 11 U.S.C. § 502(a) because it has a "right to payment" and an "enforceable obligation" under applicable state law unless an amount equal to SLV has been paid; and (2) the claims discharge question, *i.e.*, whether Delta's ability to discharge the IT Claim (even if it were equal to SLV, which it is not) under its plan of reorganization changes the state law analysis of AT&T's claim. Only the discharge issue, not the allowance issue, is a matter of bankruptcy law in this case. Whether Delta is liable on the AT&T Claims depends upon whether it has proven a valid defense under the Operative Documents — namely, that an amount equal to SLV has been paid in accordance with the relevant contracts. In contrast, whether Delta may discharge the AT&T Claims or the IT Claims after they have been allowed by paying 50¢ in "bankruptcy dollars" upon plan confirmation is not properly before this Court on the claims allowance question that is at issue here.

The Bankruptcy Court disregarded the Operative Documents' express requirements —
and the uncontroverted evidence set forth in the Affidavit of Gina Kennedy (D-30) — that
payment of the full SLV amount in cash was the necessary prerequisite for Delta to establish a
contractual §6(c) defense to the AT&T Claims.  In so ruling, the Bankruptcy Court imposed its
version of a special "bankruptcy" rule of contract interpretation, stating:

> To construe the words "pay" and "paid" in [the relevant TIA section] to mean
> only paid "in full in cash" would fly in the face of the expectation and
> contemplation of the parties who drafted [the relevant section] of the TIA
> knowing that payment of SLV would almost certainly be made **in the context of
> a bankruptcy.**  When full distribution of cash, stock or other property on an
> allowed claim in a Chapter 11 case has been made in accordance with a debtor's
> confirmed plan, the claim has been "paid" and it is legally satisfied and
> discharged. **That is the dictionary definition of "pay" and "paid," and it is the
> meaning of those words in the context of bankruptcy.**

(Decision, D-2, at 13-14) (emphasis supplied)

Although the Bankruptcy Court denied that it was applying a special bankruptcy rule of
contract interpretation earlier in the test case process (Tr. 7/10/07, D-18, at 11-14), the Decision
makes it clear that this was precisely what it was doing:

> The pay/paid/pays terminology are words of common usage and understanding
> with consistent lay and legal dictionary definitions.  **To construe pay/paid/pays
> to mean in cash in full is a rational interpretation of the words in the context
> of a solvent airline/lessee not in bankruptcy, since a money debt normally
> would not otherwise be satisfied and discharged.  But to construe
> pay/paid/pays to mean in cash in full in the context of an airline which is
> insolvent and in bankruptcy is irrational, because an insolvent airline/lessee
> in bankruptcy is incapable of paying SLV in cash in full for lack of the cash
> resources to do so, and it is barred from doing so by the Bankruptcy Code.**
> Contract provisions must be interpreted in the factual and legal context in which
> the provisions may be expected to become operative.

(Decision, D-2, at 31) (emphasis supplied)

The Bankruptcy Court's reasoning wilts when compared to the requirements of
*Travelers*:

[W]e have long recognized that the "'basic federal rule' in bankruptcy is that **state law governs the substance of claims**, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.' Accordingly, when the Bankruptcy Code uses the word "claim" – which the Code itself defines as a "right to payment," – it is usually referring to a right to payment recognized under state law. As we stated in *Butner*, "[p]roperty interests are created and defined by state law," and "[u]nless some federal interest requires a different result, **there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding**."

\*\*\*\*

Consistent with our prior statements regarding creditors' entitlements in bankruptcy, we generally presume that **claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed**.

*Travelers*, 127 S. Ct. at 1205-06 (*quoting* 11 U.S.C. § 101(5)(a) and *Butner v. United States*, 440 U.S. 48 (1979)) (*citing Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161 (1946)) (emphasis supplied) (citations omitted) (bracketed language in original).

The Supreme Court's pronouncements in *Travelers* could not have been more clear: (i) a claimant's substantive rights with respect to its claim are to be determined under applicable <u>state law</u> absent a compelling federal interest, and (ii) to the extent that a claim is enforceable under state law, it <u>must</u> be <u>allowed</u> in bankruptcy unless the Bankruptcy Code itself <u>expressly</u> disallows the claim.

As noted above, Delta quite properly admitted the AT&T Claims would be enforceable in a state court. (Tr. 11/13/07, D-43, at 98-99) Indeed, under New York law, "[a] court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (*citing Fiore v. Fiore*, 389 N.E.2d 138, 139 (N.Y. 1979) *and DeVanzo v. Newark Ins. Co.*, 353 N.Y.S.2d 29 (N.Y. App. Div. 1974) *aff'd* 374 N.Y.S.2d 619 (N.Y. Jun 26, 1975)). "Under New

York law, therefore, a court must enforce that plain meaning, 'rather than rewrite an unambiguous agreement.'" *Krumme v. West Point Stevens, Inc.*, 238 F.3d 133, 139 (2d Cir. 2000) (*quoting American Express Bank Ltd. v. Uniroyal*, 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1990)). Said another way, a state court would neither read "SLV" to mean "net SLV" nor substitute a requirement that payments be made in immediately available funds with a finding that payments could be made in stock and in negotiated credits.

The Bankruptcy Court further erred in construing "paid" in TIA §6(c) to mean anything other than payment in full, for courts have long recognized that the ordinary and common-sense understanding of "paid" means *actually paid in full*. Where the "definite word 'paid'" is used to define an obligation, it does not mean "constructive payment," and courts may not engage in a "theory of fiction to give to that word an indefinite meaning" by engrafting unsupported meanings or conditions: "The ordinary and usual meaning of 'paid' is to liquidate a liability in cash." *P. G. Lake, Inc. v. Comm'r*, 148 F.2d 898, 900 (5th Cir. 1945); see also *Scotto v. Brink's Inc.*, 962 F.2d 225, 226 (2d Cir. 1992) ("the employee is 'paid wages' when the employer *actually* pays the wages, regardless of when the wages might have been earned.") (emphasis added).

Similarly, in *Levine v. Ribicoff*, an applicant sought Social Security benefits based on wages that were credited to the employee's account on the employer's books, but not actually paid until several years after her employment. 201 F. Supp. 692 (S.D.N.Y. 1962). This Court denied eligibility, finding that "[t]he mere crediting of wages to an employee's account on the employer's books obviously did not constitute an actual payment of wages." *Id.* at 694.

The Bankruptcy Court also erred in stating that AT&T's TIAs do not require that all payments thereunder be in cash — *i.e.*, in U.S. dollars — on the grounds that, despite the fact

that the TIA expressly states that payment must be in U.S. dollars, that requirement "does not accord with the far broader definitions of 'pay' in every dictionary of the English language and every law dictionary." (Decision, D-2, at 23)  The payment referred to in TIA §6(c) is payment of Supplemental Rent as defined in the Lease, and refers to payments due under any of the Operative Documents, including the TIAs. (Lease, D-31, Ex. A, at 11)  Under the Lease, Section 3(d) requires "[a]ll payments pursuant to this Lease shall be made . . . in U.S. dollars and in immediately available funds." (Lease, D-31 Ex. A, §3(d))  Even if the reference were not so specific, under New York law, all of the interrelated contracts involved in a single transaction must be interpreted as a whole, consistent with the purpose of the transaction.  *See, e.g.*, *This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998).  Construing the Operative Documents together, the TIA §6(c) payment requirement contemplates that payment be made in U.S. dollars and in immediately available funds to satisfy this condition.

The Bankruptcy Court's approach to contract interpretation not only is incorrect but it makes no sense because it would effectively override all contract terms specifying the form and amount of payment in determining rights and obligations among the parties to complex interrelated contracts if a contracting party files for bankruptcy.  Under the Bankruptcy Court's theory, all contracting parties presumptively are on notice that contract terms are subject to being interpreted differently in the "bankruptcy context."  This view of contract interpretation has been forcefully repudiated by the *Travelers* and *Butner* line of cases.

Moreover, the Decision is wrong from a commercial and public policy standpoint.  A TIA is a guarantee of the tax treatment that a taxpayer will have in a transaction and an agreement to indemnify the taxpayer for any additional taxes incurred if the actual tax treatment is different from the one promised.  Jeffrey H. Khan, *The Mirage of Equivalence and the*

*Ethereal Principles of Parallelism and Horizontal Equity,* 57 Hastings L.J. 645, 669 (2006). The fact that SLV (which contains amounts necessary to reimburse AT&T for both its investment and tax exposure) is pledged to the Indenture Trustee does not mean that AT&T has no claim. Were that the parties' intent, AT&T would have been asked to fully subordinated its recovery under the TIAs to any recovery in favor of the Indenture Trustee. Rather, because the indemnity agreement between Delta and AT&T is set forth in a separate agreement that is not pledged and that may be enforced only by AT&T, their rights and obligations under the TIAs must be analyzed as would any claim between a debtor and a party holding a guarantee.

Even if we assume that the Indenture Trustee received an allowed claim for full SLV, because of the value of Delta's stock upon emergence, all parties agree that the Indenture Trustee did not receive full SLV. The IT Claim is not satisfied in full. Rather, the confirmation of Delta's plan acts as an injunction against the Indenture Trustee seeking any further recovery from Delta for the shortfall. (Debtors' Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Bankr. Ct. Dkt. No.5998], Ex. A., §13.3)

The fact that the Indenture Trustee cannot recover the shortfall, however, does not mean that a party with a guaranty of that same claim is similarly enjoined. The very purpose of obtaining a guarantee is to ensure payment in the event of a bankruptcy or inability to pay by the primary obligor. *See, e.g., Aetna Cas & Sur. Co. v. Namrod Development Corp,* 140 B.R. 56, 60 (S.D.N.Y. 1992)

Nothing in either the Operative Documents or in the Bankruptcy Code precludes allowance of the AT&T Claims. In fact, the existence of Section 502(e)(1)(B) of the Bankruptcy Code (governing reimbursement and contribution claims) demonstrates that when Congress desires to have the allowance of a claim by a debtor in favor of one creditor impact the claim of

other parties against the debtor it enacts a statute to accomplish that purpose. *See Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 923 (1st Cir. 1993). Nothing in the Bankruptcy Code supports Delta's argument that a contractual triggering mechanism, which triggers only upon full payment, may be overridden by discharge in bankruptcy of a debt owed to a different creditor and based on only a partial payment.

## IV.    The Bankruptcy Court Erred in Declining to Consider the Uncontroverted Extrinsic Evidence

Although a Court does not look beyond the operative document in determining whether any of the contractual provisions are ambiguous, *Kass v. Kass*, 91 N.Y.2d 554, 566 (N.Y. 1998) ("[a]mbiguity is determined by looking at the four corners of the document, not to outside sources.") (internal citations omitted), a determination of whether the contractual provisions are ambiguous must be made against the background that language is fundamentally malleable. *See Towne v. Eisner*, 245 U.S. 418, 425 (U.S. 1918) ("A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."). In other words, the fact that the meaning of a term may seem obvious or intuitive is not dispositive in the analysis of whether its meaning *within the contract* is ambiguous.

The Bankruptcy Court looked only to common dictionary definitions without considering whether seemingly common words had particular meanings in the operative documents before it. However, it is well recognized that contract interpretation requires more than ascribing the "plain" meaning of words to the contract terms at issue. *See Alexander & Alexander Services, Inc. v. Lloyd's*, 136 F.3d 82, 87 (2d Cir. 1998) ("Dictionary definitions are not determinative of the meaning of [disputed contract terms]."). Indeed, there are numerous examples of courts admitting parol evidence in order to clear up an ambiguity they perceived in contract terms with

seemingly obvious and indisputable meanings. *See, e.g., Garza v. Marine Trans. Lines Inc.*, 861 F.2d 23, 28 (2d Cir. 1988) (finding ambiguity in the term "loss or damage"); *see also Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co.*, 472 F.3d 33, 45 (2d Cir. 2006) (finding ambiguity in the term "contamination"); *UBS Sec. LLC v. Finish Line, Inc.*, No. 07-10382, slip op. at 12 (S.D.N.Y. Feb. 22, 2008) (finding ambiguity in the terms "material and adverse" and "reasonable discretion"); *Alexander & Alexander Servs., Inc.*, 136 F.3d at 87 (finding ambiguity in the term "client"); *G. Golden Associates of Oceanside, Inc. v. Arnold Foods Co., Inc.*, 870 F. Supp. 472, 479 (E.D.N.Y. 1994) (finding ambiguity in the term "products"); *LTV Corp. v. Aetna Cas. & Sur. Co. (In re Chateaugay Corp.)*, 116 B.R. 887, 903 (Bankr. S.D.N.Y. 1990) (finding ambiguity in the term "terminated"). Thus, "where the text of an agreement reasonably allows for varying interpretations--whether by the inadvertence or design of the draftsman--the need for judicial construction cannot, and may not, be avoided. *Wards Co., Inc. v. Stamford Ridgeway Associates*, 761 F.2d 117, 120 (2d Cir. 1985).

## CONCLUSION

AT&T respectfully requests the Court to (i) reverse the Disallowance Order, direct the Bankruptcy Court to enter an order allowing the AT&T Claims as to liability, and remand for determination of their proper amounts, or (ii) alternatively, remand for further evidentiary proceedings and direct the Bankruptcy Court to consider extrinsic evidence with respect to the meaning of the relevant contractual provisions.

Dated:  New York, New York
      March 14, 2008

KAYE SCHOLER LLP

*Richard G. Smolev*

Richard G. Smolev (RS 2222)
Piper A. Brock (PB 6335)
425 Park Avenue
New York, New York 10022
(212) 836-8000 (telephone)
*Counsel for Appellant AT&T Credit Holdings, Inc.*