**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                                            :
AT&T CREDIT HOLDINGS, INC.,                                 :
                                                            :
                              Appellant,                    :   **Civil Case No. 08-CV-2411 (RMB)**
                                                            :   **(ECF Case)**
             -against-                                      :
                                                            :
DELTA AIR LINES, INC.,                                      :
                                                            :
                              Appellee.                     :
                                                            :
------------------------------------------------------------x


# BRIEF ON APPEAL OF APPELLEE
## DELTA AIR LINES, INC.

DEBEVOISE & PLIMPTON LLP
Michael E. Wiles
919 Third Avenue
New York, New York 10022
Telephone:  (212) 909-6000
Facsimile:   (212) 909-6836
email: mewiles@debevoise.com
*Attorneys for Delta Air Lines, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

COUNTER-STATEMENT OF ISSUE PRESENTED ............................................... 1

STANDARD OF APPELLATE REVIEW ................................................................. 2

STATEMENT OF THE CASE ................................................................................... 2

     A.     The AT&T Transactions ................................................................. 2

     B.     Decisions on Prior Test Cases and Motions for Reconsideration ..................... 2

     C.     Arguments Regarding AT&T's Claims ......................................... 5

     D.     The January 16 Decision ............................................................... 5

ARGUMENT ............................................................................................................. 7

I.     THE TIA CLAIMS AND SLV CLAIMS "ARISE FROM" THE SAME
EVENTS ........................................................................................................ 7

II.    THE TAX INDEMNITY AGREEMENTS DO NOT REQUIRE THE
PAYMENT OF SLV "IN CASH," AND EVEN IF THEY DID SUCH
PROVISIONS WOULD BE SUPERSEDED BY FEDERAL BANKRUPTCY
LAW ............................................................................................................. 8

III.   THE BANKRUPTCY COURT'S DECISION IS CONSISTENT WITH THE
SUPREME COURT DECISION IN *TRAVELERS*................................. 10

IV.   THE BANKRUPTCY COURT'S DECISION IS CONSISTENT WITH THE
TREATMENT OF GUARANTORS UNDER THE BANKRUPTCY CODE .......... 12

V.    AT&T'S ARGUMENT THAT SLV MUST BE PAID WITHOUT OFFSETS
FOR OTHER DAMAGE RECOVERIES IS WITHOUT MERIT ........................... 13

     A.     Applicable Law Treats Other Recoveries As Payments Of SLV ................... 13

     B.     The Leases Treat FMV And Other Recoveries As "Payments" Of SLV ....... 14

     C.     AT&T's Interpretation Would Deprive Section 6(c) Of The TIA Of
Meaning And Would Render It A Nullity ...................................... 15

     D.     AT&T's Interpretation Makes No Sense ....................................... 16

22696949v14

VI.    THE "NET SLV" CLAIMS CALCULATED UNDER THE
       RESTRUCTURING AGREEMENTS ARE CONSISTENT WITH THE
       LEASES AND WITH APPLICABLE LAW .................................................. 17

VII.   THE BANKRUPTCY COURT PROPERLY EXCLUDED EXTRINSIC
       EVIDENCE ............................................................................................. 19

VIII.  ALTERNATIVELY, THE ORDER SHOULD BE AFFIRMED BECAUSE
       THE LAW REQUIRES THE DISALLOWANCE OF DUPLICATIVE
       CLAIMS, REGARDLESS OF WHAT THE CONTRACTS SAY ........................... 21

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*805 Third Avenue Co. v. M.W. Realty Associates*,
   448 N.E.2d 445 (N.Y. 1983) ...................................................................................19

*Alexander & Alexander Servs., Inc. v. Lloyd's*,
   136 F.3d 82 (2d Cir. 1998)............................................................................20 n. 3

*B. Lewis Productions, Inc. v. Angelou*,
   No. 06 Civ. 6390, 2007 WL 2295971 (S.D.N.Y. Aug. 10, 2007) .....................11 n.2

*Corhill Corp. v. S.D. Plants, Inc.*,
   176 N.E.2d 37 (N.Y. 1961) ...................................................................................16

*Diversified Graphics, Ltd. v. Groves*,
   868 F.2d 293 (8th Cir. 1989)................................................................................22

*Frank Nero Auto Lease, Inc. v. Townsend*,
   411 N.E.2d 507 (Ohio Ct. App. 1979) ..................................................................13

*Garza v. Marine Trans. Lines Inc.*,
   861 F.2d 23 (2d Cir. 1988)............................................................................20 n. 3

*G. Golden Assocs. of Oceanside, Inc. v. Arnold Foods Co., Inc.*,
   870 F.Supp. 472 (E.D.N.Y. 1994) .................................................................20 n. 3

*Havel v. Kelsey-Hayes Co.*,
   445 N.Y.S.2d 333 (N.Y. App. Div. 1981)...............................................................21

*In re Ames Department Stores, Inc.*,
   1995 WL 311764 (S.D.N.Y. May 18, 1995) .............................................................9

*In re Chateaugay Corp.*,
   115 B.R. 760 (Bankr. S.D.N.Y. 1990), *aff'd*, 130 B.R. 690 (S.D.N.Y. 1991)
   *vacated by agreement*, Nos. 89 Civ. 6012, 90 Civ. 6048, 1993 WL 388809
   (S.D.N.Y. June 16, 1993) ...............................................................................22-23

*In re Drexel Burnham Lambert Group*,
   138 B.R. 687 (Bankr. S.D.N.Y. 1992)......................................................................9

*In re Delta Air Lines, Inc.*,
   370 B.R. 552 (Bankr. S. D. N.Y. 2007)....................................................................3

iii

*In re Delta Air Lines, Inc.*,
  2007 Bankr. LEXIS 3464 (Bankr. S.D.N.Y. 2007) ................................................8

*In re Delta Air Lines, Inc.*,
  381 B.R. 57 (Bankr. S.D.N.Y. 2008) ................................................................2

*In re Enron Corp.*,
  364 B.R. 482 (S.D.N.Y. 2007) ........................................................................2

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*,
  160 B.R. 882 (Bankr. S.D.N.Y. 1993) ............................................................22

*In re Fobian*,
  951 F.2d 1149 (9th Cir. 1991) ......................................................................10

*In re Keck, Mahin & Cate*,
  241 B.R. 583 (Bankr. N. D. Ill. 1999) ...........................................................10

*In re Northwest Airlines Corp.*,
  Case No. 05-17930 (Bankr. S.D.N.Y. July 27, 2007) ..................................10

*In re Simetco, Inc.*,
  No. 93-61772, 1996 WL 651001 (Bankr. N.D. Ohio Feb. 15, 1996) ............22

*In re T.R. Acquisition Corp.*,
  309 B.R. 830 (S.D.N.Y. 2003) ......................................................................23

*In the Matter of Brinke Transportation., Inc.*,
  No. 87-03785, 1989 WL 233147 (Bankr. D.N.J. Jan. 23, 1989) ...................23

*Kates v. Yeshiva University*,
  227 N.Y.S.2d 718 (N.Y. Sup. Ct. 1962) ........................................................21

*Levine v. Ribicoff*,
  201 F.Supp. 692 (S.D.N.Y. 1962) ...........................................................11 n. 2

*Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co.*,
  472 F.3d 33 (2d Cir. 2006) .....................................................................20 n. 3

*P.G. Lake, Inc. v. Comm'r*,
  148 F.2d 898 (5th Cir. 1945) ..................................................................11 n. 2

*Raleigh v. Illinois  Department of Revenue*,
  530 U.S. 15 (2000) ................................................................................9, 10

*Reape v. New York News, Inc.*,
   504 N.Y.S.2d 469 (N.Y. App. Div. 1986) ................................................................16

*Schmidt v. Magnetic Head Corp.*,
   468 N.Y.S.2d 649 (N.Y. App. Div. 1983).................................................................19

*Scotto v. Brink's, Inc.*,
   962 F.2d 225 (2d Cir. 1992).......................................................................11 n. 2

*Siletz Trucking Co. v. Alaska Int'l Trading Co.*,
   467 F.2d 961 (9th Cir. 1972) ................................................................ 13-14

*Sw. Park Outpatient Surgery, Ltd. v. Chandler Leasing Division*,
   572 S.W.2d 53 (Tex. Civ. App. 1978) ..................................................................13

*Travelers Casualty & Surety. Co. of America v. Pacific Gas & Elec. Co.*,
   127 S. Ct. 1199 (2007) ......................................................................... 4, 9, 10-12

*Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Associates*,
   472 N.E.2d 315 (N.Y. 1984) ..............................................................................16

*Union Trust Co. of Rochester v. Willsea*,
   9 N.E.2d 820 (N.Y. 1937) ................................................................... 12-13

*Wards Co., Inc. v. Stamford Ridgeway Assocs.*,
   761 F.2d 117 (2d Cir. 1985)....................................................................20 n. 3

*Zion v. Kurtz*,
   405 N.E.2d 681 (N.Y.1980) ...............................................................................21

## Statutes and Rules

11 U.S.C. § 101(5) ....................................................................................12, 22, 24

11 U.S.C. § 502.............................................................................................12, 23

11 U.S.C. § 524(e) ..............................................................................................12

Fed. R. Bankr. P. 8013 .......................................................................................2

## Other

Black's Law Dictionary 1165 (8th ed. 2004) .......................................................8

v

Appellee Delta Air Lines, Inc. ("**Delta**") submits this brief in response to the appeal by AT&T Credit Holdings ("**AT&T**") from the Bankruptcy Court's February 7, 2007 "Order with Respect to TIA/SLV Objection 5I" (the "**Order**") [D 3].[1]

## PRELIMINARY STATEMENT

This appeal arises out of seven "leveraged lease" financings.  AT&T set up trusts to buy aircraft, and the trusts (the "**Owner Trusts**") borrowed funds to do so.  Delta then entered into leases ("**Leases**") with the Owner Trusts, who assigned the Leases to indenture trustees ("**Indenture Trustees**") as collateral for the loans.  The Leases provided for various remedies in the event of a default, including the recovery of a minimum "Stipulated Loss Value" ("**SLV**").

Delta also entered into tax indemnity agreements ("**TIAs**") in which Delta agreed to indemnify AT&T against certain tax losses.  AT&T has agreed that the computation of SLV already includes the amount needed to compensate AT&T for tax losses that AT&T might suffer upon a Lease default.  The TIAs address this potential duplication by barring indemnification if AT&T's tax loss arises out of "any event" whereby Delta "pays" an amount equal to SLV.

The Indenture Trustees (as assignees of the Leases) asserted SLV claims in Delta's chapter 11 case, and AT&T asserted TIA claims.  The Bankruptcy Court held that Delta had fully discharged and therefore "paid" its SLV obligations, and that AT&T's duplicative TIA claims were barred.  The Order should be affirmed for the reasons stated by the Bankruptcy Court or for the alternative reasons set forth in Part VIII, below.

## COUNTER-STATEMENT OF ISSUE PRESENTED

Whether AT&T's duplicative TIA Claims were barred by the TIAs and applicable law.

---

[1]    "**D**" refers to Appellant's Designation of Record and "**CD**" refers to Appellee's Counter-Designation.  The Order has been clarified by Stipulation and Order [Bankruptcy Docket No. 7139] to make clear that it applies to certain amended claims filed by AT&T.

1

## STANDARD OF APPELLATE REVIEW

Factual findings are reviewed for clear error, and conclusions of law are reviewed *de novo*. FED. R. BANKR. P. 8013; *In re Enron Corp.*, 364 B.R. 482, 485 (S.D.N.Y. 2007).

## STATEMENT OF THE CASE

### A.    The AT&T Transactions

In 1990 and 1991, Delta entered into seven leveraged lease transactions in which AT&T was the "owner participant." *See* TIA/SLV Objection 5I [D 10] at 8-10. The transactions provided tax benefits to AT&T: the Owner Trusts are "grantor trusts" whose existence is ignored for tax purposes, so that AT&T had use of accelerated depreciation and other tax deductions.

Section 15 of each of the AT&T Leases describes non-exclusive remedies that could be exercised upon a default. The Lessor (or Indenture Trustee) has the right under these provisions to recover SLV; if other damage recoveries (such as sale proceeds) are not equal to SLV, Delta is liable for the difference. The SLV differed depending on the date of a default, and decreased over time. *See, e.g.,* Lease for N 963DL (Mansour Aff. Ex. A), § 15 and Exhibit C thereto.

Delta also entered into seven TIAs with AT&T, the terms of which are identical insofar as they are relevant to this appeal. In each TIA, Delta agreed to indemnify AT&T if, "as the result of" any "act" or default by Delta, AT&T were to "recapture" depreciation deductions or incur other tax losses. *See, e.g.*, TIA for N963DL (Mansour Aff. Ex. D), § 5(a). However, AT&T is not entitled to indemnification for any loss "arising as a result of . . . any event" whereby Delta "pays an amount equal to [SLV]." *Id.* at § 6(c).

### B.    Decisions on Prior Test Cases and Motions for Reconsideration

The Bankruptcy Court has ruled on other "test case" objections to TIA claims and it incorporated those rulings into the January 16, 2008 Decision regarding AT&T's claims (the **"January 16 Decision"**). *See* January 16 Decision [D 2] at 32-33, reported at 381 B.R. 57.

1.    __The May 16 Decision__.  The first test case objection [CD 1] involved TIA claims filed by DFO Partnership ("**DFO**").  The DFO agreements bar TIA claims if a loss arises as a result of "any event whereby a party to any of the Operative Documents is required to pay" SLV. The second test case objection involved TIA claims filed by Northwestern Mutual Life Insurance Company ("**Northwestern**").  The Northwestern agreements bar TIA claims if Delta "pays" SLV or "an amount determined by reference thereto."  *See* Decision dated May 16, 2007 [D 11] (the "**May 16 Decision**") at 10, 13.  The May 16 Decision is reported at 370 B.R. 552.

Delta argued that the TIA claims were duplicative of SLV claims and that the TIA claims were barred.  DFO and Northwestern agreed that SLV included the amount needed to compensate them for tax losses upon a default.  DFO Response [CD 3] at 9-10; Northwestern Response [CD 8] at 5-6.  However, they argued that the TIA claims should be allowed.

DFO's main argument was that it never pledged the "tax component" of SLV to the Indenture Trustees.  DFO Response [CD 3] at 10-12.  The Bankruptcy Court disagreed, holding that "the entirety of SLV" had been pledged.  May 16 Decision [D 11] at 10-11.

DFO also argued that the TIA exclusion does not apply unless Delta is required to pay SLV without deductions for other damage recoveries.  DFO Response at 12-13, 15-20.  The Bankruptcy Court held that DFO's position contradicted the Leases.  May 16 Decision at 10.

Northwestern argued that its claims should not be barred unless Delta paid SLV in full and in cash.  The Court held that the TIAs include no such requirement.  The Bankruptcy Court also noted that bankruptcy is one of the events that triggers the SLV obligation, so the parties must have anticipated that SLV might be "paid" in bankruptcy.  *Id.* at 10, 12-14.

Finally, the Bankruptcy Court held that one Northwestern TIA claim was not barred, because the Court believed that a settlement term sheet did not "refer" to SLV.  *Id.* at 15.

3

2.    **The July 10 Decision.**  Delta moved for reconsideration of the May 16 Decision, pointing out that the relevant term sheet explicitly referred to SLV.  *See* Motion [D 16] at 3-4. The Bankruptcy Court agreed, and reversed its ruling on that point. July 10, 2007 Tr. [D 18] at 8.

Northwestern also moved for reconsideration, arguing that the Bankruptcy Court had relied on bankruptcy policies to override the language of the TIAs, in violation of *Travelers Casualty & Surety Co. of America. v. Pacific Gas & Electric Co.*, 127 S. Ct. 1199 (2007).  The Bankruptcy Court denied Northwestern's motion, and explained:

> What I said was, or meant to convey in my opinion, was that when the parties used the phrase in Paragraph 6(c), refer to an event whereby the lessee pays stipulated loss value or an amount determined by reference thereto, the parties must have had, in their contemplation, understanding and, therefore, their intent, the self-evident postulate that stipulated loss value might be required to be paid, or an amount determined by reference to stipulated loss value might be required to be paid in the context of bankruptcy.  And in that context, it would be perfectly clear to anybody familiar with bankruptcy and presumably, the lawyers and principals who were responsible for this agreement, that the concept of payment in bankruptcy must contemplate the possibility, indeed, the nearly certain probability, that the payment would not be dollar-for-dollar in cash.
>
> In so ruling, I was not making a ruling that bankruptcy law supervened to govern the terms of this agreement that we're concerned with, Section 6(c).  Rather, my point was that in construing what the parties contemplated and, therefore, intended in writing Section 6(c) as they did, they must have contemplated the possibility, if not the likelihood, of an obligation to pay SLV in the context of bankruptcy, in which context it would almost certainly be impossible to pay in full, in cash.

July 10 Tr. at 12-13.  Northwestern has filed an appeal to this Court.

3.    **The August 20 Decision.**  DFO also moved for reconsideration, again arguing that its TIA claims were not barred unless SLV were paid in cash and without deductions for other recoveries.  Motion [D 15] at 8-10.  The Bankruptcy Court held that DFO's contention contradicted the plain language of the agreements.  August 20, 2007 Tr. [D 23] at 41-44, 64.

4.    **The November 7 Decision.**  DFO filed a second motion for reconsideration [D 26], this time arguing that the relevant Lease remedies did not permit SLV to be reduced because

of other damage recoveries.  Motion [D 26] ¶¶ 14-17.  Delta argued that DFO's argument was without merit and also contradicted DFO's prior contentions.  Response [D 34] at 4-5, 8-10.  The Bankruptcy Court denied DFO's second reconsideration motion at a hearing on November 6, 2007.  November 6, 2007 Tr. [D 40] at 4, 29-31, 66-67.  DFO has appealed.

**C.**     **Arguments Regarding AT&T's Claims**

On August 16, 2006**,** AT&T filed seven TIA claims against Delta.  Delta objected that the TIA claims were duplicative of SLV claims for the same aircraft.  *See* TIA/SLV Obj. 5I [D 10].  In response, AT&T agreed that the SLV liquidated damage computation already included compensation for AT&T's tax losses.  *See, e.g.,* Aff. of Gina Kennedy [D 30] ¶ 8.  Nevertheless, AT&T requested allowance of its TIA claims in addition to the SLV claims.

AT&T's primary argument before the Bankruptcy Court was that the TIA Claims and SLV claims did not arise from the same "events" and that Section 6(c) therefore did not apply.  AT&T argued that the SLV claims arose from Lease defaults, whereas the TIA claims arose from foreclosures.  AT&T Response [D 29] ¶¶ 9-11.  AT&T admitted, however, that the foreclosures themselves arose out of Delta's Lease defaults.  AT&T Sur-Reply [D 38] at 3-4.

AT&T (like DFO) also argued that the TIA exclusion should only apply if Delta were to pay SLV in full, in cash and without any deductions for other damage recoveries.  AT&T Response ¶¶ 20-26, 28.  Finally, AT&T contended that it was not the "purpose" of Section 6(c) to protect Delta from double liability, and that the exclusion should not apply unless AT&T actually received the "tax" component of SLV.  Kennedy Aff. [D 30] ¶ 6.

**D.**     **The January 16 Decision**

The Bankruptcy Court issued a decision on January 16, 2008 (the "**January 16 Decision**") which addressed AT&T's claims as well as other claims.  The Bankruptcy Court first rejected arguments that it should interpret the TIAs in accordance with the alleged "purposes" of

5

AT&T or Delta, reasoning that the parties had different purposes that were antithetical to each other.  January 16 Decision at 5-8.  The Bankruptcy Court held that the TIAs have to be interpreted in accordance with the words that the parties used, viewed in the factual and legal context in which the agreements were made.  *Id.*

The Bankruptcy Court then rejected AT&T's contention that the TIA claims were only barred if SLV was paid "in full, in cash," holding that those contentions "do not find support in the actual words used by the parties." *Id*. at 11, 18.  The Court held that the words "pay" and "paid" are "words of common usage and meaning" and that "pay" means to satisfy a debt by delivering money or property that is sufficient, in law, to discharge the debt.  *Id.* at 11-13, 18.  The TIA exclusions therefore apply so long as Delta has satisfied and discharged Delta's SLV payment obligations, and Delta has done so.  *Id.* at 12, 15-17, 18.

The Court rejected AT&T's argument that its tax loss did not arise from an "event" whereby Delta was obligated to pay SLV, noting that in every transaction "the 'event' whereby Delta must pay SLV was Delta's default under the Lease, and in every transaction the owner participant suffered a tax loss due to a foreclosure arising from the same 'event,' namely, Delta's default under the Lease."  January 16 Decision at 18-19.  The Court also adopted its prior rulings that other recoveries by the Indenture Trustees "do constitute payment [of SLV] in the sense of satisfaction and discharge of the amount of SLV to be required to be paid by Delta."  *Id.* at 19.

Finally, the Bankruptcy Court rejected affidavits that AT&T had submitted regarding the alleged "purpose" of Section 6(c), finding that the exclusion clearly focuses on whether Delta's SLV payment obligations have been discharged, regardless of the recoveries received by AT&T.  *Id*. at 22-32.  The Bankruptcy Court also noted that AT&T's proffered affidavits were mere argument and would not have constituted admissible parol evidence in any event.  *Id*.

**ARGUMENT**

AT&T admits that SLV already includes compensation for the tax losses covered by the TIAs. *See, e.g.*, Aff. of Gina Kennedy [D 30] ¶ 8. Each of the TIAs addresses this duplication by providing that AT&T has no TIA Claim if its tax losses arise as a result of "any event whereby the Lessee pays an amount equal to Stipulated Loss Value or Termination Value." Under the Bankruptcy Code, the allowance of SLV claims, and the making of distributions thereon in accordance with Delta's confirmed plan of reorganization, discharges all of Delta's SLV payment obligations. Accordingly, Delta has paid the SLV claims and does not also have to pay the duplicative TIA claims. AT&T's arguments to the contrary are without merit.

## I.     THE TIA CLAIMS AND SLV CLAIMS "ARISE FROM" THE SAME EVENTS

AT&T admits that foreclosure sales arose from Delta's Lease defaults and that SLV obligations arose from those same defaults. AT&T argues that the foreclosure sales and Lease defaults are separate "events," AT&T Br. at 12, but that argument is without merit.

First, the contracts bar a TIA claim if the tax Loss and the SLV obligation "arise" out of "any" common event. Here, the same event – Delta's Lease default – prompted foreclosures and also gave rise to SLV Claims. There is no basis for AT&T's arbitrary attempt to focus only on the foreclosures, and to ignore the "events" that gave rise to the foreclosures in the first place.

Second, the foreclosures indisputably occurred as a result of the Lease defaults. AT&T argues that the foreclosures were not inevitable, *see id.*. at 11-12, but that is irrelevant. The issue is whether AT&T's tax Losses actually did "arise out of" the Lease defaults, and they did.

In arguing the contrary, AT&T has attempted to draw an analogy to the Bankruptcy Court's disallowance of TIA claims filed by Lone Star Partners. The TIAs to which Lone Star was a party stated that no claim could be asserted if a tax loss arose from a sale, unless (1) the sale occurred while a Default was outstanding, and (2) the sale itself was "attributable to an

exercise of remedies" under the Leases.  Lone Star voluntarily sold its owner participant

positions; the Bankruptcy Court held that the voluntary sales were not "attributable to an exercise

of remedies" and that the TIA claims were barred.  *See* 2007 Bankr. LEXIS 3464 * 18-20.

The Lone Star ruling is inapposite.  Here, the TIAs provide that no claim may be asserted

if the tax loss and SLV obligation "arise" from "any" common event, and they plainly did.

Third, Section 5 of each of the TIAs makes clear that AT&T has no claim unless the

"event" that gives rise to a tax loss is an action or a default by Delta itself.  *See, e.g.,* TIA for

N963DL (Mansour Aff. Ex. D), § 5(a).  AT&T recognized this in each of its proofs of claim, and

went to great lengths to attribute its tax losses to Delta's defaults under the Leases.  *See* Proof of

Claim 4901 [D 42], ¶¶ 9-11.  If AT&T now wishes to argue that the "event" giving rise to its tax

loss was a foreclosure (and *not* Delta's default), then the TIAs would not apply at all.

## II.    THE TAX INDEMNITY AGREEMENTS DO NOT REQUIRE THE PAYMENT OF SLV "IN CASH," AND EVEN IF THEY DID SUCH PROVISIONS WOULD BE SUPERSEDED BY FEDERAL BANKRUPTCY LAW

AT&T argues that Section 6(c) of the TIAs does not apply unless SLV is paid "in cash."

However, the words "in cash" do not appear in Section 6(c).  AT&T's effort to add such a

requirement is contrary to the plain language of the contracts, and contrary to bankruptcy law.

The concept of "payment" does not require "cash."  Black's Law Dictionary defines

"payment" as the "performance of an obligation by the delivery of money or some other valuable

thing accepted in full or partial discharge of the obligation."  BLACK'S LAW DICTIONARY 1165

(8th ed. 2004).  Cash is one way to discharge an obligation, but it is not the only way.

In the transactions that are the subject of this appeal, the Operative Documents

contemplate many circumstances in which the obligation to pay SLV may be satisfied other than

through cash payments.  Section 15(c) of each Lease, for example, provides that the "Fair Market

Value" of the Aircraft partially satisfies the obligation to pay SLV, regardless of whether a sale

8

occurs.  *See, e.g.,* Lease for N963DL (Mansour Aff. Ex. A), § 15(c).  If the Fair Market Value of an Aircraft equals or exceeds the amount specified in the SLV table attached to the Lease, then the SLV obligation is fully satisfied, without any payment of cash at all.

Section 15(d) of the Lease also counts "sale proceeds" toward payments of SLV.  The Indentures explicitly permit such sale proceeds to include cash or credit or "other property."  *See, e.g.,* Indenture for N963DL (Mansour Aff. Ex. C), § 7.03(c).  The Indentures also permit the Indenture Trustees to bid in their debts as "payment" in a foreclosure.  *Id.* at § 7.03(d).

AT&T argues that Sections 3(d) and 20 of the Leases require certain Lease payments in cash.  However, AT&T's claims arise under the tax indemnity agreements, not the Leases, and AT&T has not cited a single provision in the TIAs requiring a cash payment of SLV.

AT&T also argues that each TIA requires full payment, in cash, of *indemnities* that are owed under the TIA.  AT&T Br. at 16 (citing TIA for N963DL (Mansour Aff. Ex. D), § 10).  However, this provision just illustrates that the parties knew how to refer to payment "in full and in cash" when intended.  Section 6(c) contains no such requirement; it prevents duplicative claims by barring a TIA claim whenever Delta "pays" SLV, no matter how the payment occurs.

More importantly, a creditor's rights under a contract are "subject to any qualifying or contrary provisions of the Bankruptcy Code."  *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 127 S. Ct. 1199, 1201, 1204-05 (2007) (quoting *Raleigh v. Ill Dep't of Revenue*, 530 U.S. 15, 20 (2000)) (internal quotations omitted).  Federal bankruptcy law permits a debtor to satisfy obligations in the ways set forth in a confirmed plan of reorganization, regardless of whether "cash" payments are specified in a contract.  January 16 Decision at 22; *In re Ames Department Stores, Inc.*, 1995 WL 311764, *2 (S.D.N.Y. May 18, 1995); *In re Drexel Burnham Lambert Group*, 138 B.R. 687, 709 (Bankr. S.D.N.Y. 1992).

In accordance with its confirmed Chapter 11 plan, Delta is delivering property to the holders of SLV claims that is sufficient (under applicable bankruptcy law) to discharge, in their entirety, all of Delta's SLV payment obligations.  This constitutes "payment" of the obligations and overrides any contrary contract provisions.  *See In re Northwest Airlines Corp.*, Case No. 05-17930 (Bankr. S.D.N.Y. July 27, 2007) (attached hereto as **Appendix A**) (agreeing that the allowance and discharge of SLV claims constitutes a "payment" of the SLV claims that bars TIA claims); *In re Keck, Mahin & Cate*, 241 B.R. 583, 596 (Bankr. N. D. Ill. 1999) ($1 million self-insured retention was "paid" for purposes of an insurance policy when a claim was allowed and discharged under a bankruptcy plan).

## III.    THE BANKRUPTCY COURT'S DECISION IS CONSISTENT WITH THE SUPREME COURT DECISION IN *TRAVELERS*

AT&T grossly mischaracterizes the decisions below by contending that the Bankruptcy Court violated rules set forth in the *Travelers* decision.  AT&T Br. at 18-24.

In *Travelers*, a surety sought attorneys fees that were recoverable under the plain language of a contract.  The lower courts held that attorneys' fees should not be awarded for time spent litigating "bankruptcy" issues, based on policies set forth by the Ninth Circuit in its decision in *In re Fobian*, 951 F.2d 1149 (9th Cir. 1991).  *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 127 S. Ct. 1199, 1203 (2007).  The Supreme Court reversed.  The Supreme Court confirmed that state law contract rights are "subject to any qualifying or contrary provisions of the Bankruptcy Code."  *Id.* at 1204-05 (quoting *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000) (internal quotations omitted).  The Court noted, however, that the "Fobian rule" had no textual support in the Bankruptcy Code.  As a result, the attorneys' fee claims were not subject to any "contrary provisions" of the Bankruptcy Code, and disallowance could only occur if the claims were barred under state law.  *Travelers*, 127 S.Ct at 1204-07.

10

In this case, the Bankruptcy Court correctly held that the word "pay" should be interpreted in the context of the agreements in which it appears. Bankruptcy was one of the events – if not the main event – under which SLV would be payable, so the parties must have anticipated "payment" in the context of bankruptcy. This holding was based on ordinary rules of contract interpretation, and did not offend *Travelers*. *See* July 10 Tr. [D 18] at 12-13.

Similarly, the Bankruptcy Court did not offend *Travelers* when it recognized that Delta's SLV payment obligations had been discharged by the confirmed Plan. The Bankruptcy Code permits Delta to satisfy its payment obligations in the manner set forth in a confirmed plan of reorganization. In this respect the Bankruptcy Code takes priority over any contract terms that might require a different form of payment. *See* cases cited on page 9, above.

Although AT&T purports to find fault with the Bankruptcy Court's use of bankruptcy "policies" to override contract terms, what AT&T is really arguing is that its TIA claims should be considered as if there had never been a bankruptcy filing, and as if the Bankruptcy Code did not provide Delta with a discharge.[2] There is nothing in *Travelers* that supports this contention. The bankruptcy discharge is an incontrovertible fact, and the discharge of Delta's payment obligations constitutes a "payment" by Delta regardless of the court in which the issue arises. If, for example, an SLV claimant were to sue Delta in state court, contending that Delta had not "paid' the SLV claim, a state court would be required to give effect to Delta's bankruptcy

---

[2]    The cases cited by AT&T did not involve a payment that constitutes a discharge, and are inapposite. *See B. Lewis Productions, Inc. v. Angelou*, No. 06 Civ. 6390, 2007 WL 2295971 (S.D.N.Y. Aug. 10, 2007) (irrevocable advance paid prior to an agreement did not constitute a royalty paid after the execution of the agreement); *Scotto v. Brink's, Inc.*, 962 F.2d 225 (2d Cir. 1992) (employer not obligated to provide benefits during period where wages were earned but not paid, as contract required benefits only when wages were paid); *P.G. Lake, Inc. v. Comm'r*, 148 F.2d 898 (5th Cir. 1945) (taxpayer could not claim interest deduction where taxpayer accrued interest but did not transfer it to the lender); *Levine v. Ribicoff*, 201 F.Supp. 692 (S.D.N.Y. 1962) (social security claimant not eligible for benefits because she had not received wages for six calendar quarters, as required by law).

11

discharge in the same manner as it was given effect by the Bankruptcy Court. Similarly, if AT&T's TIA claims somehow were being addressed in state court, the arguments about the discharge of Delta's payment obligations would be the same.

In fact, it is AT&T who is trying to use bankruptcy as a way of *increasing* Delta's liabilities. Assume, for example, that the required SLV payment were $100, of which $25 represented the "tax" component. In bankruptcy a "claim" is not supposed to exceed the out-of-bankruptcy "right of payment." *See* 11 U.S.C. §§ 101(5), 502. Accordingly, the bankruptcy "claims" asserted by the Indenture Trustee and by AT&T against Delta should not exceed $100 – the amount of their collective "right to payment" outside of bankruptcy. AT&T's interpretation would mean that Delta's liability in bankruptcy would be greater than its out-of-bankruptcy liability, which is contrary to Section 101(5).

## IV.    THE BANKRUPTCY COURT'S DECISION IS CONSISTENT WITH THE TREATMENT OF GUARANTORS UNDER THE BANKRUPTCY CODE

AT&T also argues that the Bankruptcy Court's ruling would somehow disrupt the law of third party guarantees. AT&T Br. at 23-24. However, Section 524(e) of the Bankruptcy Code explicitly states that the discharge of a debtor does *not* discharge or affect the liability of a third party guarantor. *See* 11 U.S.C. § 524(e). There is nothing in the Bankruptcy Court's decision that would (or could) interfere with the operation of Section 524(e).

The decision in *Union Trust Co. of Rochester v. Willsea*, 9 N.E.2d 820 (N.Y. 1937), makes this clear. In *Union Trust*, a debtor in bankruptcy transferred stock in satisfaction of a debt. The stock did not have value equal to the full nominal amount of the debt. A guarantor argued that the discharge of the debtor constituted "payment" of the obligation and that the payment relieved the guarantor of his obligation. *Id.* at 820. The New York State Court of Appeals did not disagree that the debtor's discharge amounted to a payment. Nor did it dispute

12

the well-established rule that a discharge of a debtor normally discharges a guarantor. *Id.* However, the court rejected the guarantor's argument because the Bankruptcy Act specifically provided that the discharge of a debtor did not affect the liability of the guarantor. *Id.* at 821.

This appeal does not involve the liability of a third party guarantor. The TIAs make clear that Delta has no obligation thereunder if Delta has satisfied and discharged Delta's own payment obligations with respect to SLV, and Delta has done so.

## V.    AT&T'S ARGUMENT THAT SLV MUST BE PAID WITHOUT OFFSETS FOR OTHER DAMAGE RECOVERIES IS WITHOUT MERIT

AT&T has argued that Section 6(c) only applies if the "payment" that Delta is obligated to make equals the full amount of SLV in the tables attached to the underlying Leases, without any deductions for fair market values or for other recoveries. *See* AT&T Br. at 13-14. AT&T's argument is without merit for four reasons.

### A.    Applicable Law Treats Other Recoveries As Payments Of SLV

The Bankruptcy Court correctly held that other recoveries by the Indenture Trustee (whatever form they take) are "payments" of SLV in that they discharge all or a portion of Delta's obligations with respect to SLV. January 16 Decision at 19-20. In fact, it has long been settled that a lessor *must* treat the proceeds of re-leasing or of sale as credits against liquidated damages, because otherwise the liquidated damage provisions would operate as unenforceable penalties. *See Frank Nero Auto Lease, Inc. v. Townsend*, 411 N.E.2d 507, 510-11 (Ohio Ct. App. 1979) (failure to provide credit for proceeds from new lease rendered damage provision an unenforceable penalty); *Sw. Park Outpatient Surgery, Ltd. v. Chandler Leasing Div.,* 572 S.W.2d 53, 56-57 (Tex. Civ. App. 1978) (failure to provide a credit for proceeds of a sale or re-leasing would be an unenforceable penalty); *Siletz Trucking Co. v. Alaska Int'l Trading Co.*, 467 F.2d 961, 963 (9th Cir. 1972) (credit for proceeds, and discounting of future revenues to present value,

13

are necessary to prevent damage calculation from constituting an unenforceable penalty).  In this respect, the Leases and the SLV term sheets merely recognize offsets that the law requires.

Mr. Smolev, who acts as counsel to both AT&T and DFO, admitted that under the Leases "the lessor or the indenture trustee as its assignee sometimes receives SLV through a combination of payments by the lessee and recovery from other sources, such as the sale of the aircraft." *See* Nov. 6 Tr. at 4.  He also agreed with the Bankruptcy Court's suggestion "that SLV can be recovered by the indenture trustee from two sources, in effect: . . . the value of the aircraft, combined with a cash payment of SLV." *Id.* at 29-30.  The Bankruptcy Court correctly noted that it did not make sense to acknowledge that the Leases called for SLV to be "recovered" in these ways but to argue, at the same time, that SLV was not thereby being "paid." *Id.* at 30-31.

### B.    The Leases Treat FMV And Other Recoveries As "Payments" Of SLV

Furthermore, the Leases themselves equate the payment of "offsetted" amounts with the "actual payment" of SLV.  Section 15(c) of each Lease provides, for example, that the Lessor may demand payment of the following:

> . . .  any installment of Basic Rent with respect to the Aircraft . . . plus an amount equal to the excess, if any, of (i) the Stipulated Loss Value for the Aircraft computed as of the date specified in Exhibit C [hereto] . . . over (ii) the Fair Market Value for the Aircraft . . . together with interest, to the extent permitted by applicable law, at the Past Due Rate on the amount of such Stipulated Loss Value, from the date as of which such Stipulated Loss Value is computed to the date of actual payment of such amount;

Lease for N963DL (Mansour Aff. Ex. A ), § 15(c) (emphasis added); *see also id.* at § 15(d).

The interest calculations run from the date on which "such Stipulated Loss Value is computed" to the date of "actual payment" of "such amount."  However, the "amount" that is actually paid under these provisions is SLV *after* deductions for fair market value or sale proceeds.  These provisions therefore equate the payment of an "offsetted" amount with the "actual payment" of SLV.  In fact, if AT&T were correct – and if the payment of the "offsetted"

14

amount did not constitute a payment of SLV – then the interest computations could not be made, because there never would be an "actual payment" of SLV.

### C.    AT&T's Interpretation Would Deprive Section 6(c) Of The TIA Of Meaning And Would Render It A Nullity

Section 6(c) of each TIA provides that there is no TIA claim in any event where the Lessee is required to pay "Termination Value." *See* TIA for N963DL (Mansour Aff. Ex. D), § 6(c). There is only one situation in which "Termination Value" is paid under the Lease: namely, in the event of an optional termination due to the obsolescence of the Aircraft. *See e.g.* Lease for N963DL (Mansour Aff. Ex. A), § 9. Section 9 of the Lease provides that in that event the Aircraft should be sold, and the Lessee "<u>shall pay</u> to Lessor . . . <u>the amount</u>, if any, <u>by which the</u> <u>Termination Value</u> . . . <u>exceeds</u> the Net Sales Price" from the sale of the aircraft. *Id.* (emphasis added). Under AT&T's reasoning, a payment under Section 9 of the Lease would not trigger the exclusion of Section 6(c), because Section 9 requires the Lessee to pay only the excess of Termination Value over the sales price. Such an interpretation, however, would deprive Section 6(c) of any meaning insofar as it relates to Termination Value, because Section 9 of the Lease is the only circumstance under which the "Termination Value" concept is invoked.

The Lease similarly provides for offsets to the Lessee's obligations to pay SLV:

- If a default occurs, the Lessor may elect to recover the difference between SLV and the fair market value or actual sale proceeds. *See Id.* at § 15.

- If payments are received from governmental authorities, Section 10 of the Lease provides that such payments "shall be paid to Lessor in reduction of Lessee's obligation to pay such Stipulated Loss Value" or, "if Stipulated Loss Value [is] already paid by Lessee, shall . . . be applied to reimburse Lessee for its payment of such Stipulated Loss Value." *Id.* at § 10(c)(i).

- If an Event of Loss occurs, as noted above, insurance proceeds are applied "in reduction" of Lessee's obligation to pay SLV. *Id.* at § 11.

- If a Termination Event occurs, the Lessee must pay the "excess" of Termination Value over the sale proceeds. *Id.* at § 9.

If AT&T were correct – and if a deduction for other damage recoveries meant that the Lessee does not "pay" SLV or Termination Value – then Section 6(c) would be deprived of its meaning. No contract should be interpreted in a manner that renders any of its provisions meaningless. *See Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 472 N.E.2d 315, 318 (N.Y. 1984) (court must avoid an interpretation "that would leave contractual clauses meaningless"); *Corhill Corp. v. S.D. Plants, Inc.*, 176 N.E.2d 37, 38 (N.Y. 1961) (court should not adopt an interpretation which will leave a provision "without force and effect.").

### D.    AT&T's Interpretation Makes No Sense

Finally, AT&T's interpretation of the contracts simply makes no sense. Assume, for example, that an Indenture Trustee were to sell an aircraft for an amount that exceeds SLV. In that case, the Lessee would not owe any payment under the Leases, and AT&T would receive all payments in excess of the amounts of the outstanding debts, including payment of the portion of SLV that (according to AT&T) provides compensation for AT&T's tax losses. Under AT&T's interpretation of the contracts, however, AT&T could still assert a TIA claim, because SLV would have been recovered from sale proceeds and the Lessee would not have "paid" SLV. Contracts should not be interpreted in a manner that produces such absurd results. *Reape v. New York News, Inc.*, 504 N.Y.S.2d 469 (N.Y. App. Div. 1986) (rejecting interpretation of newspaper delivery commission that would have led to an absurd result).

16

VI.   **THE "NET SLV" CLAIMS CALCULATED UNDER THE RESTRUCTURING AGREEMENTS ARE CONSISTENT WITH THE LEASES AND WITH APPLICABLE LAW**

AT&T also argues that Delta's "net" payments of SLV under the relevant settlement term sheet are inconsistent with the Leases.  *See* AT&T Br. at 14.  This argument is incorrect.

The Leases require that SLV be adjusted to account for other recoveries obtained by the Lessor.  For example, Section 15(c) of the Lease provides that if a default occurs, the Lessor may seek (i) SLV, plus (ii) unpaid rent, minus (iii) the fair market value of the aircraft.  Section 15(d) and 15(e) of the Lease similarly provide that  sales proceeds must be deducted from SLV.

The calculations set forth in the relevant term sheet and Restructuring Agreements take the same approach: they take account of (1) SLV, (2) unpaid rents, and (3) the value of other recoveries that the lessor/indenture trustee will receive.  The "value" of those other recoveries is represented by the sum of (a) the present value of the rents that the Lessor will receive under a new lease, plus (b) the present value of the expected sale proceeds that the Lessor will receive at the end of the lease term.  The Indenture Trustees, who own the relevant claims, agree that these offsets are appropriate.  In fact, as noted above, applicable law requires that liquidated damages be offset by such recoveries.

AT&T argues that the offsets do not strictly fall under the specific categories enumerated in sub-paragraphs (a) through (e) of Section 15 of the Leases, because those sub-sections only refer to offsets for "fair market value" or "sales proceeds."  However, the sums calculated in accordance with the Bingham Term Sheet and the Restructuring Agreements *do* represent a computation of "fair market value," which consists of (a) the present value of the new lease payments, and (b) the present value of the future sale proceeds.

Furthermore, the remedies available to the Lessor are not limited to Sections 15(a) through 15(e).  Section 15(g) of each Lease states that the Lessor may "exercise any other right

17

or remedy which may be available under applicable law . . . ." *See e.g.* Lease for N963DL

(Mansour Aff. Ex. A ), § 15(g).  The last paragraph of Section 15 of each Lease also states:

> Except as otherwise expressly provided above, no remedy referred to in this Section 15 is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity.  The exercise or beginning of exercise by Lessor of any one or more of such remedies shall not preclude the simultaneous or later exercise by Lessor of any other remedies.

*Id.* at § 15.

Paragraphs 15(c) and 15(e) therefore are not exclusive remedies.  Instead, they just illustrate the types of offsets that are contemplated under the Lease with respect to payment of SLV, and that are required under applicable law.  The Bankruptcy Court correctly held that "the adjustments called for under the Modified Term Sheet are substantially the same if not identical to the adjustments provided for under the "Remedies" sections of the Lease respecting the payment of SLV."  January 16 Decision at 19.

AT&T argues that Section 15(c) of the Lease required the Indenture Trustees to collect SLV without offsets for fair market value, but that contention is simply wrong.  The Lease provides that if the Lessor cannot obtain "possession" of the Aircraft the Fair Market Value is deemed to be zero.  This provision addresses the narrow possibility that a Lessor might not be able to exert control over the underlying aircraft because, for example, the aircraft might have been moved to a foreign jurisdiction.  Fair Market Value is deemed to be "zero" in that limited circumstance because, if the Lessor has no access to the Aircraft, then it may not turn the hypothetical fair market value into a real recovery.  That is not the case here.

When a Lease Default occurs, the Indenture Trustee may elect the remedies that it chooses to pursue.  *See, e.g.,* Indenture for N963DL (Mansour Aff. Ex. C), § 7.02(a).  The Lease treats "possession" as something that occurs at the option of the party exercising remedies.  *See,*

18

*e.g.,* Lease for N963DL (Mansour Aff. Ex. A), § 15.  The Indenture Trustees have never denied

that they acquired "possession" within the meaning of the Leases, and they have never contended

that "zero" would be a proper "fair market value" offset.  The Indenture Trustees had full control

and legal possession of the Aircraft and the ability to realize the full market values thereof.

Finally, AT&T misleadingly contends that Delta "admitted" that its SLV calculations

with respect to AT&T's TIA claims were not consistent with the Lease and "could not prevent

AT&T's recovery under the TIAs if the matter were being heard in a state court."  AT&T Br. at

14-15.  The only "admission" made by Delta is that the *value* of the stock being distributed by

Delta to holders of allowed claims is not equal to the nominal amounts of the claims being

allowed.  *See* November 13 Tr. at 97-99.  Delta made clear to the Bankruptcy Court that (a) the

allowed SLV Claims were consistent with the Leases and with applicable law, (b) the recoveries

being recognized in the computation of the SLV Claims constituted "payments" of SLV under

the documents and under applicable law, and (c) Delta's allowance of the "net" SLV Claims, and

distributions thereon in accordance with the Plan, discharged all of Delta's payment obligations

and constituted full "payment" of SLV.  *See* Delta Reply [D 37] at 8-9, 13-15, 19-21; Delta

Response to Sur-Reply [D 42] at 8-9.

## VII.    THE BANKRUPTCY COURT PROPERLY EXCLUDED EXTRINSIC EVIDENCE

AT&T contends that the Bankruptcy Court erred by failing to admit extrinsic evidence.

AT&T Br. at 24-25.  However, AT&T argued below that Section 6(c) was unambiguous and

should be enforced according to the "plain reading of its language."  AT&T Response at 5.

Extrinsic evidence is not proper where the contracts are not ambiguous.  *See Schmidt v. Magnetic

Head Corp.*, 468 N.Y.S.2d 649, 654 (N.Y. App. Div. 1983); *see also 805 Third Avenue Co. v.

M.W. Realty Assocs.*, 448 N.E.2d 445, 447 (N.Y. 1983).

19

On appeal, AT&T cites several cases in which words with "seemingly obvious and indisputable meanings" were actually found to be ambiguous.  AT&T Br. at 24-25.  In those cases, however, the courts found that the contractual context of the words created the ambiguity.[3]  In this case, the contracts permit no reasonable interpretation of the word "pay" other than that adopted by the Bankruptcy Court.  January 16 Decision at 31-32.

AT&T also argues that the TIA is a "guaranty" that AT&T would receive compensation for its tax loss, no matter what happened.  AT&T Br. at 22-23.  However, that is not what Section 6(c) says.  By its terms, Section 6(c) bars a TIA claim if Delta has satisfied and discharged Delta's SLV obligations, regardless of whether AT&T receives anything.  Defaults (and foreclosures) can happen outside bankruptcy, too; it was entirely possible that (a) a non-bankruptcy default would occur, (b) AT&T would elect (as it did in this case) not to exercise its right to repay the debts, and (c) the lenders would foreclose on the pledged collateral and take ownership of the SLV claim.  If Delta thereafter paid SLV "in full and in cash" – in whatever amount is appropriate – AT&T's TIA claims plainly would be barred, even though AT&T would have received no portion of the SLV payment.  As the Bankruptcy Court held, the TIAs "prevent double payment by Delta," and AT&T's argument to the contrary "finds no support in, and is refuted by, the provisions themselves."  January 16 Decision at 23.

---

[3]  *See, e.g., Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co.*, 472 F.3d 33, 45 (2d Cir. 2006) (the word "contamination" was ambiguous where one interpretation could have negated the insurer's entire obligation); *Alexander & Alexander Servs., Inc. v. Lloyd's*, 136 F.3d 82, 87 (2d Cir. 1998) (party agreed that the word "client" could have multiple meanings); *Garza v. Marine Trans. Lines Inc.*, 861 F.2d 23, 28 (2d Cir. 1988) (the phrase "loss or damage" could have been interpreted differently based on the structure of the contract at issue); *Wards Co., Inc. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 121-22 (2d Cir. 1985) (location of the phrase "without consent of Lessor" meant that it could have modified two different phrases, which would have produced different results); *G. Golden Assocs. of Oceanside, Inc. v. Arnold Foods Co., Inc.*, 870 F.Supp. 472, 474, 479 (E.D.N.Y. 1994) ("products" could have had multiple meanings under the contract at issue).

Although AT&T contends on appeal that the contracts require consideration of industry customs, the Bankruptcy Court was correct in noting that "[d]espite pages of briefing and two affidavits, the owner participants have not identified a single word in TIA § 7(c) or 6(c) or elsewhere in the Operative Agreements which they claim has arcane or a specialized meaning generally recognized in the airline finance industry, nor have they suggested that there is any custom or practice in the industry which would give rise to any ambiguity in the contract language." *Id.* at 26.  AT&T's argument in the Bankruptcy Court was that the TIA should be interpreted as a "guaranty" that AT&T would receive the "tax component" of SLV – an argument that the Bankruptcy Court reviewed in detail and properly rejected.  *Id.* at 22-23.

Moreover, the affidavit filed by AT&T was not based on communications between the parties; instead, it represented nothing other than AT&T's arguments about its alleged subjective interpretations of the agreements, without even an allegation that AT&T's interpretations had ever been communicated to Delta.  AT&T Response at 6-7.  The Bankruptcy Court correctly held that this evidence would not have been proper, even if an ambiguity had existed.  Decision at 29-30; *see also Havel v. Kelsey-Hayes Co.*, 445 N.Y.S.2d 333, 335 (N.Y. App. Div. 1981) (an unexpressed subjective "intent" that was not communicated to the other party is not admissible as evidence); *Zion v. Kurtz*, 405 N.E.2d 681, 687 (N.Y. 1980) (same); *Kates v. Yeshiva University,* 227 N.Y.S.2d 718, 721 (N.Y. Sup. Ct. 1962) (same).

## VIII.  ALTERNATIVELY, THE ORDER SHOULD BE AFFIRMED BECAUSE THE LAW REQUIRES THE DISALLOWANCE OF DUPLICATIVE CLAIMS, REGARDLESS OF WHAT THE CONTRACTS SAY

The Bankruptcy Court correctly disallowed the TIA Claims based on the plain language of Section 6(c).  Alternatively, those claims should have been disallowed because they are already encompassed within the SLV Claims.

21

A claimant often may be entitled to recover for a single injury based on multiple legal theories; yet a loss provides a claimant with only one right of payment, no matter now many separate legal theories the claimant may invoke in support of that right of payment. *See, e.g.*, *Diversified Graphics, Ltd. v. Groves*, 868 F.2d 293, 295 (8th Cir. 1989) ("Regardless of whether the harm was the result of negligence or breach of fiduciary duty or a combination of both, there is only a single injury and there may only be a single recovery.") (citation omitted). This rule applies in bankruptcy cases as well. For bankruptcy purposes, a "claim" is a "right to payment." 11 U.S.C. § 101(5). The existence of multiple theories under which recovery may be sought from a debtor does not change the fact that a single loss gives rise to a single right to payment and therefore a single "claim" against the debtor. *See, e.g.*, *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 894 (Bankr. S.D.N.Y. 1993) ("multiple recoveries for an identical injury are generally disallowed.") (citation omitted).

In *Finley*, the debtor failed to make required pension plan contributions, resulting in an underfunding of its pension plan. *Id.* at 893. The pension plan trustee (the "Trustee") and the Pension Benefit Guaranty Corporation (the "PBGC") filed claims against the debtor on different legal theories. The Bankruptcy Court held that the two claims related to the same "loss" – the economic effect on the pension plan of the debtor's failure to make required payments – and that two claims could not be allowed for the same loss. *Id.* at 894.

Other cases have also reached the same conclusion. *See, e.g.*, *In re Simetco, Inc.*, No. 93-61772, 1996 WL 651001, at *3 (Bankr. N.D. Ohio Feb. 15, 1996) (disallowing claim to extent it related to the same loss covered by another claim); *In re Chateaugay Corp.*, 115 B.R. 760, 783-84 (Bankr. S.D.N.Y. 1990), *aff'd*, 130 B.R. 690 (S.D.N.Y. 1991), *vacated by agreement*, Nos. 89 Civ. 6012, 90 Civ. 6048, 1993 WL 388809 (S.D.N.Y. June 16, 1993) (holding claims for unpaid

contributions and claims for "plan insufficiency" were duplicative of each other); *In the Matter of Brinke Transp., Inc.*, No. 87-03785, 1989 WL 233147, at *3 (Bankr. D.N.J. Jan. 23, 1989) (striking claims subsumed in other claims). Just as in those cases, the SLV claims and TIA claims just represented two ways of recovering for one tax loss. AT&T assigned the SLV claims to the Indenture Trustees; their rights as secured lenders take priority, and AT&T cannot seek a duplicative TIA recovery for a tax loss claim that has already been allowed and compensated in the form of the SLV claims.

The Bankruptcy Court rejected this general argument and held that parties are free, in separate contracts, to provide for multiple recoveries for a single loss. January 16 Decision at 4; May 16 Decision at 6-8. The Bankruptcy Court's decision rested on three errors of law.

<u>First</u>, the Bankruptcy Court incorrectly decided that contract claims should be treated differently from other claims, because other claims involve a right to recover for an injury, while parties are free to contract to pay duplicative claims if they wish, regardless of the actual loss. *Id.* Outside of bankruptcy, however, contract claims must be based on actual losses. A contractual agreement to pay an amount, upon default, that is not based on the other party's actual loss is contrary to public policy and void as a penalty. *See, e.g.*, *In re T.R. Acquisition Corp.*, 309 B.R. 830, 837-38 (S.D.N.Y. 2003) (lease provision calling for double rent if tenant failed to vacate was disproportionate to damages suffered and an unenforceable penalty). If, as AT&T contends, the Leases and the TIAs required Delta to compensate for the same loss twice, the double payment would be an unenforceable penalty. *See also* 11 U.S.C. § 502(e) (barring creditor and guarantor from asserting duplicative claims against bankruptcy estate).

<u>Second</u>, the Bankruptcy Court erroneously believed that the contract obligations addressed different debts owed to different parties because amounts payable under the Leases are

23

received by the Indenture Trustee (as assignee) while amounts payable under the TIAs are received by AT&T.  *See id.; see also* May 16 Decision at 7-8.  However, the Indenture Trustees are assignees.  Delta entered into the Leases with the Owner Trusts;  the Indenture Trustees, as pledgees, merely stand in the shoes of the Owner Trustees to collect sums due under the Leases.

As described above, the Owner Trusts are "grantor trusts" that exist solely for the benefit of the Owner Participants.  For tax purposes, the Owner Trustee has no separate existence; the Owner Trustee and Owner Participant are the same entity.  That is the whole reasons why compensation for AT&T's potential tax losses is included in the SLV computations.

Third, the Bankruptcy Court did not take account of the multiple liability that would arise if more than one claim were allowed for a single loss.  As noted above, the claims asserted against a debtor in bankruptcy are not supposed to exceed the debtor's out-of-bankruptcy payment obligations.  *See* 11 U.S.C. § 101(5).  If both AT&T and the Indenture Trustees were permitted to seek compensation for the same tax loss suffered by AT&T, that would mean that Delta's bankruptcy liabilities would exceed its out-of-bankruptcy payment obligations.

To the extent that SLV Claims and TIA Claims (which are included in SLV Claims) are designed to provide compensation for the same loss incurred by the same party, they simply represent multiple legal theories upon which the same loss may be recovered.  For bankruptcy purposes, a single loss can give rise to only one "right to payment" and only one claim against the debtor, regardless of how many separate contractual theories of recovery may be asserted.

## **CONCLUSION**

For all of the foregoing reasons, and those stated in the Bankruptcy Court's rulings, Delta submits that the Order should be affirmed.[4]

Dated:  New York, New York
          March 31, 2008

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

/s/ Michael E. Wiles                        _____
Michael E. Wiles
919 Third Avenue
New York, New York 10022
Telephone:  (212) 909-6000
Facsimile:   (212) 909-6836
email: mewiles@debevoise.com
Attorneys for Appellee Delta Air Lines, Inc.

---

[4]    The Bankruptcy Court did not find it necessary to determine whether SLV Claims would have to be reduced if any TIA Claims were allowed.  *See* August 20 Hearing Tr. at 156-159. If for any reason the Order were to be reversed and any TIA Claims were to be allowed, the Bankruptcy Court would need to decide that issue.

# APPENDIX A

1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
2

3
                                      .  Case No. 05-17930 (ALG)
4     IN RE:                          .
                                      .  (Jointly Administered)
5     NORTHWEST AIRLINES              .
      CORPORATION, et al,             .  New York, New York
6                                     .  Friday, July 27, 2007
                                      .  3:31 p.m.
7                    Debtors.         .
      . . . . . . . . . . . . . . ..
8
        TRANSCRIPT OF COURT DECISION ON MOTION TO APPROVE STIPULATION
9                  REGARDING "GFCC AIRCRAFT CLAIMS"
                   BEFORE THE HONORABLE ALLAN L. GROPPER
10                     UNITED STATES BANKRUPTCY JUDGE

11    APPEARANCES:  (Via Telephone)

12    For the Debtors:              Mark C. Ellenberg, Esq.
                                    Douglas S. Mintz, Esq.
13                                  CADWALADER, WICKERSHAM
                                     & TAFT, LLP
14                                  1201 F Street N.W.
                                    Washington, D.C. 20004
15
      Counsel for General Foods
16    Corporation:                  David F. Abbott, Esq.
                                    Kenneth E. Noble, Esq.
17                                  David S. Curry, Esq.
                                    MAYER, BROWN, ROWE & MAW, LLP
18                                  1675 Broadway
                                    New York, New York 10019
19    (Appearances continued)

20    Audio Operator:               Electronically Recorded
                                    by Michelle Brown, ECRO
21
      Transcription Company:        Rand Transcript Service, Inc.
22                                  80 Broad Street, Fifth Floor
                                    New York, New York 10004
23                                  (212) 504-2919
                                    www.randtranscript.com
24
      Proceedings recorded by electronic sound recording, transcript
25    produced by transcription service.

```
 1   APPEARANCES:

 2   For the Post-Effective Date
     Creditors' Committee:          Lorenzo Marinuzzi, Esq.
 3                                  OTTERBOURG, STEINDLER, HOUSTON
                                     & ROSEN, P.C.
 4                                  230 Park Avenue
                                    New York, New York 10169
 5
     For the U.S. Bank National
 6   Association, as Trustee:       Jeanne P. Darcey, Esq.
                                    EDWARDS, ANGELL, PALMER
 7                                   & DODGE, LLP
                                    111 Huntington Avenue
 8                                  Boston, Massachusetts 02199

 9   For BAE Systems
     Funding, Ltd.:                 Ken Coleman, Esq.
10                                  ALLEN & OVERY, LLP
                                    1221 Avenue of the Americas
11                                  New York, New York 10020

12   For Lehman Brothers:           Shalom L. Kohn, Esq.
                                    SIDLEY AUSTIN, LLP
13                                  One South Dearborn
                                    Chicago, Illinois 60603
14
     For Philip Morris
15   Capital Corporation:           Douglas B. Levene, Esq.
                                    PHILIP MORRIS CAPITAL
16                                   CORPORATION
                                    225 High Ridge Road
17                                  Stamford, Connecticut 06905

18

19

20

21

22

23

24

25
```

1     (Proceedings commence at 3:31 p.m.)

2     (Conference call established.)

3          THE COURT:  Good afternoon.  This is Judge Gropper.

4  Who's on the line, please?  May I have appearances?  Let's

5  start with the debtors.

6     (Operator confers.)

7          MR. MINTZ:  Doug Mintz is on from Cadwalader.

8          MR. ELLENBERG:  Your Honor, this is Mark Ellenberg for

9  Cadwalader on the line, too.

10          THE COURT:  All right.  We have the debtors.

11          GFCC?

12          MR. ABBOTT:  Good afternoon, Your Honor.  This is

13  David Abbott from Mayer, Brown, Rowe & Maw, on behalf of GFCC.

14  I have in the room with me Ken Noble, also from Mayer Brown;

15  Dave Curry I believe will be joining us on the call, and Doug

16  Levene who's in-house counsel at GFCC.

17          MR. LEVENE:  Yes, Doug Levene here.

18          THE COURT:  All right.  Good afternoon.

19          MR. ABBOTT:  Good afternoon.

20          THE COURT:  Anyone for BAE?

21          MS. INGMAN:  This is Tania Ingman for BAE.  Ken

22  Coleman is expected to join, also.

23          THE COURT:  All right.  Anyone for the indenture

24  trustee?

25          MS. DARCEY:  Yes.  Good afternoon, Your Honor.  This

1    is Jeanne Darcey from Edwards, Angell, Palmer & Dodge for the

2    trustee.

3            THE COURT:  All right.  Any other counsel who wish to

4    note their appearances?

5            MR. MARINUZZI:  Good afternoon, Your Honor.  Lorenzo

6    Marinuzzi, Otterbourg, Steindler, Houston & Rosen, on behalf of

7    the Post-Effective Date Committee.

8            MR. KOHN:  And Shalom Kohn, Sidley Austin, on behalf

9    of Lehman Brothers, Your Honor.

10            THE COURT:  All right.  Anyone else?

11       (No verbal response.)

12            THE COURT:  Very good.  Well, thank you for joining us

13   this afternoon.  I have written out my decision, and I'll read

14   it into the record as perhaps the fastest way to proceed

15   forward.

16            Who just joined us?

17            MR. CURRY:  David Curry, Mayer Brown.

18            THE COURT:  All right.  Very good.  I've taken

19   appearances, and I have appearances from the principal parties,

20   or from all of the parties.

21            This is a motion by the reorganized debtors for

22   approval of a stipulation that fixes the claims filed by the

23   holders of the debt on ten aircraft that the debtors leased

24   under leveraged lease transactions.  The leases were rejected,

25   and the aircraft were sold at a foreclosure sale at the behest

1  of the lenders, who had a security interest in the aircraft, as

2  well as the leases.  There is no dispute that the sale of the

3  aircraft, together with the proofs of claim given to the

4  lenders hereby, under the stipulation, do not pay the debt in

5  full.

6         The stipulation is supported by U.S. Bank, National

7  Association, as indenture trustee for the holders of the

8  secured debt; by BAE Systems (Funding 1 (Limited) "BAE"), a

9  lender and now the owner of the aircraft by virtue of its

10 credit bid at the foreclosure sale; and by the Post-Effective

11 Date Committee of Creditors.

12        Five of the aircraft included in the original

13 stipulation were not objected to; it was agreed at oral

14 argument that the Court would enter a separate order approving

15 the stipulations with regard to those five aircraft, and that

16 has been done today.

17        Five of the aircraft were the subject of one objection

18 filed by the equity participant in the leveraged lease

19 transactions -- in effect, the beneficial owner through a

20 trustee of the five aircraft before the foreclosure -- General

21 Foods Credit Corporation ("GFCC").  GFCC objects primarily on

22 the ground that the claims provided to the debt impair its

23 rights under a tax indemnity agreement with the debtors that is

24 the subject of its separate proofs of claim filed in these

25 Chapter 11 cases.  The tax indemnity agreement ("TIA") was the

1   same for the five aircraft, and only one such agreement will be

2   dealt with in this decision.

3        The form of aircraft leveraged lease transaction that

4   is at issue herein was described in a recent opinion of Judge

5   Hardin of this Court In Re Delta Air Lines, Inc., 05-B-17923,

6   2007 WL 1462207 (Bankr. S.D.N.Y., May 16, 2007).

7        In light of the fact that that opinion comprehensively

8   analyzes the form of transaction involved, and since all

9   parties here endorse and rely on that opinion, the Court will

10  not repeat all of the background set forth therein.  Suffice it

11  to say that there, as here, the crux of the dispute arose out

12  of the fact that the operative documents gave a claim to the

13  debt for a stipulated loss value of the aircraft under certain

14  circumstances, such as a loss of the aircraft or certain events

15  of default, and stipulated loss value contains a component

16  measured by the tax losses of the equity.  There, as here, the

17  equity owner of the aircraft had a tax indemnity agreement with

18  the lessee airline, indemnifying it for tax losses under

19  certain circumstances.

20       Judge Hardin held that, under the terms of the

21  agreements at issue in Delta, the debt held the claim for the

22  tax loss component embedded in stipulated loss value; and,

23  under the terms the tax indemnity agreements at issue there,

24  the equity was not entitled to a claim under the tax indemnity

25  agreement.

1    In so holding, Judge Hardin rejected the debtors'

2    argument in _Delta_ that there could not be duplicative claims

3    for tax losses by the debt and by the equity; what he called a

4    "cosmic argument against overlapping claims."  The Court there

5    held that the rights of the parties could only be determined by

6    a careful examination of the agreements that they entered into.

7    No one in this case has relied on the so-called

8    "cosmic argument."  All agree that the dispute should be

9    resolved by careful examination of the applicable agreements.

10   We, accordingly, start with the same proposition that guided

11   the _Delta_ Court:  That the rights of the parties should be

12   determined by a painstaking analysis of the agreements at

13   issue.

14   We start that analysis with several uncontested

15   points.  As noted above, under certain circumstances, the

16   lessee (the airline) may be liable for the stipulated loss

17   value of the plane, an amount calculated by reference to the

18   cost of the aircraft multiplied by a factor set forth on a

19   schedule attached to the lease.  There is no dispute here that

20   stipulated loss value constitutes the basis for calculating the

21   claims that are fixed by the stipulation, and there is no

22   dispute that the claimants are entitled to a claim for at least

23   a portion of the stipulated loss value of the five aircraft.

24   It is also uncontested that stipulated loss value

25   ("SLV" hereafter) contains a component that includes the tax

1  losses that have been or will be suffered by the equity (GFCC)

2  as a result *inter alia* of the defaults under the lease and the

3  subsequent foreclosures.  The crux of the parties' dispute

4  relates to this component of SLV, the portion of stipulated

5  loss value represented by the tax losses, because in Judge

6  Hardin's words:

7          "A component of SLV is an amount designed to

8          compensate for the same tax consequences triggered by

9          an early termination of the leases as that covered by

10         the TIAs."

11         GFCC claims that it, rather than the debt, is entitled

12  to a claim for the tax component of SLV, based on the

13  documents, and that is the crux of its objection.  It starts

14  with the argument that the definition of "stipulated loss

15  value" in the leases, which defines SLV by reference to the

16  cost of the aircraft multiplied by a percentage listed on the

17  applicable exhibit, and then contains an adjustment providing

18  *inter alia* that SLV shall be the amount so determined:

19         "-- as may be adjusted from time to time, as provided

20         in ... Section 7 of the tax indemnity agreement."

21         Section 7 of the tax indemnity agreement -- or TIA --

22  provides for an adjustment to SLV under certain circumstances.

23  It reads as follows:

24         "If any amount is required to be paid by lessee under

25         Section 4 hereof, owner-participant will compute the

1    stipulated loss value percentages and termination

2    value percentages and special purchase price with

3    respect to the aircraft, to reflect such payment in

4    accordance with the manner in which such values were

5    originally computed, or adjusted pursuant to Section 3

6    of the lease, by owner-participant, and shall certify

7    to lessee either that such values as set forth in the

8    lease do not require change or, as the case may be,

9    the new values necessary to reflect the foregoing

10    recomputation, describing in reasonable detail the

11    basis for computing such new values, and upon such

12    certification, such new values shall be substituted

13    for the values appearing in the lease."

14    GFCC's argument in substance is that an amount is

15    "required to be paid" to it under the TIA, that SLV payable

16    under the leases must be adjusted, and the claim provided to

17    the debt is overstated by the unadjusted tax component thereof.

18    The debtors' principal response is that no amount in

19    respect to the tax component is required to be paid to GFCC

20    under the TIA by virtue of an exclusion therein.  That

21    exclusion appears in Section 5 of the TIA, providing that:

22    "Notwithstanding anything to the contrary in this

23    agreement, lessee shall not be required to indemnify

24    owner-participant with respect to a loss or foreign

25    tax credit loss to the extent such loss or foreign tax

1        credit loss occurs as a direct result of one or more

2        of the following events ..."

3    There follow certain events.  The debtors rely in the

4 event in Section 5(c), which is:

5        "Any event as a result of which lessee or any other

6        person has paid stipulated loss value or termination

7        value, or paid the amount required to be the greater

8        of the fair market value of the aircraft and

9        stipulated loss value or termination value in

10        accordance with the provisions of the operative

11        documents, except to the extent that such payment does

12        not reflect the timing of the occurrence for federal

13        income tax purposes;"

14    As all parties agreed at oral argument, the meaning of

15 this section is critical to the resolution of the instant

16 dispute.  GFCC also agreed that the TIA must be read as a

17 whole.  Therefore, if Section 5(c) relieves the debtor from an

18 obligation to indemnify GFCC as owner-participant, then no

19 amount is required to be paid to it in respect of the tax

20 component of the SLV in Section 7 is not applicable.

21    The debtors argue that Section 5(c) governs because

22 the "event" has taken place, as a direct result of which the

23 debtors will have paid stipulated loss value; that is, the

24 debtors' bankruptcy filing and default under the lease.

25    GFCC responds with two points:

1      First, GFCC points to the word "paid" in Section 5(c)

2  and contrasts it to the clause "required to be paid" in Section

3  7, and it contends while Section 5(c) requires actual payment,

4  Section 7 only mandates "required to be paid."  It argues, in

5  effect, that it is "required to be paid" under the TIA because,

6  as of today, the debt has not been "paid."

7      Notwithstanding the difference in wording, Section 5

8  generally applies "notwithstanding anything to the contrary" in

9  the TIA, indicating that Section 5 events must be considered

10  when determining the applicability of Section 7.  The operative

11  event for purposes of Section 5 and Section 5(c), the

12  bankruptcy and default, has already taken place, and SLV will

13  have been paid once the stipulation is approved and payment is

14  made on the relevant proofs of claim.

15      Moreover, the proposition that Section 7 trumps

16  Section 5(c), and that the language in Section 7, "required to

17  be paid," means that an obligation to make a Section 5(c)

18  payment could never be made without first making a required

19  payment under Section 7 stretches the language "required to be

20  paid" beyond the breaking point.  Section 7 does not, for

21  example, provide for an adjustment of SLV when an amount shall

22  first become payable or contain any similar language.  An

23  amount is not "required to be paid" for purposes of Section 7

24  if it is not payable under the TIA, read as a whole, and that

25  includes Section 5(c), which, as noted, applies

1    "notwithstanding anything to the contrary in the agreement."

2           Moreover, it would lead to a result that is at odds

3    with the basic structure of the transaction.  Under the

4    operative documents, stipulated loss value, including the tax

5    component, is part of a package of security assigned to the

6    indenture trustee for the benefit of the debt.  One of the

7    operative documents, the trust indenture and security

8    agreement, contains a waterfall directing payments in respect

9    of the collateral after an event of default.  As should not be

10   surprising, in light of the fact that debt usually comes before

11   equity, the waterfall contains provisions for payments to the

12   debt before payments to the equity.  Payments to the owner-

13   trustee for any tax, expenses, or other losses come forth in

14   line after payment to the debt holders to make them whole.

15   There is no dispute that the claims granted to the debt

16   pursuant to the stipulation, together with the fair market

17   value of the aircraft as per the foreclosure sale, will not

18   make the debt whole.  It cannot be assumed that an amount to be

19   paid to the debt should be reduced on account of a claim by

20   equity, and an intention to do so would have to be clearly

21   expressed in the applicable contracts.

22          GFCC responds that the security granted to the

23   indenture trustee does not include:

24          "All payments required to be made under the tax

25          indemnity agreement by lessee, and all payments of

1   supplemental rent by lessee in respect of any amounts

2   payable under the tax indemnity agreement."

3  See Page 6 of the trustee indenture and security

4 agreement.

5  But this exclusion is only applicable for payments

6 required to be made or amounts payable under the TIA.  As

7 stated earlier, amounts are not payable or required to be paid

8 under the TIA if they are within the exclusion in Section 5(c).

9  GFCC's further argument is that Section 5(c) does not

10 apply because, even after allowance and payment of the proofs

11 of claim, the debt will not have been "paid" SLV because it

12 will not have been paid in full, in cash.

13  Judge Hardin rejected a similar contention in

14 connection with the <u>Delta</u> case.  Although the documents that

15 Judge Hardin dealt with were slightly different from those

16 before this Court, his alternative holding in connection with

17 what he called the "second Delta objection" was that the word

18 "pays" does not mean "paid in cash."  The term instead, in the

19 words of the <u>Delta</u> Court:

20   "-- must be construed in such a manner as to comport

21   with the meaning of payment in the context of

22   bankruptcy, which the parties expressly contemplated

23   in the TIA, as well as in the other agreements.  There

24   is rarely likely to be full payment of claims in

25   bankruptcy; and, in the ordinary course of any Chapter

1        11 case, payment of claims under a plan may be in cash

2        or equity or debt securities of the debtor, or a

3        combination of cash and securities."

4        Judge Hardin went on to contrast the language of the

5    TIA in <u>Delta</u> to the requirement in the lease there that lease

6    payments be made in U.S. Dollars, and he noted that the TIA

7    there could have required payment in cash, but it did not.

8        The TIA here does not require payment in cash.  GFCC

9    attempts to bolster its "paid in full, in cash argument" by

10   reference to a clause in Section 5(c) of the TIA in this case

11   that provides that payment must be made "in accordance with the

12   provisions of the operative documents ..."

13       At the outset, it is not clear that this clause

14   modifies the word "paid."  There is a comma in Section 5(c)

15   setting off the words "paid stipulated loss value or

16   termination value," from the remainder of the section.  The

17   plainest reading of the section is to give effect to the comma

18   and conclude that the words "in accordance with the provisions

19   of the operative documents" do not modify the term "SLV."  See

20   generally <u>In Re Ron Pair Enterprises</u>, 489 U.S. 235, 242 (1989).

21       Beyond this, GFCC's construction misconstrues the

22   words "in accordance with the provisions of the operative

23   documents."  The term "operative documents" is defined in

24   Section 1(j) of the TIA by reference to the definition in the

25   lease, and the lease defines "operative documents" as including

1   at least fifteen separate documents; including the lease, the

2   TIA, and the trust indenture and security agreement.  These

3   documents relied, among many other things, for events of

4   default, foreclosure, and remedies and rights on the part of

5   the debt and the owner-participant.  The operative documents do

6   not require payment in all cases in cash, in full, and the

7   words "in accordance with the provisions of the operative

8   documents" cannot be limited to this meaning.

9           The proofs of claim that have been accorded to BAE and

10  the indenture trustee are "in accordance with the provisions of

11  the operative documents."  The Court, thus, concludes that

12  based on the plain meaning of the parties' agreements, GFCC's

13  objections to the stipulation relating to the remaining five

14  aircraft must be overruled.

15          GFCC further objects to some of the language of the

16  stipulation, and it has suggested some further language.  It

17  objects to Paragraph 2, which provides as follows:

18          "The aggregate amount of the allowed claims was

19          calculated by reference to the stipulated loss value

20          ("SLV") in accordance with each pre-petition lease.

21          Allowance of the allowed claims plus the fair market

22          value with respect to each relevant aircraft

23          constitutes full payment and discharge of stipulated

24          loss value with respect to each pre-petition lease as

25          required pursuant to the relevant pre-petition leases

1       and the other operative documents."

2       The Court finds that this paragraph, settling any

3  possible claims against the debtors from the debt, is

4  consistent with its ruling as set forth above, that SLV does

5  not have to be reduced by virtue of the provisions of Section 7

6  of the TIA and the applicable definition of "SLV" in the lease.

7       GFCC also seeks to add a paragraph that the

8  stipulation shall have no effect whatsoever, whether legal or

9  factual, on GFCC's claims under the TIA; and that all of GFCC's

10  rights and claims against the indenture trustee, BAE, and the

11  other parties to the operative documents and their successors

12  and assignees are fully preserved.  This contention requires

13  consideration of the procedural posture of this matter, and

14  also of the scope of the stipulation.

15       As to the procedural posture, GFCC has filed proofs of

16  claim based on its construction of the TIA, and the debtors

17  have not yet objected to the claim, and their time to do so has

18  not yet elapsed.  It is not appropriate for the debtors to

19  contend that a decision on this motion will invalidate GFCC's

20  proofs of claim.  There may be elements to its claim that do

21  not include those tax losses that are a component of SLV, and

22  thus included in the claims being allowed hereby to others.

23       In any event, while the decision today may be highly

24  persuasive in the future, the Court cannot deal directly with

25  GFCC's proof of claim, and the parties are free to argue as to

1    the effect of this decision on such proof or proofs of claim.

2    The debtors say that they do not want any risk of duplicative

3    liability, but they move for court approval of the stipulation

4    before dealing with the GFCC proofs of claim.  Moreover, the

5    TIA ultimately requires in Section 5(c) that a claim be "paid."

6    Thus, the stipulation should be approved as written with

7    respect to the debtors.

8         With respect to the third parties and GFCC's alleged

9    possible claims against BAE, the indenture trustee, and others,

10   GFCC argues that the Court does not have jurisdiction to bar

11   such claims.  There is nothing in the stipulation that purports

12   to bar any claims or constitute an injunction; and, in view

13   thereof, the provision suggested by GFCC is unnecessary, as

14   well as inappropriate, especially if there were some

15   implication that GFCC might have a claim against any other

16   party to these proceedings for amounts received under the

17   stipulation with the debtors.  The Court cannot conceive on

18   what legal theory there might be such a claim, but will leave

19   the issue to another Court to deal with at another time, if

20   necessary.

21        In sum, the Court will so order the proposed

22   stipulation with regard to the remaining five aircraft, and the

23   debtors should submit an appropriate stipulation for signing.

24        I thank all of the parties for excellent argument and

25   briefs, and I think that concludes the proceedings this

1  afternoon.  Thank you very much.

2         COUNSEL:  Thank you for your time.  Thank you.

3         THE COURT:  Good afternoon.

4         COUNSEL:  Thank you.

5         THE COURT:  All right.

6      (Court and court personnel confer.)

7      (Proceedings concluded at 4:02 p.m.)

8                        CERTIFICATION

9         I certify that the foregoing is a correct transcript

10 from the electronic sound recording of the proceedings in the

11 above-entitled matter to the best of my knowledge and ability.

12

13

14
   _____     July 28, 2007
15 Coleen Rand, AAERT Cert. No. 341
   Certified Court Transcriptionist
16 Rand Transcript Service, Inc.

17

18

19

20

21

22

23

24

25