**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------ x

| | |
|---|---|
| In re: | : Appeal from: |
| | : Chapter 11 Case No. 05-17923 (ASH) |
| **DELTA AIR LINES, INC., et al.,** | : |
| | : |
| Debtors. | : |
| | : |
| | : |

------------------------------------------------------ x
| | |
|---|---|
| | : |
| **AT&T CREDIT HOLDINGS, INC.,** | : Case No. 08-CV-2411 (DLC) |
| | : (ECF Case) |
| Appellant, | : |
| | : |
| v. | : |
| | : |
| **DELTA AIR LINES, INC., and** | : |
| **THE POST-EFFECTIVE DATE** | : |
| **COMMITTEE OF DELTA AIR** | : |
| **LINES, INC.,** | : |
| | : |
| Appellees. | : |

------------------------------------------------------ x

### BRIEF ON APPEAL OF SLV CLAIMANT THE BANK OF NEW YORK, AS INDENTURE TRUSTEE, IN RESPONSE TO APPELLANT'S OPENING BRIEF

Mark M. Elliott
Michael J. Reilly
Joshua Dorchak
**BINGHAM MCCUTCHEN LLP**
399 Park Avenue
New York, New York  10022
(212) 705-7000

Attorneys for The Bank of New York,
as Indenture Trustee

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

COUNTERSTATEMENT OF ISSUES PRESENTED ........................................................2

STATEMENT OF THE CASE ...............................................................................................2

STATEMENT OF FACTS.........................................................................................................4

    The Leveraged Lease Transactions ...............................................................................4

    The IT's Collateral.............................................................................................................4

    The IT's Control of Remedies .......................................................................................5

    Priority of SLV Claims Over TIA Claims...................................................................6

    The SLV Claims ................................................................................................................6

ARGUMENT................................................................................................................................7

I.    THE BANKRUPTCY COURT CORRECTLY HELD THAT THE TIA CLAIMS
    ARE EXPRESSLY BARRED BY THE TIAS ...................................................................7

    A.    The SLV Claims Are in Fact Claims for SLV in Accordance with the
        Leases. ......................................................................................................................8

    B.    By Allowing, Distributing on, and Fully Discharging the SLV Claim,
        Delta Pays SLV. .....................................................................................................12

II.    THE ORDER MUST BE AFFIRMED WITH RESPECT TO THE SLV CLAIMS .......15

CONCLUSION ...........................................................................................................................16

i

## TABLE OF AUTHORITIES

### CASES

*425 Fifth Ave. Realty Assocs. v. Yeshiva Univ.*, 643 N.Y.S.2d 542
(1st Dep't 1996)..............................................................................................12

*B. Lewis Prods., Inc. v. Angelou*, No. 06 Civ 6390 (DLC), 2007 WL
2295971 (S.D.N.Y. Aug. 10, 2007) ..............................................................13

*In re Delta Air Lines, Inc.*, 381 B.R. 57 (Bankr. S.D.N.Y. 2008) ......................2

*In re Keck, Mahin & Cate*, 241 B.R. 583 (Bankr. N.D. Ill. 1999) ..............13, 14

*In re Northwest Airlines Corp.*, Case No. 05-17930 (ALG)
(Bankr. S.D.N.Y. July 27, 2007) ...................................................................3

*Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000)........................................15

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*,
-- U.S. --, 127 S. Ct. 1199 (2007) .........................................................14, 15

*Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*,
482 N.Y.S.2d 465 (N.Y. 1984)...................................................................10

### STATUTES

11 U.S.C. § 524(a) ...................................................................................13, 15

11 U.S.C. § 1123(a)(5)(J) .........................................................................13, 15

11 U.S.C. § 1141(d) .................................................................................13, 15

### OTHER

Ian Shrank & Arnold G. Gough, Jr., eds., Equipment Leasing - Leveraged
Leasing (4th ed., Supp. Feb. 2007) ..................................................*passim*

ii

The Bank of New York, not in its individual capacity, but solely as Indenture Trustee (in such capacity, "BNY"), through its undersigned counsel, respectfully submits this brief in response to the Appellant's Opening Brief on Appeal ("Appellant's Brief") filed by Appellant AT&T Credit Holdings, Inc. ("AT&T") in support of its appeal (the "Appeal") from the Bankruptcy Court's Order with Respect to TIA/SLV Objection 5I, dated February 7, 2008 (the "Order") [D-3].[1]

## PRELIMINARY STATEMENT

BNY holds claims (the "SLV Claims") for stipulated loss value ("SLV") under the leases (the "Leases") for six of the aircraft at issue in the Appeal (N131DN, N178DN, N962DL, N963DL, N964DL and N965DL) (collectively, the "Aircraft"). In the Order, the Bankruptcy Court overruled Delta Air Lines, Inc.'s ("Delta's") objection to the SLV Claims. AT&T does not seek in the Appeal to disturb the Order with respect to the SLV Claims; nor did Delta appeal or cross-appeal from the Order with respect to the SLV Claims.

BNY respectfully submits this limited response to AT&T's Appellant's Brief to set forth certain facts pertinent to the rights of BNY and to address certain key issues in the Appeal. Specifically -- and contrary to AT&T's contentions in the Appeal -- the Bankruptcy Court correctly held that AT&T's claims (the "TIA Claims") are barred by the plain terms of the applicable tax indemnity agreements (the "TIAs"), because, among other things:

A.    The SLV Claims are in fact claims for "SLV," as that term is used in the Leases; and

B.    Delta "pays" SLV by discharging the SLV Claims through the allowance and distribution process set forth in Delta's confirmed reorganization plan.

For these reasons, among others, the Order should be affirmed in all respects.

---

[1]    "D-__" and "CD-__" refer to items in AT&T's Designation of Record on Appeal and Delta's Counter-Designation, respectively.

BNY reserves its right to respond further in the event any party to the Appeal seeks to disturb the Bankruptcy Court's rulings with respect to the SLV Claims.

## COUNTERSTATEMENT OF ISSUES PRESENTED

Whether the Bankruptcy Court correctly held that the TIA Claims are barred based on the plain terms of the TIA Exclusion Provision (as defined below).

## STATEMENT OF THE CASE

To date, four "TIA/SLV Objections" have been decided in Delta's chapter 11 proceedings. Although the language of the exclusion provision of the TIAs at issue differs to some degree as among the four TIA/SLV Objections, Delta makes the same essential assertion: that there is an "overlap" between the TIA claims and SLV claims concerning certain aircraft, to the extent that a portion of each SLV claim may have been intended, like the corresponding TIA, to compensate the Owner Participant ("OP") for the recapture of certain tax benefits. In each of the TIA/SLV Objections, Delta requests, based on an alleged general principle of law and/or based on the terms of the applicable contracts, that the TIA claims be disallowed or, in the alternative, that the SLV Claims be reduced to the extent of the "overlap." For each of the TIA/SLV Objections, the Bankruptcy Court (Hardin, B.J.), based on the plain terms of the TIAs, (a) sustained the objection as to the TIA claims, and disallowed and expunged them, and (b) overruled the objection as to the SLV claims.

The Appeal concerns TIA/SLV Objection 5I, which was decided along with TIA/SLV Objection 3 in Judge Hardin's Decision with Respect to TIA/SLV Objections 3 and 5I (the "Decision"). D-2 (published as *In re Delta Air Lines, Inc.,* 381 B.R. 57 (Bankr. S.D.N.Y. 2008)). The Decision cross-references and further develops the reasoning underlying Judge Hardin's earlier Decision with Respect to TIA/SLV Objections 1 and 2, issued on May 16, 2007, as supplemented on reconsideration (the "First TIA/SLV Decision"). *See* D-11, D-18, D-23, D-40.

In the Decision, Judge Hardin correctly held that:

- Delta's "cosmic argument" -- namely, that the TIA Claims and the SLV Claims reflect a single claim for a single loss and so cannot both be allowed to the extent they "overlap," irrespective of the parties' contracts -- is "factually and legally wrong." D-11 (First TIA/SLV Decision) at 6-8 (cited generally in D-2 at 4).

- An unambiguous exclusion provision in the TIAs expressly bars the TIA Claims, because an "event" occurred "whereby Delta "pays an amount equal to [SLV]" under the Leases. D-2 at 10, 18-19; *see* D-11 (First TIA/SLV Decision) at 8-10, 12.

- The SLV Claims reflect "the amount of SLV required to be paid by Delta," including certain offsets that "are quite consistent with the payment of SLV contemplated under Section 15 of the Lease." D-2 at 19-21; *see, e.g.,* D-23 (8/20/07 Hr'g Tr.) at 64.

- Delta pays SLV by discharging the SLV Claims through allowance and distribution pursuant to Delta's reorganization plan. D-2 at 19; *see id.* at 11-14; D-11 (First TIA/SLV Decision) at 14; D-23 (8/20/07 Hr'g Tr.) at 64.

- "[T]here is no colorable contractual or cosmic argument for the proposition that [an SLV claimant] should be compelled to relinquish either to Delta or the owner participant all or any part of its contractual entitlement to the entirety of SLV as security for the loan." D-2 at 5; *see id.* at 17; D-11 (First TIA/SLV Decision) at 11.

In the interim between the First TIA/SLV Decision and the Decision, the former was cited with approval by Judge Gropper of the Bankruptcy Court in the Northwest Airlines chapter 11 proceedings, in a decision approving settlement of certain SLV claims in full, based in part on a TIA exclusion provision like those at issue in the TIA/SLV Objections. *See* Transcript of Court Decision on Motion to Approve Stipulation Regarding "GFCC Aircraft Claims," at 13-14, *In re Northwest Airlines Corp.,* Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. July 27, 2007) (the "Northwest Decision") (unpublished; attached as Appendix 1 hereto).

AT&T appealed from the Order, as it concerns the TIA Claims. Delta did not appeal or cross-appeal from the Order.

## STATEMENT OF FACTS

**The Leveraged Lease Transactions**

The First TIA/SLV Decision provides a summary of the leveraged lease transactions at issue in the Appeal. D-11 at 3-4 (cited generally at D-2 at 3). BNY notes here only those aspects of the transactions that are of particular importance with respect to the Appeal and the SLV Claims.[2]

**The IT's Collateral**

As is common in leveraged lease transactions, the Owner Trustee ("OT") granted the Indenture Trustee ("IT") a security interest in and lien upon certain assets (the "Collateral") under the Trust Indenture and Security Agreement (the "Indenture"), to secure the principal, interest, premiums and related fees and charges (collectively the "Debt") owed by the OT to the IT for the benefit of the Lenders. *See generally* 1 Equipment Leasing - Leveraged Leasing, Ian Shrank & Arnold G. Gough, Jr., eds. (4th ed., Supp. Feb. 2007) ("Shrank") at § 8:5.2 at 8-30. The Collateral includes, among other things, the Aircraft and the "Lease and all Rent thereunder, including, without limitation, all amounts of Basic Rent and Supplemental Rent, and payments of any kind thereunder." D-33, Ex. C (Indenture) at 3 (Granting Clause § 2), Art. 1 at 8-9 ("Indenture Estate"). Supplemental Rent expressly includes SLV. D-33, Ex. A (Lease) § 1 at 11.

Thus, the Indenture expressly provides that SLV is pledged to the IT in its entirety, without exception, as part of the Collateral, until such time as the Debt is paid in full. D-33, Ex. C (Indenture) at 3 (Granting Clause § 2), Art. 1 at 7-8 (SLV is not among "Excepted Payments" excluded from Collateral). By contrast, the Lessee's separate indemnification of the OP's tax

---

[2]    The Lease, Indenture, TIA, and Participation Agreement (the "Operative Documents") cited herein concern N131DN. The Operative Documents concerning the other Aircraft are substantially the same.

losses under the TIA is excluded from the Collateral. D-33, Ex. C (Indenture), Art. 1 at 7-8 ("Excepted Payments"); *see* 1 Shrank § 8:5.2 at 8-30.

SLV is a form of liquidated damages, which is pre-calculated (as a percentage of the cost of the Aircraft) for every month throughout the term of the Leases, as set forth in Exhibit C to the Leases. D-33, Ex. A (Lease), Ex. C. The Leases require the Lessee to pay SLV in certain defined circumstances, such as an Event of Default or the destruction of the Aircraft. Importantly, however, in every instance where the Leases require payment of "SLV," SLV is subject to certain reductions or offsets (e.g., for the sale value of the aircraft) designed to ensure that SLV does not exceed the Lessor's actual loss. *See, e.g.,* D-33, Ex. A (Lease) § 15(d) at 52-53.

**The IT's Control of Remedies**

Delta's bankruptcy filing and discontinuance of rent payments as scheduled constituted "Events of Default" under the Lease, D-33, Ex. A (Lease) §§ 14(a), 14(f) at 48-50, and under the Indenture, D-33, Ex. C (Indenture) § 7.01(a) at 43-44.

Where there is an Event of Default under the Lease and the Indenture, the IT has the right to control the exercise of remedies under the Lease and the order in which those remedies are exercised, to the exclusion of the OT. D-33, Ex. C (Indenture) §§ 7.02 at 46-48, 7.05 at 54; *see* 1 Shrank § 8:6.7 at 8-49; *see also* D-33, Ex. A (Lease) § 15 at 51-54 (Remedies). For example, the IT may demand outstanding rent plus SLV, and upon payment of SLV may proceed to sell the Aircraft and pay over the proceeds to Delta. D-33, Ex. A (Lease) § 15(e) at 53-54. Moreover, where there is an Event of Default under the Indenture, the IT has the right to exercise the remedies of a secured party against the OT, including without limitation the right to foreclose on the lien against the Collateral and repossess the Aircraft. D-33, Ex. C (Indenture) § 7.03 at 48-52; *see* 1 Shrank § 8:7.1 at 8-51.

Where there is an Event of Default under the Lease and the Indenture, any payments -- including SLV -- received from the Lessee by the IT must be distributed by the IT pursuant to a strict system of priority (the "Waterfall"). D-33, Ex. C (Indenture) § 5.03 at 36-38; *see* 1 Shrank § 8:7.1 at 8-51. First, the proceeds are applied to the IT's costs. D-33, Ex. C (Indenture) § 5.03 at 36-38. Second, the proceeds are applied to the Debt, until all principal, interest, and premiums are "pa[id]...in full." *Id.* Third -- and only if the Debt is first paid in full -- "the balance, if any, of such payments . . ." is distributed to the OT for the benefit of the OP. *Id.* Thus, where the Lessee makes a payment of SLV in an amount less than or equal to the Debt, the OT is entitled by contract to nothing. *See id.* Conversely, where the Lessee makes a payment of SLV in an amount greater than the Debt, the excess is forwarded to the OT for the benefit of the OP. *See id.* However, where the IT has foreclosed upon the Collateral pursuant to the Indenture -- as occurred here -- the OT loses any right to any of the Collateral, including recovery of any portion of SLV through the Waterfall or otherwise. *See* D-33, Ex. C (Indenture) § 7.02 at 46-47.

**Priority of SLV Claims Over TIA Claims**

In contrast to an SLV claim, a TIA claim does not accrue immediately upon an Event of Default under the Lease. D-33, Ex. A (Lease) § 14 at 48-50; *cf.* D-33, Ex. D (TIA) § 5(a) at 7-8. Rather, the TIA claim accrues when the OP incurs a recapture of tax benefits, which occurs only after the IT forecloses upon the aircraft, which in turn necessarily occurs after an Event of Default under the Leases. Ex. D (TIA) § 5(a) at 7-8; *see* Appellant's Brief at 3-4. Thus, in a lease default scenario, a TIA claim can never accrue before an SLV claim.

**The SLV Claims**

The SLV Claims were evidenced by a proof of claim (no. 5335) filed by BNY as IT based on a certain Court-approved Term Sheet and a Letter Agreement, both entered into by Delta and BNY. D-33, Ex. E (Term Sheet) at 2-3, Ex. F (Letter Agreement), Ex. G (proof of

claim no. 5335); D-4 (Order approving Term Sheet). These SLV Claims were calculated in such a manner as to most accurately approximate the actual loss, as follows: SLV, *plus* outstanding rent, *less* a credit for the present value of future rent payments and the residual value of the Aircraft at the expiration of the Lease. D-33, Ex. E at 2-3.

Delta has allowed that portion of each of the SLV Claims that indisputably is not subject to any alleged overlap with a TIA Claim concerning the same Aircraft. As a result of the Decision and the Orders, which were not appealed with respect to the SLV Claims, the SLV Claims should now be allowed in full.

## ARGUMENT

Each of the relevant TIAs expressly and unambiguously denies AT&T any TIA Claim as a result of "any event whereby [Delta] pays an amount equal to [SLV]." The Bankruptcy Court correctly found that "[o]n the face of it, this provision bars the owner participant's TIA claim . . .," because the SLV Claims and the TIA Claims arise from the same "event": Delta's default under the Lease. D-2 at 18-19.

Contrary to AT&T's arguments, Delta is in fact paying SLV, because (i) the SLV Claims are in fact claims for SLV in accordance with the Leases, and (ii) Delta fully discharges its obligation to pay SLV by allowing and distributing on the SLV Claims. The Decision is entirely consistent with the unambiguous contracts, the facts, and the applicable law. Accordingly, the Order should be affirmed in all respects.

## I.    THE BANKRUPTCY COURT CORRECTLY HELD THAT THE TIA CLAIMS ARE EXPRESSLY BARRED BY THE TIAS.

The TIA expressly provides:

> Notwithstanding any provision to the contrary contained in Section 4 hereof, the Owner Participant shall **not** be entitled to any payment under Section 5 hereof in respect of any Loss or any

Foreign Tax Credit Loss arising as a result of one or more of the following **events**:

***

(c) **Any event whereby the Lessee pays an amount equal to [SLV]** . . . .

D-33, Ex. D (TIA) § 6 at 12-13 (emphasis added) (the "TIA Exclusion Provision").[3]  The

Bankruptcy Court correctly held: "On the face of it, this provision bars the owner participant's

TIA claim . . . ." D-2 at 18.

BNY wishes to address two of AT&T's principal arguments against the application of the

TIA Exclusion Provision:  (1) Delta purportedly is not really paying SLV because the SLV

Claims as calculated include certain offsets (even though such offsets are provided for in the

Leases); and (2) Delta allegedly will not "pay" SLV, even though Delta is allowing and

distributing on the SLV Claims, thereby fully discharging those claims.  These arguments

contradict the Operative Documents and applicable law.

A.    <u>**The SLV Claims Are in Fact Claims for SLV in Accordance with the Leases.**</u>

AT&T attempts to elude the TIA Exclusion Provision by arguing that Delta is not in fact

paying SLV because Delta is paying something other than the SLV amount that appears in

Exhibit C to the Leases.  In fact, however, the Leases expressly mandate that SLV is to be

reduced by offsets.  This of course must be the case.  SLV is a form of liquidated damages

designed to fully compensate the Lessor for a breach of the Lease.  In the event the Lessor

recoups value from the Aircraft, in the form of, e.g., the Aircraft's fair market value or sale

value, or insurance proceeds in the event of an accident, these recoupments must be taken into

account in calculating the amount of SLV to which the Lessor is entitled.  Therefore, Judge

---

[3]    The provision contains an exception, "except to the extent that the calculation of [SLV] does not accurately reflect the timing of any such event for Federal income tax purposes," but neither AT&T nor any party in interest has argued that this exception applies to the SLV Claims asserted herein.

Hardin correctly rejected AT&T's argument, holding that the offsets within the SLV Claims based on the Term Sheet are "substantially the same if not identical to" the offsets to SLV provided in the Remedies section of the Leases. D-2 at 19. As Judge Hardin reasoned in the First TIA/SLV Decision, "the concept of stipulated loss value is to make the indenture trustee for the lenders whole with regard to the amount of the loan, basically, and that requires a netting of the calculation that's called for against the sale value or fair market value of the aircraft." D-23 (8/20/07 Hr'g Tr.) at 60 (cited generally in D-2 at 18). Thus, Judge Hardin correctly concluded that "the indenture trustees' claims are based upon the entirety of SLV as calculated under the Lease (net of payment credits under the [Term Sheet] which are entirely consistent with Section 15 of the Lease) . . . ."). D-2 (Decision) at 16.

In fact, every single clause of the Leases that requires payment of SLV contemplates a payment of SLV that accounts for offsets, as follows:

- § 10(c)(i) at 41: SLV, *less* payments from governmental authorities;

- § 11(a) at 45: SLV, *less* insurance proceeds;

- § 15(c) at 52: SLV, *plus* back rent, *less* fair market value of Aircraft;

- § 15(d) at 52-53: SLV, *plus* back rent, *less* sale value of Aircraft; and

- § 15(e) at 53-54: SLV, with *refund* of proceeds of sale of Aircraft.

D-33, Ex. A (Lease); *see* D-23 (8/20/08 Hr'g Tr.) at 64; *see also* D-2 at 18-22.

Because the Leases invariably provide that SLV is to be paid net of offsets, any argument that Delta's payment of a net SLV amount does not satisfy the TIA Exclusion Provision would render that provision "a meaningless sham," because on this theory, Delta would <u>never</u> be "required to pay SLV." D-2 at 20; *see* D-40 (11/6/07 Hr'g Tr.) at 66-67. In so holding, Judge Hardin followed black letter New York law that requires contract terms to be interpreted "so as

to give full effect to all provisions of the agreement." *See id.* (citing *Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.,* 482 N.Y.S.2d 465, 468 (N.Y. 1984)).

AT&T argues that the Term Sheet and Restructuring Agreements were "not authorized by the Leases." *See* Appellant's Br. at 5. This is plainly incorrect. The Remedies section of the Leases expressly provides that the Lessor may "exercise any other right or remedy which may be available under applicable law . . . ." D-33, Ex. A (Lease) § 15(g) at 54. The last paragraph of the Remedies section reaffirms this, providing that the express remedies in the Lease "each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity . . . ." *Id.* § 15 at 54; *cf.* D-33, Ex. C (Indenture) § 7.03(b) at 49 (permitting IT to re-lease Aircraft after foreclosure).

AT&T then argues that the SLV Claims are not really claims for SLV, because the SLV Claims include an offset for the fair market value of the Aircraft ("FMV"). This is also incorrect. As Judge Hardin correctly found, "[t]he rent payments under the restructured lease plus the residual value of the Aircraft are, by agreement of the parties [in the Term Sheet], the analog to the fair market value for the Aircraft referred to in Section 15(c) of the Lease and the sale proceeds of the Aircraft referred to in Section 15(d) of the Lease." D-2 at 20; *see* D-23 (8/20/07 Hr'g Tr.) at 64 (TIA Exclusion Provision applies because Term Sheet "fundamentally provides for the payment of [SLV] with the offsets that are not materially different from the offsets that are provided under every provision, every subdivision . . . of Section 15 of the lease, that provides for [SLV] under those circumstances").

AT&T further argues that here, under section 5(b)(ii) of the Leases, the proper FMV credit is "zero," because the Lessor did not physically repossess the Aircraft. AT&T's interpretation of 5(b)(ii) and 15(c) is incorrect. The purpose of section 5(b)(ii) is plainly to

protect the Lessor. *See* D-33, Ex. A (Lease) § 5(b)(ii) at 17-18. If the value of the Aircraft to the Lessor is zero, FMV is zero. Thus, FMV is only zero in the unique situation where the Lessor demands possession of the Aircraft but is unable to "obtain" such possession, because in that scenario the Lessor would be unable to recover any value from the Aircraft.

It is uncontested that nothing of the kind occurred here. Under the arrangement reflected in the Term Sheet and approved by Judge Hardin, the Lessor indisputably will recoup value -- indeed, fair market value -- from the Aircraft, in the form of future rent payments and the residual value of the Aircraft upon the termination of the restructured leases. *See* D-33, Ex. E (Term Sheet) at 2-3 and Annex C (representative SLV Claim calculation). AT&T does not and cannot argue that the fair market value of the Aircraft to the Lessor was actually zero.

AT&T's argument also flies in the face of common business sense. BNY, exercising its rights as lienholder on the Lessor's interest in the Lease, made the business decision to re-lease the Aircraft to Delta without physically repossessing them -- with the goal of maximizing the return on BNY's interest in the Aircraft (in the form of future rent) and avoiding repossession, which could have disrupted Delta's service to its customers, seriously harmed Delta and jeopardized BNY's recovery. The implication of AT&T's argument is that an offset for FMV would only be warranted if BNY instead took the purposeless and harmful step of physically repossessing the Aircraft before re-leasing them.

And, of course, BNY never contended that FMV should be zero, even though that contention would have benefited BNY. BNY never took such a position, because it would have been absurd to claim in the circumstances that they were not in fact recouping FMV from these Aircraft. In light of the Lease terms and common sense, BNY also did not contest that such FMV should be figured into the calculation of SLV.

Judge Hardin correctly held that the calculation of the SLV Claims is "quite consistent with the payment of SLV contemplated under Section 15 of the Lease." D-2 at 20; *see* D-23 (8/20/07 Hr'g Tr.) at 58-59, 64; D-40 (11/6/07 Hr'g Tr.) at 66-67.

### B. By Allowing, Distributing on, and Fully Discharging the SLV Claim, Delta Pays SLV.

AT&T also argues that the TIA Exclusion Provision does not apply because Delta will not "pay" SLV in cash and in full. Judge Hardin correctly rejected this argument, which contradicts the contracts and the context.

"The contract does *not* say paid 'in full in cash,' and the Court is not free to change the contract by inserting those words." D-2 at 11 (emphasis in original); *see, e.g., 425 Fifth Ave. Realty Assocs. v. Yeshiva Univ.*, 643 N.Y.S.2d 542, 543 (1st Dep't 1996). Thus, the question is limited to whether Delta is "paying" the SLV Claims. Judge Hardin correctly answered that question in the affirmative, holding that Delta's obligation to "pay" SLV must be construed within "the context of [Delta's] bankruptcy." D-2 at 13-14, 22-24; *see* D-11 at 14. This is not, as AT&T would have it, "overrid[ing]" the terms of the TIAs: rather, this is enforcing the terms of the TIAs based on the facts -- specifically, the fact that Delta is in bankruptcy. *See id.; see also* Northwest Decision at 13-14 (App. 1 hereto) (applying similar reasoning).

The Operative Documents expressly contemplate a Delta bankruptcy, and it is beyond question that the parties and their counsel were aware that an insolvent bankruptcy debtor cannot and must not pay its general unsecured claims in full.[4] *See* D-2 at 13-14. Thus, as Judge Hardin reasoned, neither the Leases nor the TIAs can "rationally be construed as expecting the airline to

---

[4]    The leading treatise on leveraged leases opens its chapter entitled "Equipment Leasing and the Bankruptcy Code" as follows: "Bankruptcy is the acid test for the parties' business transaction and for the lawyers' documentation of the transaction. Many negotiated agreements or carefully drafted clauses in standard form may be held temporarily in abeyance or permanently modified in a bankruptcy case." 1 Shrank § 7:1 at 7-3.

make [SLV] payments in full in cash . . . ." D-2 (Decision) at 14. Accordingly, Judge Hardin correctly enforced the TIA Exclusion Provision in the only manner that is consistent with the plain meaning of the term "pay" and the parties' expectations. *See id.*[5]

As Judge Hardin explained in detail, quoting ten separate dictionaries, the consistent and essential meaning of the word "pay" (or "payment") is to provide something of value that is sufficient to discharge an obligation. D-2 at 11-13. This definition applies both in and outside bankruptcy. While the obligation to "pay" can be discharged by giving the face amount of a debt in cash, that is not the only way to "pay" -- and "payment" cannot be effected by that means in the context of Delta's bankruptcy, where Delta is barred by the Bankruptcy Code and its Reorganization Plan from paying SLV in cash and in full. In the context of Delta's bankruptcy, "payment" is -- and can only be -- effected by providing value sufficient to discharge Delta's obligations through the allowance and distribution process. *See, e.g.,* 11 U.S.C. § 524(a) (injunction against pursuing claims), § 1123(a)(5)(J) (debtor may issue stock "in exchange for claims"), § 1141(d) (discharge of debts).[6]

Based on the same reasoning, the Northern District of Illinois Bankruptcy Court has held that discharge of a claim in bankruptcy is "payment" of such claim as it may impact third parties as well as the direct obligee. *See In re Keck, Mahin & Cate,* 241 B.R. 583, 596 (Bankr. N.D. Ill. 1999). In *Keck*, the debtor's insurer had a contractual obligation to pay claims under the policy only after the debtor "paid" its self-insured retention ("SIR") of $1 million. 241 B.R. at 595-96. Under the debtor's proposed reorganization plan, the debtor allowed the applicable creditors

---

[5]    Nothing in the TIAs at issue here indicates that they are a "guarantee" of AT&T's "tax treatment" or AT&T's receipt of sufficient funds through the Waterfall. *See* D-2 at 10-11; *cf.* Appellant's Br. at 22-23.

[6]    The *Angelou* decision cited by AT&T does not involve bankruptcy and holds only that "paid" is not equivalent to "earned." *See* Appellant's Br. at 17 (citing *B. Lewis Prods., Inc. v. Angelou,* 2007 WL 2295971 (S.D.N.Y.)). The decision does not speak at all to the issue of what it means to "pay," whether in or outside of bankruptcy.

unsecured claims in the amount of $1 million for the SIR portion of their recovery. *Id.* at 596. Advancing an argument conceptually similar to AT&T's argument in the Appeal, the debtor's insurer asserted that it should not have any obligation to pay claims, because the debtor would not actually "pay" $1 million against its SIR obligations. *Id.* The Court rejected the insurer's argument, holding that the debtor would in fact "pay" its SIR under the plan, as follows:

> The SIRs are to be satisfied in exactly the same way as every other unsecured claim against the Debtor. ... An obligation to pay is satisfied when something of value is given and accepted in full discharge of that obligation. *See Black's Law Dictionary* 1150 (7th ed. 1999). That is what the Plan provides.

*Id.* This logic applies with equal force to Delta's payment of SLV by allowance and distribution on the SLV Claims. *See* D-2 at 13 ("Where A's debt obligation to B has been fully discharged as a matter of fact and law, it is unavailing to argue that A has not "paid" B because B did not derive enough money from the payment to pay C."); *see also* D-11 at 11; Northwest Decision at 13-14 (Judge Gropper cites with approval Judge Hardin's holding that in the bankruptcy context "pay" means discharge of claims pursuant to a chapter 11 plan) (App. 1 hereto).

Thus, all three of the Bankruptcy Judges who have addressed this question (to BNY's knowledge) concluded that a bankruptcy debtor's contractual obligation is "paid" with respect to the obligee and with respect to any third party whose rights or obligations are contingent upon such payment when the debtor allows and distributes on such claim and such claim is discharged under the Bankruptcy Code.

AT&T is incorrect when it contends that Judge Hardin "imposed [his] version of a special 'bankruptcy' rule of contract interpretation" upon the TIAs, purportedly contrary to the mandate of *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.,* -- U.S. --, 127 S. Ct. 1199, 1204-05 (2007) and other Supreme Court decisions that provide that state law generally governs contract interpretation in bankruptcy. As shown above, Judge Hardin gave

the word "pay" its well accepted meaning in or outside bankruptcy -- to give something of value that discharges one's obligations. *See* D-2 at 11-14. He therefore did not interpret the clause at issue differently than it would be interpreted outside bankruptcy. In any event, Judge Hardin rightly gave the word "pay" its only appropriate application in bankruptcy. *See* D-2 at 13-14, 23-24. This was not inconsistent with *Travelers*; rather, it was mandated by *Travelers*. Thus, *Travelers* teaches that a creditor's contractual rights against a bankruptcy debtor are "subject to any qualifying . . . provision of the Bankruptcy Code." 127 S. Ct. at 1204-05 (quoting *Raleigh v. Ill. Dep't of Revenue,* 530 U.S. 15, 20 (2000)). The application of 11 U.S.C. § 524(a) (injunction against pursuing claims), § 1123(a)(5)(J) (debtor may issue stock "in exchange for claims") and § 1141(d) (discharge of debts) -- all unquestionably "provision[s] of the Bankruptcy Code" -- most certainly "qualif[ies]" a potential creditor's right, if any, to receive payment of 100 cents on the dollar in cash. *See* D-2 at 14-15, 23-24. Therefore, Judge Hardin's holding is not only consistent with the well accepted definition of "pay," it is also consistent with *Travelers* and similar Supreme Court jurisprudence.

## II.     THE ORDER MUST BE AFFIRMED WITH RESPECT TO THE SLV CLAIMS.

AT&T did not appeal the Order to the extent it overrules Delta's limited objection to the SLV Claims, and AT&T does not argue that the SLV Claims can or should be reduced as a result of its alleged TIA Claims. Delta did not cross-appeal on this (or any) point with respect to TIA/SLV Objection 5I. Accordingly, the Order must stand with respect to the SLV Claims. In the event any party should argue in this proceeding that the SLV Claims should be reduced for any reason, BNY reserves its right to address such arguments.

## CONCLUSION

For the foregoing reasons, BNY respectfully requests that the Order be affirmed in all

respects.

Dated: New York, New York
April 1, 2008

**BINGHAM MCCUTCHEN LLP**

By:  /s/  Mark M. Elliott
     Mark M. Elliott
     Michael J. Reilly
     Joshua Dorchak
     399 Park Avenue
     New York, New York  10022
     (212) 705-7000
     mark.elliott@bingham.com
     michael.reilly@bingham.com
     joshua.dorchak@bingham.com

     Attorneys for The Bank of New York,
     as Indenture Trustee

A/72488079.1

**APPENDIX 1**

1                      UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK

2

3
                              .  Case No. 05-17930 (ALG)
4 IN RE:                         .
                            .  (Jointly Administered)
5 NORTHWEST AIRLINES          .
   CORPORATION, et al,        .  New York, New York
6                             .  Friday, July 27, 2007
                            .  3:31 p.m.
7                 Debtors.     .
   . . . . . . . . . . . . . . . .

8
     TRANSCRIPT OF COURT DECISION ON MOTION TO APPROVE STIPULATION
9                REGARDING "GFCC AIRCRAFT CLAIMS"
          BEFORE THE HONORABLE ALLAN L. GROPPER
10             UNITED STATES BANKRUPTCY JUDGE

11 APPEARANCES:  (Via Telephone)

12 For the Debtors:              Mark C. Ellenberg, Esq.
                            Douglas S. Mintz, Esq.
13                            CADWALADER, WICKERSHAM
                            & TAFT, LLP
14                             1201 F Street N.W.
                            Washington, D.C. 20004
15
   Counsel for General Foods
16 Corporation:                   David F. Abbott, Esq.
                            Kenneth E. Noble, Esq.
17                             David S. Curry, Esq.
                            MAYER, BROWN, ROWE & MAW, LLP
18                             1675 Broadway
                            New York, New York 10019
19 (Appearances continued)

20 Audio Operator:             Electronically Recorded
                            by Michelle Brown, ECRO
21
   Transcription Company:     Rand Transcript Service, Inc.
22                             80 Broad Street, Fifth Floor
                            New York, New York 10004
23                             (212) 504-2919
                            www.randtranscript.com
24
   Proceedings recorded by electronic sound recording, transcript
25 produced by transcription service.

1    APPEARANCES:

2    For the Post-Effective Date
     Creditors' Committee:            Lorenzo Marinuzzi, Esq.
3                                     OTTERBOURG, STEINDLER, HOUSTON
                                        & ROSEN, P.C.
4                                     230 Park Avenue
                                      New York, New York 10169
5
     For the U.S. Bank National
6    Association, as Trustee:         Jeanne P. Darcey, Esq.
                                      EDWARDS, ANGELL, PALMER
7                                       & DODGE, LLP
                                      111 Huntington Avenue
8                                     Boston, Massachusetts 02199

9    For BAE Systems
     Funding, Ltd.:                   Ken Coleman, Esq.
10                                    ALLEN & OVERY, LLP
                                      1221 Avenue of the Americas
11                                    New York, New York 10020

12   For Lehman Brothers:             Shalom L. Kohn, Esq.
                                      SIDLEY AUSTIN, LLP
13                                    One South Dearborn
                                      Chicago, Illinois 60603
14
     For Philip Morris
15   Capital Corporation:             Douglas B. Levene, Esq.
                                      PHILIP MORRIS CAPITAL
16                                      CORPORATION
                                      225 High Ridge Road
17                                    Stamford, Connecticut 06905

18

19

20

21

22

23

24

25

3

1     (Proceedings commence at 3:31 p.m.)

2     (Conference call established.)

3          THE COURT:  Good afternoon.  This is Judge Gropper.

4    Who's on the line, please?  May I have appearances?  Let's

5    start with the debtors.

6     (Operator confers.)

7          MR. MINTZ:  Doug Mintz is on from Cadwalader.

8          MR. ELLENBERG:  Your Honor, this is Mark Ellenberg for

9    Cadwalader on the line, too.

10          THE COURT:  All right.  We have the debtors.

11          GFCC?

12          MR. ABBOTT:  Good afternoon, Your Honor.  This is

13   David Abbott from Mayer, Brown, Rowe & Maw, on behalf of GFCC.

14   I have in the room with me Ken Noble, also from Mayer Brown;

15   Dave Curry I believe will be joining us on the call, and Doug

16   Levene who's in-house counsel at GFCC.

17          MR. LEVENE:  Yes, Doug Levene here.

18          THE COURT:  All right.  Good afternoon.

19          MR. ABBOTT:  Good afternoon.

20          THE COURT:  Anyone for BAE?

21          MS. INGMAN:  This is Tania Ingman for BAE.  Ken

22   Coleman is expected to join, also.

23          THE COURT:  All right.  Anyone for the indenture

24   trustee?

25          MS. DARCEY:  Yes.  Good afternoon, Your Honor.  This

4

1   is Jeanne Darcey from Edwards, Angell, Palmer & Dodge for the

2   trustee.

3           THE COURT:  All right.  Any other counsel who wish to

4   note their appearances?

5           MR. MARINUZZI:  Good afternoon, Your Honor.  Lorenzo

6   Marinuzzi, Otterbourg, Steindler, Houston & Rosen, on behalf of

7   the Post-Effective Date Committee.

8           MR. KOHN:  And Shalom Kohn, Sidley Austin, on behalf

9   of Lehman Brothers, Your Honor.

10          THE COURT:  All right.  Anyone else?

11     (No verbal response.)

12          THE COURT:  Very good.  Well, thank you for joining us

13  this afternoon.  I have written out my decision, and I'll read

14  it into the record as perhaps the fastest way to proceed

15  forward.

16          Who just joined us?

17          MR. CURRY:  David Curry, Mayer Brown.

18          THE COURT:  All right.  Very good.  I've taken

19  appearances, and I have appearances from the principal parties,

20  or from all of the parties.

21          This is a motion by the reorganized debtors for

22  approval of a stipulation that fixes the claims filed by the

23  holders of the debt on ten aircraft that the debtors leased

24  under leveraged lease transactions.  The leases were rejected,

25  and the aircraft were sold at a foreclosure sale at the behest

i

5

1    of the lenders, who had a security interest in the aircraft, as

2    well as the leases.  There is no dispute that the sale of the

3    aircraft, together with the proofs of claim given to the

4    lenders hereby, under the stipulation, do not pay the debt in

5    full.

6            The stipulation is supported by U.S. Bank, National

7    Association, as indenture trustee for the holders of the

8    secured debt; by BAE Systems (Funding 1 (Limited) "BAE"), a

9    lender and now the owner of the aircraft by virtue of its

10   credit bid at the foreclosure sale; and by the Post-Effective

11   Date Committee of Creditors.

12           Five of the aircraft included in the original

13   stipulation were not objected to; it was agreed at oral

14   argument that the Court would enter a separate order approving

15   the stipulations with regard to those five aircraft, and that

16   has been done today.

17           Five of the aircraft were the subject of one objection

18   filed by the equity participant in the leveraged lease

19   transactions -- in effect, the beneficial owner through a

20   trustee of the five aircraft before the foreclosure -- General

21   Foods Credit Corporation ("GFCC").  GFCC objects primarily on

22   the ground that the claims provided to the debt impair its

23   rights under a tax indemnity agreement with the debtors that is

24   the subject of its separate proofs of claim filed in these

25   Chapter 11 cases.  The tax indemnity agreement ("TIA") was the

1  same for the five aircraft, and only one such agreement will be

2  dealt with in this decision.

3       The form of aircraft leveraged lease transaction that

4  is at issue herein was described in a recent opinion of Judge

5  Hardin of this Court In Re Delta Air Lines, Inc., 05-B-17923,

6  2007 WL 1462207 (Bankr. S.D.N.Y., May 16, 2007).

7       In light of the fact that that opinion comprehensively

8  analyzes the form of transaction involved, and since all

9  parties here endorse and rely on that opinion, the Court will

10  not repeat all of the background set forth therein.  Suffice it

11  to say that there, as here, the crux of the dispute arose out

12  of the fact that the operative documents gave a claim to the

13  debt for a stipulated loss value of the aircraft under certain

14  circumstances, such as a loss of the aircraft or certain events

15  of default, and stipulated loss value contains a component

16  measured by the tax losses of the equity.  There, as here, the

17  equity owner of the aircraft had a tax indemnity agreement with

18  the lessee airline, indemnifying it for tax losses under

19  certain circumstances.

20       Judge Hardin held that, under the terms of the

21  agreements at issue in Delta, the debt held the claim for the

22  tax loss component embedded in stipulated loss value; and,

23  under the terms of the tax indemnity agreements at issue there,

24  the equity was not entitled to a claim under the tax indemnity

25  agreement.

7

1    In so holding, Judge Hardin rejected the debtors'

2  argument in Delta that there could not be duplicative claims

3  for tax losses by the debt and by the equity; what he called a

4  "cosmic argument against overlapping claims."  The Court there

5  held that the rights of the parties could only be determined by

6  a careful examination of the agreements that they entered into.

7    No one in this case has relied on the so-called

8  "cosmic argument."  All agree that the dispute should be

9  resolved by careful examination of the applicable agreements.

10  We, accordingly, start with the same proposition that guided

11  the Delta Court:  That the rights of the parties should be

12  determined by a painstaking analysis of the agreements at

13  issue.

14    We start that analysis with several uncontested

15  points.  As noted above, under certain circumstances, the

16  lessee (the airline) may be liable for the stipulated loss

17  value of the plane, an amount calculated by reference to the

18  cost of the aircraft multiplied by a factor set forth on a

19  schedule attached to the lease.  There is no dispute here that

20  stipulated loss value constitutes the basis for calculating the

21  claims that are fixed by the stipulation, and there is no

22  dispute that the claimants are entitled to a claim for at least

23  a portion of the stipulated loss value of the five aircraft.

24    It is also uncontested that stipulated loss value

25  ("SLV" hereafter) contains a component that includes the tax

8

1  losses that have been or will be suffered by the equity (GFCC)

2  as a result *inter alia* of the defaults under the lease and the

3  subsequent foreclosures.  The crux of the parties' dispute

4  relates to this component of SLV, the portion of stipulated

5  loss value represented by the tax losses, because in Judge

6  Hardin's words:

7          "A component of SLV is an amount designed to

8          compensate for the same tax consequences triggered by

9          an early termination of the leases as that covered by

10         the TIAs."

11         GFCC claims that it, rather than the debt, is entitled

12  to a claim for the tax component of SLV, based on the

13  documents, and that is the crux of its objection.  It starts

14  with the argument that the definition of "stipulated loss

15  value" in the leases, which defines SLV by reference to the

16  cost of the aircraft multiplied by a percentage listed on the

17  applicable exhibit, and then contains an adjustment providing

18  *inter alia* that SLV shall be the amount so determined:

19         "-- as may be adjusted from time to time, as provided

20         in ... Section 7 of the tax indemnity agreement."

21         Section 7 of the tax indemnity agreement -- or TIA --

22  provides for an adjustment to SLV under certain circumstances.

23  It reads as follows:

24         "If any amount is required to be paid by lessee under

25         Section 4 hereof, owner-participant will compute the

9

1        stipulated loss value percentages and termination

2        value percentages and special purchase price with

3        respect to the aircraft, to reflect such payment in

4        accordance with the manner in which such values were

5        originally computed, or adjusted pursuant to Section 3

6        of the lease, by owner-participant, and shall certify

7        to lessee either that such values as set forth in the

8        lease do not require change or, as the case may be,

9        the new values necessary to reflect the foregoing

10       recomputation, describing in reasonable detail the

11       basis for computing such new values, and upon such

12       certification, such new values shall be substituted

13       for the values appearing in the lease."

14       GFCC's argument in substance is that an amount is

15 "required to be paid" to it under the TIA, that SLV payable

16 under the leases must be adjusted, and the claim provided to

17 the debt is overstated by the unadjusted tax component thereof.

18       The debtors' principal response is that no amount in

19 respect to the tax component is required to be paid to GFCC

20 under the TIA by virtue of an exclusion therein.  That

21 exclusion appears in Section 5 of the TIA, providing that:

22       "Notwithstanding anything to the contrary in this

23       agreement, lessee shall not be required to indemnify

24       owner-participant with respect to a loss or foreign

25       tax credit loss to the extent such loss or foreign tax

10

1   credit loss occurs as a direct result of one or more

2   of the following events ..."

3       There follow certain events.  The debtors rely in the

4   event in Section 5(c), which is:

5       "Any event as a result of which lessee or any other

6       person has paid stipulated loss value or termination

7       value, or paid the amount required to be the greater

8       of the fair market value of the aircraft and

9       stipulated loss value or termination value in

10      accordance with the provisions of the operative

11      documents, except to the extent that such payment does

12      not reflect the timing of the occurrence for federal

13      income tax purposes;"

14      As all parties agreed at oral argument, the meaning of

15  this section is critical to the resolution of the instant

16  dispute.  GFCC also agreed that the TIA must be read as a

17  whole.  Therefore, if Section 5(c) relieves the debtor from an

18  obligation to indemnify GFCC as owner-participant, then no

19  amount is required to be paid to it in respect of the tax

20  component of the SLV in Section 7 is not applicable.

21      The debtors argue that Section 5(c) governs because

22  the "event" has taken place, as a direct result of which the

23  debtors will have paid stipulated loss value; that is, the

24  debtors' bankruptcy filing and default under the lease.

25      GFCC responds with two points:

11

1    First, GFCC points to the word "paid" in Section 5(c)

2  and contrasts it to the clause "required to be paid" in Section

3  7, and it contends while Section 5(c) requires actual payment,

4  Section 7 only mandates "required to be paid." It argues, in

5  effect, that it is "required to be paid" under the TIA because,

6  as of today, the debt has not been "paid."

7    Notwithstanding the difference in wording, Section 5

8  generally applies "notwithstanding anything to the contrary" in

9  the TIA, indicating that Section 5 events must be considered

10  when determining the applicability of Section 7. The operative

11  event for purposes of Section 5 and Section 5(c), the

12  bankruptcy and default, has already taken place, and SLV will

13  have been paid once the stipulation is approved and payment is

14  made on the relevant proofs of claim.

15    Moreover, the proposition that Section 7 trumps

16  Section 5(c), and that the language in Section 7, "required to

17  be paid," means that an obligation to make a Section 5(c)

18  payment could never be made without first making a required

19  payment under Section 7 stretches the language "required to be

20  paid" beyond the breaking point. Section 7 does not, for

21  example, provide for an adjustment of SLV when an amount shall

22  first become payable or contain any similar language. An

23  amount is not "required to be paid" for purposes of Section 7

24  if it is not payable under the TIA, read as a whole, and that

25  includes Section 5(c), which, as noted, applies

12

1  "notwithstanding anything to the contrary in the agreement."

2      Moreover, it would lead to a result that is at odds

3  with the basic structure of the transaction.  Under the

4  operative documents, stipulated loss value, including the tax

5  component, is part of a package of security assigned to the

6  indenture trustee for the benefit of the debt.  One of the

7  operative documents, the trust indenture and security

8  agreement, contains a waterfall directing payments in respect

9  of the collateral after an event of default.  As should not be

10  surprising, in light of the fact that debt usually comes before

11  equity, the waterfall contains provisions for payments to the

12  debt before payments to the equity.  Payments to the owner-

13  trustee for any tax, expenses, or other losses come forth in

14  line after payment to the debt holders to make them whole.

15  There is no dispute that the claims granted to the debt

16  pursuant to the stipulation, together with the fair market

17  value of the aircraft as per the foreclosure sale, will not

18  make the debt whole.  It cannot be assumed that an amount to be

19  paid to the debt should be reduced on account of a claim by

20  equity, and an intention to do so would have to be clearly

21  expressed in the applicable contracts.

22      GFCC responds that the security granted to the

23  indenture trustee does not include:

24      "All payments required to be made under the tax

25      indemnity agreement by lessee, and all payments of

13

1          supplemental rent by lessee in respect of any amounts

2          payable under the tax indemnity agreement."

3          See Page 6 of the trustee indenture and security

4 agreement.

5          But this exclusion is only applicable for payments

6 required to be made or amounts payable under the TIA.  As

7 stated earlier, amounts are not payable or required to be paid

8 under the TIA if they are within the exclusion in Section 5(c).

9          GFCC's further argument is that Section 5(c) does not

10 apply because, even after allowance and payment of the proofs

11 of claim, the debt will not have been "paid" SLV because it

12 will not have been paid in full, in cash.

13          Judge Hardin rejected a similar contention in

14 connection with the Delta case.  Although the documents that

15 Judge Hardin dealt with were slightly different from those

16 before this Court, his alternative holding in connection with

17 what he called the "second Delta objection" was that the word

18 "pays" does not mean "paid in cash."  The term instead, in the

19 words of the Delta Court:

20          "-- must be construed in such a manner as to comport

21          with the meaning of payment in the context of

22          bankruptcy, which the parties expressly contemplated

23          in the TIA, as well as in the other agreements.  There

24          is rarely likely to be full payment of claims in

25          bankruptcy; and, in the ordinary course of any Chapter

14

1          11 case, payment of claims under a plan may be in cash

2          or equity or debt securities of the debtor, or a

3          combination of cash and securities."

4          Judge Hardin went on to contrast the language of the

5  TIA in <u>Delta</u> to the requirement in the lease there that lease

6  payments be made in U.S. Dollars, and he noted that the TIA

7  there could have required payment in cash, but it did not.

8          The TIA here does not require payment in cash.  GFCC

9  attempts to bolster its "paid in full, in cash argument" by

10  reference to a clause in Section 5(c) of the TIA in this case

11  that provides that payment must be made "in accordance with the

12  provisions of the operative documents ..."

13          At the outset, it is not clear that this clause

14  modifies the word "paid."  There is a comma in Section 5(c)

15  setting off the words "paid stipulated loss value or

16  termination value," from the remainder of the section.  The

17  plainest reading of the section is to give effect to the comma

18  and conclude that the words "in accordance with the provisions

19  of the operative documents" do not modify the term "SLV."  See

20  generally <u>In Re Ron Pair Enterprises</u>, 489 U.S. 235, 242 (1989).

21          Beyond this, GFCC's construction misconstrues the

22  words "in accordance with the provisions of the operative

23  documents."  The term "operative documents" is defined in

24  Section 1(j) of the TIA by reference to the definition in the

25  lease, and the lease defines "operative documents" as including

15

1   at least fifteen separate documents; including the lease, the

2   TIA, and the trust indenture and security agreement.  These

3   documents relied, among many other things, for events of

4   default, foreclosure, and remedies and rights on the part of

5   the debt and the owner-participant.  The operative documents do

6   not require payment in all cases in cash, in full, and the

7   words "in accordance with the provisions of the operative

8   documents" cannot be limited to this meaning.

9        The proofs of claim that have been accorded to BAE and

10  the indenture trustee are "in accordance with the provisions of

11  the operative documents."  The Court, thus, concludes that

12  based on the plain meaning of the parties' agreements, GFCC's

13  objections to the stipulation relating to the remaining five

14  aircraft must be overruled.

15       GFCC further objects to some of the language of the

16  stipulation, and it has suggested some further language.  It

17  objects to Paragraph 2, which provides as follows:

18           "The aggregate amount of the allowed claims was

19           calculated by reference to the stipulated loss value

20           ("SLV") in accordance with each pre-petition lease.

21           Allowance of the allowed claims plus the fair market

22           value with respect to each relevant aircraft

23           constitutes full payment and discharge of stipulated

24           loss value with respect to each pre-petition lease as

25           required pursuant to the relevant pre-petition leases

16

1    and the other operative documents."

2    The Court finds that this paragraph, settling any

3    possible claims against the debtors from the debt, is

4    consistent with its ruling as set forth above, that SLV does

5    not have to be reduced by virtue of the provisions of Section 7

6    of the TIA and the applicable definition of "SLV" in the lease.

7    GFCC also seeks to add a paragraph that the

8    stipulation shall have no effect whatsoever, whether legal or

9    factual, on GFCC's claims under the TIA; and that all of GFCC's

10   rights and claims against the indenture trustee, BAE, and the

11   other parties to the operative documents and their successors

12   and assigneds are fully preserved.  This contention requires

13   consideration of the procedural posture of this matter, and

14   also of the scope of the stipulation.

15   As to the procedural posture, GFCC has filed proofs of

16   claim based on its construction of the TIA, and the debtors

17   have not yet objected to the claim, and their time to do so has

18   not yet elapsed.  It is not appropriate for the debtors to

19   contend that a decision on this motion will invalidate GFCC's

20   proofs of claim.  There may be elements to its claim that do

21   not include those tax losses that are a component of SLV, and

22   thus included in the claims being allowed hereby to others.

23   In any event, while the decision today may be highly

24   persuasive in the future, the Court cannot deal directly with

25   GFCC's proof of claim, and the parties are free to argue as to

17

1   the effect of this decision on such proof or proofs of claim.

2   The debtors say that they do not want any risk of duplicative

3   liability, but they move for court approval of the stipulation

4   before dealing with the GFCC proofs of claim.  Moreover, the

5   TIA ultimately requires in Section 5(c) that a claim be "paid."

6   Thus, the stipulation should be approved as written with

7   respect to the debtors.

8           With respect to the third parties and GFCC's alleged

9   possible claims against BAE, the indenture trustee, and others,

10  GFCC argues that the Court does not have jurisdiction to bar

11  such claims.  There is nothing in the stipulation that purports

12  to bar any claims or constitute an injunction; and, in view

13  thereof, the provision suggested by GFCC is unnecessary, as

14  well as inappropriate, especially if there were some

15  implication that GFCC might have a claim against any other

16  party to these proceedings for amounts received under the

17  stipulation with the debtors.  The Court cannot conceive on

18  what legal theory there might be such a claim, but will leave

19  the issue to another Court to deal with at another time, if

20  necessary.

21          In sum, the Court will so order the proposed

22  stipulation with regard to the remaining five aircraft, and the

23  debtors should submit an appropriate stipulation for signing.

24          I thank all of the parties for excellent argument and

25  briefs, and I think that concludes the proceedings this

18

1  afternoon.  Thank you very much.

2         COUNSEL:  Thank you for your time.  Thank you.

3         THE COURT:  Good afternoon.

4         COUNSEL:  Thank you.

5         THE COURT:  All right.

6      (Court and court personnel confer.)

7      (Proceedings concluded at 4:02 p.m.)

8                        CERTIFICATION

9         I certify that the foregoing is a correct transcript

10  from the electronic sound recording of the proceedings in the

11  above-entitled matter to the best of my knowledge and ability.

12

13  *Coleen Rand*

14  _____          July 28, 2007

15  Coleen Rand, AAERT Cert. No. 341
    Certified Court Transcriptionist
16  Rand Transcript Service, Inc.

17

18

19

20

21

22

23

24

25