UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

---

AT&T CREDIT HOLDINGS, INC.,

                    **Appellant,**

v.

DELTA AIR LINES, INC.

                    **Appellee.**

Case No. 08-CV-2411 (RMB)
(ECF Case)

---

## APPELLANT'S REPLY BRIEF

KAYE SCHOLER LLP
Richard G. Smolev (RS 2222)
Piper A. Brock (PB 6335)
425 Park Avenue
New York, New York 10022
(212) 836-8000 (telephone)
(212) 836-8689 (facsimile)

*Counsel for Appellant*
*AT&T Credit Holdings, Inc.*

The Court now has before it four separate appeals from the Delta TIA test case process.[1] Examining the tax indemnity agreements from each of those appeals demonstrates that while there are structural similarities in the agreements (e.g., an owner participant cannot receive identical tax loss indemnity through both the Indenture waterfall and then again through the TIA), the specific events triggering the exclusion from Delta's indemnity obligation are markedly different. These differences arise from separate comprehensive business negotiations between Delta and each owner participant and represent the totality of the bargain between the parties and therefore must be given effect as memorialized in the Operative Documents.

One particular difference that the Bankruptcy Court ignored is that an exclusion triggered if Delta makes a payment calculated "by reference to" SLV cannot mean the same thing as Exclusion 6(c) in the AT&T TIAs, which is triggered only when Delta "pays an amount *equal to*" SLV.

Beyond applying its "bankruptcy context" interpretation to change the meaning of the parties' agreements, the fundamental procedural and substantive error committed by the Bankruptcy Court was that it assumed that all of Delta's tax indemnity agreements were essentially the same. This view led the Bankruptcy Court down a path where it did not give effect to the precise language that AT&T and Delta used to document their agreements or to ask whether or how those agreements were affected by the specific facts of Delta's agreements with its Indenture Trustees regarding the AT&T Aircraft.

As it has in other test case appeals, Delta resorted to the use of quotation marks in its brief to support its argument that the Operative Documents must be read to say something that they do not say.

At pages 7 and 8 of its brief, for example, in response to AT&T's argument that Exclusion 6(c) does not apply in light of the sequence of events that occurred with respect to its

---

[1]  07-CV-7745 (RMB); 07-CV-11437 (RMB); 08-CV-2411 (RMB) and 08-CV-2449 (RMB)

Aircraft, Delta says that the TIAs "bar a TIA claim if the tax Loss and the SLV obligation 'arise' out of 'any' common event." Clearly, the AT&T TIAs do not say that.

Delta is relieved of its indemnity obligations only when AT&T's Loss arises "as a **result** of one or more of the" specific events listed in Section 6 of the TIAs. While everything post-default in some way can be traced to that default, this language requires a causal connection between the specific exclusion and the Loss. Exclusion 6(c) applies when the Loss resulted from "any event **whereby** [Delta] **pays** an amount equal to Stipulated Loss Value". This language requires a proximate connection between the "event" in question and the payment of SLV. Accordingly, the question the Court must ask to determine whether Exclusion 6(c) even applies is whether the allowance of the Indenture Trustee's claim (which, according to Delta, constituted payment of SLV), after AT&T's interest already was foreclosed, resulted in AT&T's Loss. If, as here, there is no causal and proximate connection between allowance of the Indenture Trustee's claim and AT&T's Loss, Exclusion 6(c) cannot be invoked to relieve Delta of its indemnity obligation.

Delta, however, focuses on the word "event" and ignores the remainder of Exclusion 6(c) to argue that Exclusion 6(c) is triggered by Delta's Lease default even though the agreements it reached with its Indenture Trustee to satisfy its rejection damage claims did not have any effect on AT&T. Delta's interpretation guts Exclusion 6(c) of its context and rationale.

All parties agree that AT&T incurred no Loss upon Delta's Lease default, but rather, only upon foreclosure of its interest more than a year later.[2] Similarly, after foreclosure, which extinguished AT&T's residual rights to any payments under the Leases, the subsequent allowance of a claim in favor of the Indenture Trustee (even if the amount and manner of

---

[2] Because Delta did not want to face the risk that a buyer at a foreclosure sale wouldn't do business with it (and thus further complicate its ability to emerge from bankruptcy with a fleet of aircraft at lease rates it could afford), Delta mandated in the Restructuring Agreements that the foreclosures be conditioned upon the Leases remaining in place. (D-29, Ex. B (Restructuring Agreement) § 6.08 at 16)

payment of that claim were viewed as a payment of SLV) could have no effect on AT&T whatsoever, much less cause any Loss to it.

By the time that Delta rejected the Leases and entered into new leases with its Indenture Trustee, thereby triggering the Indenture Trustee's Lease rejection damage claims, AT&T's Loss had been immutably fixed. AT&T's Loss did not arise as a result of and could not be affected by any event specified in Section 6(c) of the TIA because the Loss already had arisen.

The second instance where Delta uses quotation marks to attempt to change the plain meaning of the Operative Documents is on page 18 of its brief, a style also used by BNY at page 11 of its brief. In its opening papers, AT&T pointed to the definition of Fair Market Value in the Leases to show that even if Exclusion 6(c) were applicable **and** even if an amount "equal to" SLV fairly could be interpreted to mean any amount payable by Delta under the remedies section of the Leases, Delta is not paying anywhere near what it would be paying under the remedies provisions of the Leases as applied to the actual facts regarding the AT&T Aircraft. Delta and BNY try to ignore these facts and to limit the applicability of the plain language of a defined term in the Leases to some narrow circumstance that is not in the Leases and for which neither offered testimony in the Bankruptcy Court.

The Leases plainly say that if the lessor does not obtain "possession of the Aircraft *pursuant to Section 15(a) hereof,*" Fair Market Value for purposes of Section 15(c) [the remedy section that requires Delta to pay SLV minus Fair Market Value] is deemed zero. (D-31, Ex. A (Lease) § 5(b)(ii) at 18 (emphasis added)) Section 15(a) of each of the Leases allows the lessor to demand possession "in accordance with all of the provisions of Section 5." (D-31, Ex. A (Lease) § 15(a) at 51) Section 5 of each of the Leases contains detailed protocols for physical delivery of the Aircraft in a specified condition to a location in the continental United States. (D-31, Ex. A (Lease) § 5(c) at 18-20) Indeed, the Restructuring Agreements themselves expressly prohibit the Indenture Trustee from taking any action contrary to or otherwise interfering in any way with "the continued possession, use and operation of, and quiet enjoyment of, the Aircraft...

3

by the Lessee." (D-29, Ex. B (Restructuring Agreement) § 6.11(y) at 17; *see also* § 6.02(b) at 14-15 (prohibiting transfer of title to the Aircraft without Delta's consent)) Appellees' effort to read some notion of constructive possession into the Leases on the part of the Indenture Trustee is just wrong.

Clearly, if Delta had asked a state court to find that Fair Market Value were to be deemed something other than zero under the facts of this case - and that Delta thus had paid SLV so as to trigger Exclusion 6(c) – it could point to no provision in the Leases to support that proposition.

It is misleading even to refer to the claims that Delta negotiated with the Indenture Trustee as "SLV claims. This negotiated amount is neither in the amount of SLV as defined and calculated in accordance with the Leases nor the amount that Delta would pay had the Lease remedies been enforced in accordance with their terms. The statement that Delta makes at page 17 of its brief that its payments "do represent a computation of 'fair market value'" contains no reference to the lower court record because there was no testimony supporting that proposition and (unlike the Northwest Airlines court, which is allowing parties to make a full and complete record), the Bankruptcy Court did not allow the parties to take discovery into any of the facts underlying the claim objection.[3]

Ultimately, the question before this Court is whether the Supreme Court's *Butner* and *Travelers* decisions and their related line of cases require allowance of the AT&T Claims if they would be allowed in a state court proceeding. Delta and BNY do not dispute that those cases mandate that result. Rather, they argue that *Travelers* requires that AT&T's right to have its claims interpreted as they would in any other court is subject to the bankruptcy principle that claims against a debtor may be discharged through stock distributions under a plan.

This argument misses the point. AT&T agrees that once its TIA claims are allowed,

---

[3] *See* Transcript of Hearing Before the Honorable Allan L. Gropper, United States Bankruptcy Judge, at 14-19, *In re Northwest Airlines Corp.*, Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Feb.13, 2008), a portion of which was filed as Exhibit A to the Appellant's Reply Brief in case 07-cv-11437 in this Court (Document 20-2) and is incorporated by reference.

those claims may be treated in the same way that all unsecured claims are treated under Delta's plan of reorganization. But before any court gets to the question of how an allowed claim may be treated, *Travelers* mandates that the court first has to ask whether the claim would be allowed had bankruptcy not intervened.

Appellees make several additional points that are worth noting. The first relates to the amounts being paid under the Restructuring Agreements. Even if Exclusion 6(c) is applicable, it is satisfied only when Delta "*pays an amount equal to Stipulated Loss Value.*" By definition, an amount equal to SLV paid in immediately available funds as required by the Leases and TIAs (D-31, Ex. A (Lease) § 3(d); Ex. D (TIA) § 10) pays the debt and also compensates AT&T in an agreed amount for its tax Loss. This language reflects the parties' understanding that if AT&T did not receive compensation for its tax Loss through the waterfall of the Indenture, then AT&T would retain its indemnity claim under the TIA.

Here, without any supporting testimony, Delta argued the parties must have intended a combination of an allowed claim from Delta and negotiated credits for both future rent and for the value of the Aircraft that BNY obtained from AT&T through foreclosure would constitute a payment of SLV by Delta for purposes of Exclusion 6(c). A "credit" is not payment. Moreover, it is irrational to think AT&T agreed at deal inception Delta could free itself from liability for AT&T's tax Loss by taking credit for an asset that AT&T, not Delta, owned. Delta never owned and cannot monetize the residual value of the Aircraft against its obligation to pay SLV under Exclusion 6(c).

As Delta merely leased the AT&T Aircraft, it had no right to any value that those Aircraft had at the end of the Lease term unless it paid full SLV in accordance with the Leases. There was nothing in the Operative Documents or in the Bankruptcy Court record to suggest that AT&T agreed to make a gift to Delta of AT&T's own asset (i.e., the residual value of the Aircraft that rightfully belonged to AT&T until the moment of foreclosure) or to allow either Delta or the Indenture Trustee to credit any interest in this residual value or, for that matter, the

5

rent stream under the new leases, against SLV for purposes of determining whether Delta paid an amount equal to SLV and thus satisfied the conditions of Exclusion 6(c).

Appellees plainly could not argue in a state court that the combination of an allowed claim against Delta, a promise by Delta under the new leases to pay rent and the residual value of the Aircraft obtained by the Indenture Trustee from AT&T constituted either "payment" of SLV or one made solely by Delta. In the first place, the state court would give effect to the unambiguous terms used in Exclusion 6(c): "pay" does not mean "promise to pay"; "the Lessee" does not mean "the Lessee and AT&T"; and the defined term "SLV" does not mean some lesser amount, but rather, the specific number derived from a calculation specified in the Leases. (D-31, Ex. A (Lease), definition of "Stipulated Loss Value" at 11.)[4] Second, even if the state court were inclined to move away from the defined term "SLV" and to ask whether SLV contained some implied netting concept, the court would look to the Leases to determine precisely what Delta would pay in the remedies scenario at issue and then compare that amount to what it was paying under its agreement with its Indenture Trustees. However creative the Appellees were in the use of quotation marks, they cannot get around the fact that the Leases plainly say that if the lessor does not have physical possession of the Aircraft in a remedies scenario, Delta must pay full SLV without offset in order to bring itself within the purview of Exclusion 6(c).

Both Delta and BNY argue that the interest computation in certain remedy sections of the Leases are support for the argument that SLV must mean net SLV, but a careful reading of the cited language shows the term SLV is used in those sections in according with its defined meaning and not the one imputed by Appellees. The term Stipulated Loss Value is used in each of these sections to mean the amount calculated in accordance with the schedule to the Leases, which comports with its definition in Section 1 of the Leases and is incorporated by reference into the TIAs. The amount to be paid by Delta clearly is referred to as "the excess" of SLV over

---

[4] AT&T cited the authorities supporting this principle of contract interpretation on pages 20-21 of its opening brief.

the applicable offset, and not an amount equal to SLV. Further, the reference to the "amount of such Stipulated Loss Value" used in the interest computation clearly is a reference back to the amount of Stipulated Loss Value determined in accordance with the calculations required by the Leases and not the amount paid by Delta. If the latter were the case, then the provision would read "together with interest . . . on the amount of such excess." Delta contended in the Bankruptcy Court that there are no instances in the Leases where it pays SLV without some sort of offset, but that argument relies on viewing the Lease language in the abstract, divorced from the possible range of factual scenarios to which the language might apply, and was rebutted fully when AT&T pointed to seven such situations, including the instant one involving the AT&T Aircraft. (D-29 (Response) at 6-9)

Delta next contends that some overarching bankruptcy principle prohibits it from paying the same claim twice. This is a rehashing of the so called "cosmic" argument that the Bankruptcy Court rejected. The claims of the Indenture Trustee and of AT&T are separate and distinct claims held by separate parties under separate contracts. The claims under the TIAs fall within the definition of Excepted Payments and were not collaterally assigned to the Indenture Trustee. (D-31, Ex C (Indenture) at 6,7)

As AT&T discussed in its opening brief (a point that neither Delta nor BNY discussed in their briefs), when Congress sought to have the allowance of one claim by a debtor in favor of one creditor impact the claim of another party against the debtor, it enacts a statute to accomplish that purpose.

Lacking that statutory support, Delta relies upon cases that are inapposite because they either deal with co-debtors arising under contract, statute or tort or a single creditor (or its representative) seeking a double recovery from one debtor by asserting multiple theories for the same quantum of damages. None of the cases cited by Delta speak to the propriety of independent claims asserted by distinct creditors under different contracts. Although BNY suggests in a caption on page 6 of its brief that its claims have some priority over the TIA claims,

7

it never develops that argument because the Operative Documents create no priority of the Indenture claims over TIA claims. Were that the parties' intent, AT&T would have agreed that it was entitled to no indemnity claim under its TIA until the Indenture Trustee was paid in full.

Delta also incorrectly argues at page 16 of its brief that AT&T is seeking a double recovery because by focusing on the word "pays" in Exclusion 6(c), there could be a situation where the Indenture Trustee sells the Aircraft for more than SLV, pays the balance remaining after the debt is paid to the owner participant and the owner participant still would have a TIA claim. This argument is wrong for three reasons.

First, although Delta assumes in its brief that all enforcement scenarios are equal, they are not. Once the Indenture Trustee forecloses on the owner participant's interest in the collateral and bids in its debt at the foreclosure sale, it owes nothing to the owner participant. If, by some unlikely turn in the market, the aircraft later becomes worth more than its value at foreclosure, the Indenture Trustee retains that upside. If, on the other hand, some third party bids in excess of SLV at the foreclosure sale, the owner participant is entitled to that excess because of its ownership interest in the aircraft. If Delta wanted to obtain for itself the economic benefits of any such unlikely appreciation in the aircraft's value in order to reduce its indemnity obligations for taxes under the TIA, it should have bargained for that right and then included language to such effect in the Operative Documents (although this probably would have jeopardized the desired tax treatment of the transactions and made them more expensive for Delta). In any event, Delta cannot argue that because the party to whom it originally sold the Aircraft at deal inception actually enjoys the benefits of that ownership, this somehow creates either a windfall for that party or supports an argument that the contractual indemnity for taxes assumed by Delta in connection with such sale now should be ignored or reduced.

Finally, neither Delta nor BNY pointed to the fact that the Operative Documents themselves prohibit double payment of SLV by Delta in two ways. First, the Operative Documents contain an adjustment mechanism that provides that SLV is adjusted downward (and

8

the Indenture Trustee claim adjusted accordingly) upon payment of an indemnity claim due to AT&T. (D-31, Ex A (Lease) § 3(c) and (e), at 13-15) This assures that if Delta pays a TIA claim it will not overpay SLV. Second, the survival clause of each TIA, Section 8, provides that the TIA survives only until the owner participant is paid in full. (D-31, Ex D (TIA), § 8 at 18) Even if the scenario Delta posits played out, the owner participant would receive only one payment in respect of its indemnity claim.

At page 21 of its brief, Delta also criticizes the Gina Kennedy Affidavit, D-30, as "not based upon communications between the parties" when in fact Ms. Kennedy was the attorney responsible for negotiating and documenting the TIAs on behalf of AT&T, and when she plainly states both her understanding of the meaning of the documents and the fact that no one from Delta ever communicated any other understanding. That criticism hardly supports Delta's argument that, unlike the Northwest court, the Bankruptcy Court was right in taking no testimony so as to understand the parties' intent. Beyond that, Ms. Kennedy plainly has the type of experience in the leveraged leasing industry to testify as to industry customs, usages and practices, particularly regarding the purpose and intent of Exclusion 6(c), all of which are critical to understanding how Exclusion 6(c) works in relation to the other Operative Documents. For all of their efforts to change or to explain away the plain language of the Operative Agreements, Appellees never explain why - in their view - the tax indemnity agreements even apply after an event of default if Delta's obligations under those agreements could be eviscerated by a payment to the Indenture Trustee that is less than SLV.

Finally, the *Keck* decision that both Delta and BNY cite is inapposite and has no applicability in these circumstances. 241 B.R. 583 (Bankr. N. D. Ill. 1999). First, the contract in *Keck* contained a provision that clearly expressed the parties' intent that the insurer could not use the insolvency of the insured - and the resulting inability of the insured to pay its self insured limits - as a basis to deny coverage. *Id.* at 598. In contrast, nothing in the TIAs supports Delta's argument that AT&T's TIA claim would be eliminated if Delta went into bankruptcy, and

section 20 of the Leases (discussed at page 16 of AT&T's opening brief and not rebutted by Appellees) expressly provides that Delta's payment obligations would not be affected by its bankruptcy. *Keck* certainly does not stand for the proposition that Delta's unsecured creditors can gain some windfall by completely eliminating tens of millions of dollars in indemnity claims.

Ultimately, the Court is left with Delta trying to explain away its unequivocal admission that AT&T's claims must be allowed in full unless the TIAs are interpreted in a tortured way that violates Supreme Court teachings. While it tried to retreat from that admission in its brief, a reading of the dialogue between counsel for Delta and the Bankruptcy Court makes it clear that there was no effort on Delta's part to do anything other than to answer a direct question from Judge Hardin. It admitted that Exclusion 6(c) does not defeat the AT&T Claims absent a construction "in the context of bankruptcy" that the Supreme Court does not allow.

## CONCLUSION

For the foregoing reasons, the Order of the Bankruptcy Court should be reversed and either remanded for determination of the amount of the AT&T Claims or for such further proceedings as the Court deems appropriate.

Dated: New York, New York
April 9, 2008

KAYE SCHOLER LLP

_____
Richard G. Smolev (RS 2222)
Piper A. Brock (PB 6335)
425 Park Avenue
New York, New York 10022
(212) 836-8000 (telephone)
(212) 836-8689 (facsimile)

*Counsel for Appellant*
*AT&T Credit Holdings, Inc.*